**Plaintiff's Exhibit 12-4**

# Report

## Case

Cassandra Cox vs. Callaway County, Missouri, et al
Case No. 2:18-cv-4045-0405-NKL

## Physician Author

Joel Blackburn, D.O.
5404 Chamois Drive
Columbia, Missouri 65203

## Requesting Entity

A.G. Laramore, LLC

Privileged

## Introduction/Purpose of Report

Thank you, Mr. Laramore, for the opportunity to review this case and provide my professional medical and correctional opinion. You have asked me to review the case in behalf of your client, Cassandra Cox, who received injuries while under custody at the Callaway County Jail.

I have attached my most recent CV and Fee Schedule to this report.

## Questions

I will address the following questions and my opinions regarding this case:

1) Did the Callaway County Jail staff violate their own policies and procedures? If so, did those violations constitute a dereliction of a ministerial duty that caused, or contributed to cause, Ms. Cox injuries?
2) Was Callaway County or its staff deliberately indifferent to any of Cassandra Cox's serious medical needs?
3) If Callaway County was deliberately indifferent, did their decisions or actions cause, or contribute to cause, damage to Cassandra Cox's health and any of her resulting injuries?

## Professional Qualifications

I have a Doctor of Osteopathy degree from Des Moines University College of Osteopathic Medicine in Des Moines, Iowa. I am board certified in Internal Medicine with the American Osteopathic Association.

I have practiced office and hospital-based medicine providing primary and critical care medicine to patients. I have practiced Emergency Medicine for 19 years. I most currently practiced full time Emergency Medicine at SSM, St. Mary's Hospital in Jefferson City, Missouri, and have recently accepted a position for Facility Medical Director of the Emergency Department at Capital Region Medical Center.

I have taken care of several inmate patients in an emergency environment at Moberly Regional Medical Center, Capital Region Medical Center and St. Mary's since 2003.

I have practiced Correctional Medicine since 2003. I practiced as an employed physician for Correctional Medical Services (CMS) at Moberly Correctional Center for approximately one year from 2003-2004. In April of 2004, I became the medical

director of the Boone County Detention Facility in Columbia, Missouri. I was the full- time director from April of 2004 to June of 2016 when I officially resigned that position.

My duties as medical director of Boone County Jail were management of both the medical and mental health departments. I establish protocols, policies, procedures, and pre-approved medication lists for the medical care of the inmate patients. I assisted in risk management services, cost containment, outreach services such as the Stepping-Up Initiative, and networking with local physicians, hospitals, and HIV charity services. I counseled with local prosecutors, public defender's office, county counsel, county commissioners, county auditor and budget advisor for the institution, delivery of care, and medical reimbursement of medical services for Boone County's inmate patient population. I assisted in nurse hiring, and I was instrumental in changing the way the county delivered medical care to the inmate patients. I have advised and assisted the county in changing their mental health department. I provided education and training to the county correctional officers. My focus for correctional officers is avoiding implicit biases/cognitive biases which impede our decision-making capability in medical care and delivery of the inmate patient and providing for the safe care of the inmates. For example, the implicit bias, anchoring, can lead to medical injury and sometimes death or serious injury of an inmate / patient.

**Prior Case Review**

Bennett v Haas, et al; 2:10-cv-04149-FJG; Smith Lewis, LLP

**Assumptions**

My opinions are formulated upon the assumption that I have been provided any and all relevant documentation available in the case and that said documents are accurate. Therefore, my opinions may be revised based upon additional or new information or documentation.

**Disclaimer**

My independent opinion is given to a reasonable degree of medical certainty, and to a reasonable degree of certainty in the field of corrections unless otherwise stated. My opinions are based upon my collective knowledge, experience, education, training, information, and review of the documents referenced in this report, and my examination of Cassandra Cox. This report attempts to highlight and

discuss pertinent facts related to the case that were important in developing my opinions and is not intended to be construed as all inclusive. Every attempt has been made to report, discuss and transmit the facts as accurately as possible. However, unintentional errors may occur and will be corrected and revised as needed.

**Documents Reviewed/Relied Upon**

Documentation used in establishing my medical opinion are as follows:

I) Depositions
   1. Amber Gabriel (Duenkel)
   2. Brenda Ollar
   3. Brittany Cramer (Karhoff)
   4. Clinton Maddox
   5. Derinda Kelley
   6. Dylan Ruediger
   7. Glen Ripsch
   8. Glen Ripsch 2
   9. Jackie English
   10. Katie McCown
   11. Luke Shoemaker
   12. Michael Tigner
   13. Plaintiffs
   14. Robbie Harrison
   15. Robbie Harrison 3
   16. Rustin McCormack
   17. Sean Wisswell
   18. Shane Stokes
   19. Skyler Kinney

II) Videos: I viewed 3 separate videos from body cameras dating 2/28/2016, DSJ-M8000000-000406. These videos document Cassandra Cox unresponsive, evaluation of the cell after EMS left with Cassandra Cox, and a video discussion with her father.

III) Pictures: IMG 1-32

IV) Exhibits 1 through 11
   1. Exhibit 1-1: DOS 2-26-16, Jail Intake for Cassandra Cox.
   2. Exhibit 1-2: DOS 2-28-16, Medical Records Callaway County Ambulance District.

3. Exhibit 1-3: DOS 2-26-16 and 2-28-16, Fulton Medical Center.
4. Exhibit 1-4: DOS 6-30-15 to 1-4-19, Auxvasse Clinic, Dr. Rebecca Kelly.
5. Exhibit 1-5: DOS 3-9-16 to 3-23-16, Rusk Rehabilitation Center.
6. Exhibit 1-6: DOS 1-14-14 to 8-15-16, SSM Health Audrain St. Mary's.
7. Exhibit 1-7: DOS 2-28-16 to 8-30-16, University of Missouri Hospital
8. Exhibit 1-8: DOS 11-22-16 to 12-16-18, University of Missouri Hospital
9. Exhibit 2-1: Inmate file for Cassandra Cox
10. Exhibit 2-1A: 15-minute monitoring of logs for Cassandra Cox
11. Exhibit 2-1B: Meal refusal forms for Cassandra Cox
12. Exhibit 2-2: Callaway County Jail log from 2-26-16 to 2-28-16
13. Exhibit 2-3: Time sheets for the jail for 2-26-16-2-28-16
14. Exhibit 2-4: Time sheet for Nurse Tiffany Gilmore
15. Exhibit 2-5: Supervisors logs for the jail for 2-26-16-2-28-16
16. Exhibit 3-1: Callaway County Jail Policy and Procedure Manual
17. Exhibit 3-2: Callaway County Jail Position of Qualifications and Duties
18. Exhibit 3-3: Jail suicide prevention training
19. Exhibit 3-4: Jail medical training from Advanced Correctional Healthcare
20. Exhibit 3-5: Jail medical protocols
21. Exhibit 3-6: Signed approval forms from jail medical protocols, policies and procedures
22. Exhibit 4-1: Ripsch personnel file
23. Exhibit 4-2: Cpt. Harrison personnel file
24. Exhibit 4-3: Kinney personnel file
25. Exhibit 4-4: Karhoff personnel file
26. Exhibit 3-4: McCown personnel file
27. Exhibit 4-6: Duenkel personnel file
28. Exhibit 4-7: Ollar personnel file
29. Exhibit 4-8: English personnel file
30. Exhibit 4-9: Kelley personnel file
31. Exhibit 4-10 McCormack personnel file
32. Exhibit 4-11 Maddox personnel file

33. Exhibit 4-12 Stokes personnel file
34. Exhibit 4-13 Shoemaker personnel file
35. Exhibit 4-14 Tigner personnel file
36. Exhibit 4-15: Ruediger personnel file
37. Exhibit 5-1: Investigative report for Cassandra Cox
38. Exhibit 6-1: Letter from Bruce Cox to CCJ dated 3-21-16
39. Exhibit 8-1: Inspection minutes of the Board of Jail Visitors
40. Exhibit 9-1B and 9-1C: Charges related to Correctional Officer Glen Ripsch
41. Exhibit 9-4: Answers of Brittany Karhoff Cramer
42. Exhibit 9-5: Defendant's Admissions dated 7-26-19
43. Exhibit 10-1: Fulton PD drug test results
44. Exhibit 10-2: Fulton PD arrest record and DRE
45. Exhibit 11-1: Missouri Core Jail Standards 2016
46. Exhibit 11-2: December 2016 Mortality in State Prisons

**Background of Events and Timeline**

On 2/26/2016, at approximately 4:37 AM, Cassandra Cox was placed under arrest for a DWI, drugs and other drug related charges, after being found unconscious in her vehicle at McDonalds in Kingdom City, Missouri. The engine of the vehicle was still running, the car was in drive, and the wheels of the car were over a curb. She tested positive for methamphetamine, and marijuana but a breath analyzer for alcohol was negative. Mrs. Cox performed poorly on a field sobriety test performed by the arresting officer Sean Wiswell and she was taken into custody. (Exhibit 10-1)

At approximately 5:07 AM, Ms. Cox was taken to Fulton Medical Center for a legal blood draw for suspicion of intoxication on an illegal substance. She did consent. (Exhibit 1-3). At approximately 5:41 AM on 2/26/16, a Drug Recognition Report was performed which confirmed Ms. Cox to be positive for methamphetamine and marijuana. (Exhibit 10-2)

At approximately 8 AM on 2/25/16, Cassandra was brought to the Callaway County Jail by the Fulton Police Department and was booked into the jail. (Exhibit 2-1). Cassandra Cox was received by CCJ by Sargent Skyler Kinney who was made aware that Ms. Cox had been arrested for DWI secondary to methamphetamine and marijuana. It was normal procedure for FPD to inform the receiving CCJ officer if an

arrestee was intoxicated and Sargent Kinney believed at the time that Ms. Cox was under the influence of an illicit drug. (Deposition of Skyler Kinney pgs. 13-14, 42). Sargent Kinney relayed information concerning Cassandra Cox to Correctional Officer Glen Ripsch who was aware that Ms. Cox was under the influence of an illicit drugs. (Deposition of Skyler Kinney, pgs. 37, 88).

Officer Glen Ripsch performed a medical intake screening questionnaire. Ms. Cox indicated she had a prior history of mental or emotional problems and was under active treatment which included Zoloft. She stated she had a history of iron deficiency anemia as well. Officer Ripsch observed that Ms. Cox was showing abnormal signs of anxiety, shame, fear and depression based upon questionnaire reporting. (Exhibit 1-1).

Between 8 AM and 11:15 AM, Ms. Cox was heard to make a suicidal complaint stating that she wanted to die. She was placed on suicide watch which was to include 15-minute observation checks. She began at 11:15 AM and was not discontinued until was transported out of the jail by EMS on 2/28/16. (Exhibit 2-1A) Nurse Tiffany Gilmore was at the CCJ from 8 AM-1 PM on 2/26/16, but not present on 2/17/16, or 2/28/16. (Exhibit 2-4). According to jail records, Ms. Cox "refused" meals on 2/26/16 at 11:41 AM, 2/26/16 at 6:21 PM, and 2/28/16 at 6:50 AM.

At approximately 7:30 AM, Ms. Cox became unresponsive in her cell and was found to by EMS to have agonal breathing and to be in atrial fibrillation. Her systolic blood pressure was 80 mmHg. She received life saving measures and was transported to Fulton Medical Center for further care. She was on dopamine, and amiodarone drips, and placed on a ventilator. She was noted to have extensor posturing. (Exhibit 1-2, pg. 9).

At 8:40 AM on 2/28/16, she was found positive for methamphetamines at Fulton Hospital. (Exhibit 1-3, pg. 18). She was subsequently transferred from Fulton Hospital to University of Missouri Hospital for further critical care on 2/28/16. (Exhibit 1-2, 1-3, 1-7). She obtained further extensive rehabilitative care at Rusk Rehabilitative Center secondary to injuries obtained at CCJ on 2/28/16. (Exhibit 1-5). She needed ongoing outpatient care after leaving Rush Rehab. (Exhibit 1-8).



EXHIBIT

**Policy and Procedure Violations / Lack of Training**

A review of the Callaway County Sheriff's Office policies and procedures revealed that although the policies were adequate, the staff at the Callaway County Jail Violated those policies and procedures in several ways related to Cassandra Cox. Each of these violations delayed Ms. Cox from seeing a medical doctor on 2/26/16, 2/27/16 and at an earlier time on 2/28/16, which would have prevented the cardiac event that led to Ms. Cox's injury.

CCJ Policies and Procedures 2.04(5) and 12.05:

This policy and procedure requires and mandates that the correctional officer, who encounters an inmate who is acting bizarre due to drugs, contact EMS or transport the inmate to the emergency room. This policy is mandatory in nature, is not discretionary, and constitutes a ministerial duty.

On 2/26/16 Ms. Cox presented to Correctional Officer Glen Ripsch and Sargent Skyler Kinney for an evaluation. Officer Ripsch stated in his deposition that Ms. Cox was acting bizarrely. CO Ripsch knew that Ms. Cox was likely under the influence of methamphetamine or another similar drug. Based upon this information, the mandatory policy and procedure required CO Ripsch to call EMS or transport Cassandra Cox to Emergency Room. If CO Ripsch had transported Ms. Cox to the emergency room on the morning of 2/26/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 10.02:

This policy and procedure requires and mandates that the correctional officer, who encounters an inmate who is persistently refusing meals to be seen by a physician. This policy is mandatory in nature, is not discretionary, and constitutes a ministerial duty. Although there seems to be a dispute about what the term "persistently" means. Training Officer Brittany Karhoff stated that the inmate persistently refuses meals the inmate must be seen by a physician, she indicated that she trains her officers that persistently means two meal refusals.

On 2/26 Cassandra refused both lunches, at 11:41am and she also refused the second meal that was passed by Luke Shoemaker and Michael Tigner at 6:21pm on 2/26. Based upon this information, the mandatory policy and procedure required CO Luke Shoemaker and CO Michael Tigner to have Ms. Cox seen by a physician. If CO Michael Tigner and CO Luke Shoemaker would have contacted a physician at 6:21pm on 2/26/16, or shortly thereafter, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 13.04:

After Glen Ripsch performed the medical intake for Cassandra, Ms. Cox was heard saying she "wants to die" which is documented in Exhibit 2-1A. According to CO Ripsch and Sgt. Jackie English, Ms. Cox was placed on 15-minute monitoring at approximately 11:15am because of this suicidal statement. Ms. Cox then refused her meal at 11:41am which was passed by CO English.

Cassandra was never seen by any medical staff, and no medical staff were contacted about her suicidal statement. This demonstrates a deliberate indifference to the serious medical needs of Cassandra Cox by both CO Ripsch and Sargent English. It is also a violation of the policies and procedures of the Callaway County Jail, as the policy indicates that Ms. Cox should have been seen be a medical provider. This policy and procedure requires and mandates that the correctional officer, contact medical staff. This policy is mandatory in nature, is not discretionary, and constitutes a ministerial duty.

If CO Ripsch or Sargent English would have contacted a physician or health care provider at 11:41AM on 2/26/16, or shortly thereafter, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury.

Ms. Cox was on 15 min monitoring due to her suicidal statement, which requires that Ms. Cox be monitored and the information regarding monitoring be logged. This policy is mandatory in nature, is not discretionary, and constitutes a ministerial duty. Exhibit 2-1A indicates that, more likely than not, Ms. Cox was not monitored

for significant periods of time during her time at the Callaway County Jail. This includes the two hours leading up to her cardiac event and collapse. During this time Ms. Cox would have been exhibiting many symptoms relating to her overdose methamphetamine that occurred the morning of February 26, 2016, which includes musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis. Had Ms. Cox been properly monitored it would have been much more likely that the jail staff would have recognized Ms. Cox condition and called a physician. Had the correctional officers contacted a physician on 2/26/16, 2/27/16 and in the early morning hours of 2/28/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. From the records and depositions, the following officers violated this mandatory policy and procedure, Skyler Kinney, Dylan Ruediger, Brittany Karhoff, Katie McCown, Jackie English, Shane Stokes, Amber Duenkel, Clinton Maddox, Shane Stokes, Michael Tigner, Luke Shoemaker, Brenda Ollar, Glen Ripsch, Derinda Kelley, and Rustin McCormack. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 2.01:

There is no alcohol or drug screening in the record from the Callaway County Jail. CO Ripsch and Sgt. Kinney did not know that these forms were required and did not perform these assessments on Cassandra Cox on 2/26/16. However, the policy clearly indicates, and alcohol and drug screening are required. This policy is mandatory in nature, is not discretionary, and constitutes a ministerial duty, which both Sgt. Kinney and CO Ripsch violated. Had Ms. Cox been properly screened it would have been much more likely that the jail staff would have recognized Ms. Cox serious medical condition and called a physician. Had the correctional officers contacted a physician on 2/26/16 at the time of her booking, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 2.02:

From what we know medically about Cassandra Cox's condition on the morning of 2/26/16, she would have been exhibiting all of the signs of a person with a serious medical emergency, which includes musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis. At a minimum, according to the policy and procedure, Cassandra Cox should have been evaluated by the jail nurse, who was available at the time, before being admitted into the Callaway County Jail. Alternatively, Ms. Cox should not have been deemed fit for confinement. Sgt. Kinney and CO Ripsch violated this policy and procedure by not either having Ms. Cox taken for a fit for confinement or having her evaluated by the facility nurse. Had the correctional officers contacted a physician or the facility nurse on 2/26/16 at the time of Ms. Cox's booking, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 6.02:

Exhibit 2-1A indicates that, more likely than not, Ms. Cox was not monitored for significant periods of time during her time at the Callaway County Jail. This includes the two hours leading up to her cardiac event and collapse. During this time Ms. Cox would have been exhibiting many symptoms relating to her overdose methamphetamine that occurred the morning of February 26, 2016, which includes musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis. Had Ms. Cox been properly monitored it would have been much more likely that the jail staff would have recognized Ms. Cox condition and called a physician. Had the correctional officers contacted a physician on 2/26/16, 2/27/16 and in the early morning hours of 2/28/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. From the records and depositions, the following officers violated this mandatory policy and procedure, Skyler Kinney, Dylan Ruediger, Brittany Karhoff, Katie McCown, Jackie English, Shane Stokes, Amber Duenkel, Clinton Maddox, Shane Stokes, Michael Tigner, Luke Shoemaker, Brenda Ollar, Glen Ripsch, Derinda Kelley, and Rustin McCormack. This



Exhibit

policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 6.04 and 13.03:

Cassandra Cox was on 15 min monitoring, which requires the information be logged. However, this policy requires even stricter monitoring of 5 to 15 minutes for inmates that are suffering from mental illness, which the correctional officers acknowledge she was.

Exhibit 2-1A indicates that, more likely than not, Ms. Cox was not monitored for significant periods of time during her time at the Callaway County Jail. This includes the two hours leading up to her cardiac event and collapse. During this time Ms. Cox would have been exhibiting many symptoms relating to her overdose on methamphetamine that occurred the morning of February 26, 2016, which includes musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis. Had Ms. Cox been properly monitored it would have been much more likely that the jail staff would have recognized Ms. Cox condition and called a physician. Had the correctional officers contacted a physician on 2/26/16, 2/27/16 and in the early morning hours of 2/28/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. From the records and depositions, the following officers violated this mandatory policy and procedure, Skyler Kinney, Dylan Ruediger, Brittany Karhoff, Katie McCown, Jackie English, Shane Stokes, Amber Duenkel, Clinton Maddox, Shane Stokes, Michael Tigner, Luke Shoemaker, Brenda Ollar, Glen Ripsch, Derinda Kelley, and Rustin McCormack. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

CCJ Policies and Procedures 13.02:

As stated previously, Cassandra Cox was not properly monitored. Additionally, neither Glen Ripsch or Sklyer Kinney passed on information regarding Cassandra Cox's condition, or that she was believed to be intoxicated on methamphetamine. Based upon review of the medical record, at the time Ms. Cox was brought to the Callaway County Jail on 2/26/16, she was excessively intoxicated on

methamphetamine. Because of their fundamental lack of training, both CO Ripsch and Sgt. Kinney failed to realize this was the case.

The medical intake form (Exhibit 1-1) never asks the CO to determine if the prisoner is intoxicated, or to ask them if they are intoxicated. Both CO Ripsch and Sgt. Kinney violated this policy and procedure by failing to pass on to other officer's information about Cassandra Cox's intoxication, and in their failure to require a fit for confinement evaluation before accepting Ms. Cox into the Callaway County Jail. Had Ms. Cox been properly evaluated and information regarding her condition passed on to other staff, it is much more likely that the jail staff would have recognized Ms. Cox condition and called a physician. Had the correctional officers contacted a physician on 2/26/16, 2/27/16 and in the early morning hours of 2/28/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

Lack of Training:

Multiple depositions show deficiencies in training of the CCJ officers to recognize signs and symptoms of methamphetamine intoxication, as well as deficiencies in knowledge and understanding of the content of the policies and protocols and how they should be followed. The officers acknowledge this in their depositions. The depositions of Derinda Kelley, Dylan Ruediger, Jackie English, Katie McCown, Luke Shoemaker, Michael Tigner, and Rustin McCormack all point to acknowledgment of the above deficiencies and inconsistent use of what is outlined in the P&P manual as well as how officers transfer, relay or hand off sensitive and important information regarding inmate patients. Despite the fact that Callaway County knows that a significant number of its inmates have issues with methamphetamine, including intoxication and withdraw, no or inadequate training is provided to the Correctional Officers regarding acknowledging and dealing with methamphetamine intoxication or overdose. The majority of the officers involved in this case acknowledged that they did not feel qualified or adequately trained to determine if an inmate is intoxicated or has overdosed.

The policy violations clearly evidence a fundamental lack of understanding and training on behalf of the Callaway County Jail and its Jail Administrator Robbie





Exhibit

Harrison. From the depositions and review of the personnel files, it is the policy of the Callaway County Jail to only give each member of the jail staff a copy of the policies and procedures manual. The staff receive no formal training on the Jail's Policies and Procedures, and Callaway County, and Jail Administrator Robbie Harrison did nothing to verify the Correctional Officers caring for Cassandra Cox from 2/26/16 to 2/28/16 knew and understood the policies and procedures. In fact, Correctional Officers are allowed to independently care for inmates when they have not even read the policies and procedure manual, and before they have received any training in the Jail's Medical Protocols. This is inadequate.

Officer Shane Stokes indicates that there essentially is no independent testing or formal evaluation to determine if an officer has read and understands and can administer correctly the guidelines in the P&P manual. They are only required to sign it. This is concerning because it allows for dishonest and unethical behavior which, in 2016, seems to have been pervasive at CCJ based upon the fact that Officer Ripsch was fired for introducing contraband to inmates and other officers had obvious racial bias issues based upon direct complaints by colleagues. On page 16 of Officer Stokes' deposition, he states Officer Kelly made racist comments regarding his son.

The Correctional Officers were not aware of many of the monitoring and medical emergency policies or how they applied to a situation like that presented by Cassandra Cox. The Correctional Officers did not know and appreciate that at several points in time, medical staff or a physician should have been called on Cassadra Cox's behalf. This is due in large part to the failure of the Callaway County Jail and Jail Administrator Robbie Harrison to have a system in place to communicate from officer to officer the condition of the inmate.

The failure of the Callaway County Jail, and its Jail Administrator Robbie Harrison, to have an adequate training system in place, and to have a system of communication between officers regarding an inmates medical condition, shows a deliberate indifference to the health, safety and well-being of the inmates at the Callaway County Jail and constitute violations of accepted standards in the corrections industry. These failures to train and to have an adequate system of communication in place led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

**Deliberate Indifference to Cassandra Cox Serious Medical Needs**

Failing to Provide CPR:

Officer Brittany Cramer (Karhoff) admits that there is no consistent use of the jail protocol during the booking process (Deposition of Officer Karhoff, pgs. 40-41). Officer Cramer states she did chest compressions on the patient, Cassandra Cox, until EMS arrived and testifies to this in her deposition on page 148. However, I watched the entire video (DSJ-M8000000-000406, 2/28/2016) and at no time is there any form of Basic Life Support being performed on Cassandra Cox until after EMS arrived. Karhoff is found kneeling next to Cassandra and the other officers stand around looking at Ms. Cox and observing the patient in the video. Officer Karhoff is heard and seen noting that she is barely breathing but that she has no chest rising, (which indicates there is no breathing). Officer Karhoff makes a "guppy" movement with her mouth which is indicative of agonal breathing. The officers check Cassandra's pulse multiple times and ask each other if there is oxygen that they can place on her. At no time, do they administer lifesaving or preserving measure to Cassandra.

The BLS guidelines are very clear as early as 2010 that going from the A-B-C (Airway, Breathing, Compressions or Circulation) to C-A-B (Compressions, Airway, Breathing) to reduce the amount of time that chest compressions are administered because, in adults, chest compressions even without use of oxygen saves lives. For the UNTRAINED lay rescuer, dispatchers help them determine that abnormal breathing or what is called agonal breaths is a sign of cardiac arrest and the rescuer to administer ***chest compression-only CPR***. Passive use of oxygen is not a primary recommendation because the usefulness and effectiveness are unknown. Again, the recommendation is *high quality chest compressions* with ***little*** interruption between pulse checks lasting no longer than 10 seconds. (Circulation; November 3, 2015, Vol 132, Issue 18_suppl_2). (www.ahajournals.org, Part 5: Adult Basic Life Support and Cardiopulmonary Resuscitation Quality. New Developments in Basic Life Support Science Since 2010).

Failing to Alert Medical Staff / Pass Along Important Medical Information:

Officer Robbie Harrison deposition shows there is no indication that Nurse Gilmore ever saw the medical intake and Glen Ripsch never spoke to her about it and no

medical professional was ever contacted about Cassandra Cox per medical report (Deposition Robbie Harrison, pgs. 60-61). Robbie states that all pertinent information should be placed in the medical intake form including any known or suspected use/abuse of illegal drugs. (Deposition, pg. 66).

Several Officer stated they did not recall being told that Cassandra Cox was on methamphetamines when booked into jail, that she had made a suicidal statement, or why she was on watch.

Inadequacies of Screening Questionnaire:

I have multiple concerns with the questionnaire. (Exhibit 1-1). First, my professional opinion as a physician with over a decade of correctional experience and experience as a facility medical director is that the intake questionnaire should not only ask "yes" or "no" questions but based on the question should suggest a recommended response. Second, the Callaway County Jail questionnaire serves as a screening tool. However, Officer Ripsch failed to use it properly and CCJ failed to properly train Officer Ripsch. They also failed to perform the NCCHC screening standard. The standard is E-02 Receiving Screening (essential) "Receiving screening is performed on all inmates on arrival at the intake facility to ensure that emergent and urgent health needs are met." (2008 Standard for Health Services for jails and prisons). Commenting on this standard in CorrectCare Magazine it was stated that the medical screening is one of the most important aspects of a correctional institution and the screening process is meant to fulfill four purposes which are:

a) Identify and meet any urgent health needs of those being admitted,
b) Identify and meet any known or easily identifiable health needs that require medical intervention,
c) Identify and isolate inmates who may be potentially contagious, and
d) Obtain a medical clearance when necessary.

Step 1: Medical Clearance

This should be performed first and as soon as the individual arrives at the facility. The CorrectCare article states, "Reception personnel need to ensure that people who are unconscious, semiconscious, bleeding, mentally unstable, severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and a medical clearance into the facility."

Privileged

The reception personnel and the jail failed to adequately complete this task on Cassandra Cox who had been unconscious, mentally unstable, intoxicated on methamphetamine and/or exhibiting signs of drug withdrawal based upon her symptoms of depression, anxiety, shame and so on. The inmate patient cannot progress to the actual screening process until medical clearance is completed either at the jail or with the patient being sent to a hospital for evaluation and determination of medical stability before confinement typically known as a "fit" or a "fit for Confinement" evaluation.

Step 2: The Actual Screening

Once step 1 is complete, then step 2 can begin. The CorrectCare narrative regarding the screening process states, "The receiving screening is a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment." Again, this standard was not met because Cassandra, based upon her arrest report, past medical history and current symptoms, had a potential emergency, and she should have been referred emergently to medical.

Step 3: Documentation and Follow-Up

Once step 2 is complete, then step 3 must be completed by ensuring that findings from the screening are documented and that the patient is referred to the appropriate health care service. Unfortunately, this never occurred either because not one officer notified medical services all weekend to help Cassandra obtain medical care until she became unresponsive on Sunday, February 28, 2016. (CorrectCare NCCHC Magazine, Spring 2019, Volume 33, Issue 2, pg.4)

According to Exhibit 1-1, in the screening questionnaire, Cassandra admits to being under treatment for mental health problems. These do not seem to be taken seriously especially when she makes a complaint that she is suicidal and placed on suicide watch to be monitored every 15 minutes because this never occurs and is never handed off to other officers on shift change. However, and this points to the lack of officer training and experience and the weakness of the questionnaire, the patient was observed to have abnormal signs of anxiety, shame and fear, but yet not to be acting strange or to appear to be intoxicated even though we know that prior to booking the patient had been found unconscious and was tested positive for methamphetamines during a legal blood draw. This appears *contradictory* to

me as a physician and shows lack of attention, thoroughness and training. The officers also appear to have too much discretion in how they answer the questions on the observation aspect of the questionnaire; furthermore, I am not sure they can accurately answer them with their limited training and knowledge. As I read the deposition of Glenn Ripsch, the lack of understanding of medical training becomes apparent and it highlights the purpose of policies, protocols and procedures, why officers are required to be trained in them, and why they should be studied and followed.

Glenn Ripsch's deposition question was "…as a correction officer why would it be concerning to you if you were doing one of these health intake forms, why would it be concerning that someone could be intoxicated on methamphetamine?" Mr. Ripsch responds, "There are many health problems that could associate with being under the influence of methamphetamine." This is exactly the point! This is why an officer cannot and should not be allowed to determine or diagnose a medical condition based upon any symptom because they are not qualified and do not have the experience to tell the difference between someone who is severely intoxicated on methamphetamine versus someone who is exhibiting *similar* symptoms from another cause etiology. Therefore, the protocol states that medical should be consulted when an inmate patient exhibits certain symptoms so that a competently trained professional can determine whether those symptoms need further emergent evaluation which did not occur in this case because proper procedure was not followed. (Exhibit 1-1, pg. 2, Glenn Ripsch Deposition, pg. 34). As a result, they violate their own policy per the CCJ P&P 2.04(5) and 12.05 for Intoxicated and/or drugged subjects.

According to Officer Ripsch's deposition he implied his actions would have been different had Cassandra answered the questionnaire truthfully. Now, albeit, we cannot guarantee that patients, including inmate patients, are truthful when we obtain a medical history from them, which the questionnaire essentially is, but the questionnaire is an extremely abbreviated form of a medical history. It is a medical screening questionnaire which means its intent is to ***screen*** people to assess any risk which might reveal a need or suspicion for general, urgent or emergent medical referral. The problem with Callaway Counties screening tool is the obvious lack of training regarding it, the objective nature of it, and the interpretation of the responses. The screening questionnaire does not ask many open-ended questions. They are closed ended "yes" or "no" questions. It is my opinion that Cassandra was

being truthful on the questionnaire and was not trying to be intentionally misleading. She stated she has a history of mental, emotional and physical health problems and was under treatment for those by Dr. Nuaz. It was Officer Ripsch's opinion that she lied about use of illicit drugs when she responded "no" to regular use of alcohol or drugs. As a physician who has questions patients almost daily and has done so for 20 years, I have found that one word may have a different interpretation for a patient. I have asked patient's if they have hypertension or high blood pressure and received a "no" response only to find they are on antihypertensive medication. When I question them about their response, they reply stating that they do not have high blood pressure if they take their medications for it.

So, I believe, giving Cassandra the benefit of a doubt, that her interpretation of the word "regular" meant entirely something different to her than it did to Officer Ripsch. His implicit bias meant she was lying. Her interpretation of "regular" could mean daily. What does regular mean? If I ask a patient "do you exercise regularly?" one patient may interpret regular exercise as something that occurs daily, and another as something that occurs weekly, and so on. I feel that regular to Cassandra means daily. During my interview of her regarding illicit drug use, she does not use methamphetamine on a regular basis, but on an intermittent basis (not regular) and uses weekly, monthly and so on based upon her financial resources. If the questionnaire had stated she used methamphetamine today, she may have answered that question differently. The screening tool should ask "when was the last time you used illicit drugs, and how often do you use illicit drugs?" Then I believe that CCJ would obtain more useful and accurate information.

The same reasoning as above would apply to the officer's objective aspect of the screening tool. It is **impossible** for a patient to be assessed as having anxiety, shame and fear and not suspect in your differential diagnosis that those symptoms could be related to psychosis, depression, anxiety, panic, metabolic, alcohol or drug related issues. Those are **vague**, **nonspecific** issues that can be exhibited by multiple and interrelated problems. So, for an officer to observe a patient as having the above symptoms and then to deny that those symptoms may be due to alcohol or drug withdrawal is akin to a patient have facial drooping, but to state that it is not possible for that patient to be having a stroke. They may not be having a stroke, but it certainly is possible given an observed symptom of facial droop just as it is possible for a patient to be undergoing withdrawal from alcohol and drugs with a

constellation of symptoms of depression, anxiety, shame and fear. Therefore, the screening questionnaire should be re-worded, and changed to more open ended questions that are more likely to guide the officers thinking to a more appropriate outcome and allow for less objective interpretation since they are not medically trained to recognize the plethora of symptoms that can occur with different medical problems. (Exhibit 1-1 pg. 2)

Deliberate Indifference to an Obvious Need for Medical Intervention:

Brittany Karhoff, Katie McCown, Jackie English, Shane Stokes, Amber Duenkel, Clinton Maddox, Shane Stokes, Michael Tigner, Luke Shoemaker, Brenda Ollar, Glen Ripsch, Derinda Kelley, Dylan Ruediger, Rustin McCormack and Skylar Kinney acted with a deliberate indifference to the serious medical needs of Cassandra Cox.

At the time of her booking into the Callaway County Jail Cassandra Cox would have exhibited symptoms related to methamphetamine intoxication and overdose including musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis. These symptoms would have compounded and grew worse throughout her stay. The jail records and depositions indicate Cassandra Cox was pale, was complaining of pain throughout her body, and was emotionally upset. Cassandra Cox had made a suicidal statement and was refusing to eat. Cassandra Cox father, Bruce Cox, contacted the Callaway County Jail, and spoke to Sgt. Brittany Karhoff asking for them to send his daughter to a medical facility. Despite all of this, no medical professional was contacted on Cassandra Cox behalf until she collapsed on 2/28/16. Had the correctional officers contacted a physician or medical professional on 2/26/16, 2/27/16 and in the early morning hours of 2/28/16, it is more likely than not that Ms. Cox would have received interventional medical care which would have prevented her cardiac event and injury. This policy violation led directly to the delay in medical treatment for Cassandra Cox, and ultimately caused, or contributed to cause, her cardiac event and injury.

Emfinger

Exhibit 1-2: This is the EMS report which shows that there was at least 8 minutes elapsed between time of dispatch and arrival to the jail. It reports a patient in PEA, GCS 3, ventricular fibrillation documented by telemetry, and agonal respirations. Based upon video documentation, EMS started CPR which had not been done until their arrival. EMS intubated the patient, administered automated cardioversion, administered epinephrine per protocol and intubated the patient. Patient was anoxic without vascular circulation putting her at risk for anoxic brain injury for at least 8 minutes. Brain injury occurs at approximately 4 to 5 minutes without oxygen and death occurs shortly thereafter if there is no intervention. The jail and officers placed the patient as risk by ignoring symptoms that could be attributable to methamphetamine intoxication and withdrawal, exacerbated by lack of nutrition, no reasonable observation, no emergent medical referral, and as this worsened Cassandra's condition, she went developed metabolic acidosis and went into cardiac arrest with ventricular fibrillation. The jail and officers then contributed further to her morbidity and possible demise by not administering Basic Life Support measures by doing consistent and high-quality chest compressions to circulate blood oxygen. This led to a worsening of her condition interrupted only by EMS arrival and intervention, but because of the length of time which had occurred, Cassandra, unfortunately, experienced anoxic brain injury as noted by University of Missouri Hospital physician documentation. (Exhibit 1-2, pg. 5), (Medlineplus.gov), (Lumb AB, Hypoxia, In: Lumb AB, ed. Nunn's Applied Respiratory Physiology. 8th ed., Philadelphia, PA: Elsevier, 2017:Chap. 22)

Exhibit 1-3: Is the patient's evaluation at Fulton Medical Center and includes diagnostic studies. Her CO2 was 14 with an anion gap of 28.9 indicative of an elevated gap metabolic acidosis which can occur due prior methamphetamine intoxication and poor nutritional status.

Exhibit 1-4: Review of Cassandra Cox prior medical records and current records from her primary care provider.

Exhibit 1-5: I reviewed records from UMH and Rusk Rehab. Patient diagnosed with anoxic brain injury, stress cardiomyopathy, weakness, deconditioning, polysubstance abuse, Bipolar disorder, and Chiari Malformation unrelated to her initial event. They do feel the anoxic brain injury was due to the events at the jail and the patient was subsequently having difficulty with her ADL's and needed extensive rehabilitative services at Rusk Rehab. Echocardiogram documented

severe hypokinesis consistent with her NSTEMI and stress cardiomyopathy due to the event.

Exhibit 1-7: UHC evaluation of patient. Diagnostic CK 882 mg/dl which places patient at risk for rhabdomyolysis. The CK is a byproduct of muscle breakdown (rhabdomyolysis) which can occur due to methamphetamine toxicity or poor nutritional status. This was also a concern based upon the University Hospital's Impression and Plan page 24 of Exhibit 1-5.

Exhibit 1-8: UHC outpatient mental health clinic 11/22/2016 patient reports she feels better on Zoloft and Mirtazapine and seems to have less of a desire to use methamphetamines. This indicates that patient uses methamphetamines in part to self-treat a mental health disorder. Unfortunately, the self-treatment is with an addictive substance.

**Physical Examination of Cassandra Cox**

*History and Exam Limitations:* This is my first interaction with Mrs. Cox. Patient cannot be disrobed. Patient will have no laboratory or diagnostic studies performed such as blood work, EEG, EKG, CT or MRI of the brain.
*Medical Compliance Issues and Barriers to Healthcare*: Patient states she cannot obtain ongoing medical care secondary to lack of health insurance. When needed, she tries to see their family doctor, Dr. Kelley. Patient is affected by low socio-economic status, and poor health literacy.
*Social History*: Patient smokes tobacco ½ pack per day and has been smoking since about 15 years of age. She continues to use methamphetamines intermittently. She states that she used methamphetamine one day prior to this examination. She states she only uses marijuana when she does not have access to meth and needs to control her comedown symptoms.
*Ob/Gyn*: Patient denies ever being pregnant. She states her menstruation is irregular at this time secondary to not having her Depo-Provera which she normally gets every 3 months and was supposed to have 2 weeks ago. However, she does not have the financial means to continue it currently.
*Surgeries*: Patient denies any surgeries.
*History:* Evaluation of Cassandra Cox performed to assess current health status by observation. Patient complains only of some generalized weakness and feels this is worse since her cardiac arrest on 2/28/2016 at Callaway County Jail. She also feels that she sleeps more often. She denies any other specific complaints.



EXHIBIT

*General*: Patient is a 24-year old white female who appears her stated age. She is examined privately in a room sitting adjacent to myself seated in a chair. Patient examined fully clothed removing only clothing that would continue to maintain patient privacy. There was no nurse chaperone present. Therefore, breast, rectal or pelvic examinations were deferred and, for the purposes of this context, unnecessary.

*Alert*: Patient is awake and alert.

Distress: She appears to be in no pain or distress.

*Head*: Atraumatic and normocephalic.

*Neck*: Trachea is midline. No thyromegaly.

*Ears*: Tympanic membranes are visible and clear and intact bilaterally. Mild cerumen in the right ear canal.

*Nose*: She has a piercing with a stud in the left side of the nose. Nose patent. She has some mild nasal turbinate edema visible in the right nare. She has no nasal septal perforations.

*Eyes*: Pupils are round, equal in size and reactive to direct light. Her extra ocular motion is intact with no lateral nystagmus. Pupils are 2 mm in size bilaterally. Using Snellen eye chart at arm's length patient's vision was 20/25 with reading using both eyes open with no contacts or glasses. Patient does state that she used to have glasses but currently does not have any due to financial stressors. She states she can drive without glasses legally.

*Mouth/Throat/Dentition*: No oral lesions, posterior oropharynx is clear, and patient's dentition is good given her history of methamphetamine abuse. She had a few dental caries but nothing widespread and no major issues with dental erosion, gingivitis or periodontitis.

*Vascular*: Easily palpable and bounding right radial pulse

*Heart*: Cardiac heart sounds are clear with no murmurs, and heart rate seemed within normal rate with no tachycardia or bradycardia and the rhythm was regular.

Respirations: Normal with no distress and no audible wheezing.

*Lungs*: Lungs sounds were clear to auscultation bilaterally.

*Abdomen*: Soft, non-distended, non-tender, normal active bowel sounds.

*Edema*: No peripheral edema.

*Musculoskeletal*: Patient has severe lower thoracic scoliosis. She has never had orthopedic or surgical evaluation or treatment for this. The scoliosis is concave to the right.

*Psychiatric*: Flat affect, makes direct eye contact, pleasant, cooperative and answers questions appropriately.

*Neurological*: Patient follows commands well. Her smell seems intact. With eyes closed, I held an herb, rosemary, to her nose. She was able to tell it was an herb. She incorrectly thought it was dandelion. She had no difficulty with hearing and with conversational hearing. She was able to wrinkle her forehead, smile symmetrically, close eyes, no facial droop, normal swallow, normal tongue protrusion, and palate rises symmetrically. Shrugs shoulders equally bilaterally. Equal grip strength, bicep and plantar flexion bilaterally. Patient has no focal deficits with examination, no ataxia of the upper or lower extremities, good coordination with hand to nose touch, negative Romberg, normal tandem walk, no pronator drift and able to stand and hop on one leg and then the other with normal adjustments, in my opinion, correcting at times only momentarily to get her balance. I saw no resting or intentional tremors. Patients bicep and patellar reflexes were equal bilaterally and were 2+/4. Patient's grip strength was equal bilaterally and was 5+/5. Patient had no difficulty raising her arms over her head. She had a normal non-antalgic gait.

**Summary**

Ms. Cassandra Cox was a female inmate patient booked into Callaway County Jail on 2/26/2016 after being arrested for DWI having been found positive for methamphetamine and marijuana by FPD. Prior to arrest she was found unconscious in her car, engine still running, with the tires over the curb. She performed poorly on a field sobriety test and was noted to not be acting normally appeared under the influence of a drug. She was taken and booked into CCJ. She was not medically cleared or screened appropriately per NCCHC guidelines and based upon CCJ's own P&P manual. She never was evaluated by a competent medical specialist to determine if she was medically stable to be incarcerated traditionally called a Fit for Confinement, even though there was a nurse available on 2/26/2016. She then indicated that she did not feel well, and a questionnaire documented several symptoms such as anxiety, fear and shame which can be due to methamphetamine comedown symptoms. The questionnaire was not completed accurately and was completed by an officer found to be unethical and unreliable and later fired from CCJ for introducing contraband into the jail. She was later placed on suicide watch for making a suicidal threat which is another symptom of methamphetamine abuse, toxicity, comedown and withdrawal. She was noted to be exhibiting bizarre behavior and she was placed on 15-minute evaluations per policy and protocol after making a suicidal statement, but those were never completed sufficiently nor documented in violation of several policies and

protocols including CCJ's own P&P manual 10.02. She was also not referred to a medical specialist for the above symptoms and verbal complaints, nor based upon concerns by her father who called the facility multiple times asking that she obtain mental health treatment. CCJ also did not call a on call nurse or physician to notify them of Cassandra's symptoms and suicidal complaints which was also a CCJ violation of the P&P manual 2.04(5) and 12.05 that patient's with bizarre behavior should be treated as a medical emergency. Patient's health status continued to decline. She was depressed and did not want to eat which is a symptom of methamphetamine comedown and severe depression. Again, no one called a competent medical authority or notified their supervisors in violation of CCJ P&P Manual 10.02. From 2/26/2016 to 2/28/2016 Cassandra Cox was becoming more ill as a result of her methamphetamine toxicity, her lack of proper nutrition, lack of proper medical care and decline in mental health. She was developing metabolic acidosis and rhabdomyolysis which ultimately led to her progressing to ventricular fibrillation and cardiac arrest. She was heard to yell out in pain. Throughout this time, Cassandra cox would have been exhibiting symptoms including musculoskeletal pain, anxiety, lethargy, depression, suicidal thoughts, poor appetite and at times psychosis.

She was found unresponsive. Unfortunately, no medical intervention was initiated until EMS arrive. Cassandra Cox developed brain damage as a result of lack of oxygen to her brain for such a significant length of time called anoxic brain injury. She was intubated by EMS at CCJ, given medications, and her ventricular fibrillation converted to sinus tachycardia and she was transported to the closes facility which was Fulton Medical Center and then to University Missouri Hospital for Critical Care from injuries sustained at CCJ. These injuries occurred due to lack of preventive healthcare services in violation of MCJS standards, lack of proper resuscitative efforts in violation of MCJS standards, lack of first aid available in violation of CCJ P&P standards, and apparent indifference to her presenting complaints, ongoing health status and refusal to get her urgent or emergent medical evaluation and treatment. At UMC, Cassandra had a seizure and was diagnosed with anoxic brain injury, rhabdomyolysis, metabolic acidosis, stress cardiomyopathy and NSTEMI which was due to her cardiac arrest that occurred from lack of medical intervention at CCJ. Once she improved, she continued to have significant problems with memory and activities of daily living (ADL's) and was transferred to Rush Rehab for continued rehabilitative services before ultimately being discharged to home. At

home, she continued to have weakness, fatigue, problems with memory, problems with tremor, and ADL's.

**Conclusion**

1) *Did the Callaway County Jail staff violate their own policies and procedures? If so, did those violations constitute a dereliction of a ministerial duty that caused, or contributed to cause, Ms. Cox injuries?*
   a. Yes. It is my professional opinion that, as detailed in this report, several mandatory policies and procedures were violated, all of which caused, or contributed to cause Cassandra Cox's cardiac event and injuries as they delayed appropriate medical care.
2) *Was Callaway County or its staff deliberately indifferent to any of Cassandra Cox's serious medical needs?*
   a. Yes. It is my professional opinion that the actions of the CCJ and CCJ staff were deliberately indifferent to the serious medical needs of Cassandra Cox as detailed in this report.
      i. I feel based upon the legal definition, standards, and CCJ's actions that they were deliberately indifferent. Because of her symptoms and information at the time of arrest it would be impossible to not know Cassandra Cox was at risk of a possible serious health problem. Yet, the staff ignored the information as well as her symptoms, complaints, decline in status and concerns by her father. The staff knew of and disregarded a foreseeable risk and they failed to take reasonable precautions to protect Ms. Cox. In addition, they were not proactive even though many of them knew the patient and her prior history of drug addiction. There was inadequate training and inadequate specific training which could have reasonably prevented harm to Cassandra Cox. They certainly did not afford Cassandra proper access to health care based upon the fact that she was a prisoner, and she had no access to a competent medical opinion.
4) *If Callaway County was deliberately indifferent, did their decisions or actions cause, or contribute to cause, damage to Cassandra Cox's health and any of her resulting injuries?*
   *a.* Yes. Although, they did not cause her initial symptoms related to her methamphetamine abuse and intoxication, they did cause and

contributed to her decline over a 2 day period of time by not properly clearing her medically, lack of proper medical screening, lack of proper observation, failure to notify or have patient seen by a competent medial authority, and failure to properly treat Cassandra Cox during a cardiac arrest. This was the cause and contribution to her cardiac arrest and sequelae of anoxic brain injury, NSTEMI, stress cardiomyopathy, seizure, problems with memory, ADL's and tremors. It was the sole cause of her need for treatment by EMS, Fulton Hospital, University Hospital and Rusk Rehab. All of the treatment by EMS, Fulton Hospital, University Hospital and Rusk Rehab was reasonably and medically necessary.

Dr. Joel Blackburn

9/3/2019
Date

Privileged

**Abbreviations and Definitions**

*Agonal Breathing:* The is the term to describe when the body is struggling or gasping to breath. It is not true breathing but a brainstem reflex to help the body attempt to breath due to lack of circulating oxygen either from a cardiac arrest or an airway blockage.

*Anoxic*: Without oxygen

*ACA*: American Correctional Association

*CCJ:* Callaway County Jail

*CO:* Correctional Officer

*Differential Diagnosis*: A list of possible illnesses or diseases for a specific symptom or constellation of symptoms.

*Deliberate Indifference*: Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. In law, the courts apply the deliberate indifference standard to determine if a professional has violated an inmate's civil rights. Deliberate indifference occurs when a professional knows of and disregards an excessive risk to an inmate's health or safety. (definitions.uslegal.com)

*EKG/ECG*: Interchangeable terms for Electrocardiogram which is a heart tracing

*EMS*: Emergency Medical Services

*FPD*: Fulton Police Department

*DWI*: Driving While Intoxicated

*Implicit Bias*: An implicit bias is an unconscious belief that leads to stereotypes of certain individuals or groups of individuals and can lead to systematic errors in judgement. It is affected by upbringing, culture, socioeconomic status, occupation, political and religious affiliations.

*GCS*: Glascow Coma Scale. The scale helps to determine how severely distressed an individual is, determines baseline status follow up, and can assist in determination of intubation of a patient which is to place a tube into the airway to help a patient breath.

*CMS:* Correctional Medical Services

*MSR:* Medical Service Request

*MCJS*: Missouri Core Jail Standards

*NCCHC:* National Commission on Correctional Health Care. The NCCHC helps established standards for jails and prisons for consistent and up to date care of inmate patients.

*NSTEMI*: Non-ST Segment Elevated Myocardial Infarction which relates to a heat attack that shows no signs on the EKG.
*PEA*: Pulseless Electrical Activity. The heart is beating slightly but the contractions are no significant enough to circulate blood.
*Ventricular Fibrillation:* This is when the heart just flutters or "fibrillates" rapidly and does not circulate blood. It is one of the most common arrythmias in an adult.

Privileged