IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CASSANDRA COX, Plaintiff, vs. CALLAWAY COUNTY, MISSOURI, et al, Defendants. | ) Case No. 2:18-cv-0405-NKL |

DEPOSITION OF JOEL BLACKBURN

TAKEN ON BEHALF OF THE DEFENDANT

SEPTEMBER 17, 2019

I N D E X

Direct Examination .................................5

Cross Examination .................................208

E X H I B I T S

(ALL EXHIBITS WERE RETAINED BY MR. MCDANIELS)

Exhibit A ..........................................10

Exhibit B ..........................................11

Exhibit C ..........................................18

Exhibit D ..........................................32

Exhibit E ..........................................207

IN THEUNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

CASSANDRA COX, )
)
Plaintiff, )
)
vs. ) Case No. 2:18-cv-0405-NKL
)
CALLAWAY COUNTY, MISSOURI, et al, )
)
Defendants. )

DEPOSITION OF JOEL BLACKBURN, produced, sworn, and examined on September 17, 2019, between the hours of 11:00 o'clock in the forenoon and 4:00 o'clock in the afternoon of that day, at Alaris Litigation Services, 2511 Broadway Bluffs, Columbia, Missouri, before Jenna Petree, in a certain cause now pending UNITED STATES DISTRICT COURT WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION, wherein CASSANDRA COX is the Plaintiff, and CALLAWAY COUNTY, MISSOURI, et al are the Defendants.

A P P E A R A N C E S

For the Plaintiff:

A.G. Laramore
ANTHONY G. LARAMORE
10024 Office Center Avenue Suite 202
St. Louis, MO 63128
314-241-0999//agl@laramorelaw.com

For the Defendants:

Ryan McDaniels
NEWMAN COMLEY & RUTH, P.C.
601 Monroe Street Suite 301
Jefferson City, MO 65101
573-298-4313

The Court Reporter:

Jenna Petree
Alaris Litigation Services

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the Plaintiff and counsel for the Defendants, that the deposition of JOEL BLACKBURN may be taken in shorthand by Jenna Petree, and afterwards transcribed into typewriting; and the signature of the witness is expressly reserved.

* * * * *

JOEL BLACKBURN,

of lawful age, produced, sworn, and examined on behalf of the Defendant, deposes and says:

QUESTIONS BY MR. MCDANIELS:

EXAMINATION

MR. LARAMORE: So just for the record, the notice of deposition asked for any and all correspondence to and from Plaintiff with the Doctor. We object on basis of Rule 26(b)(4) (c) regarding communication involving reports or draft reports as being work product. We had -- No. 5, it's the same objection that reports drafts of reports are work product under Rule 26 (b)4 (c). As to Part 9, we again object to anything that calls for communications or draft reports pursuant to Rule 26(b)4(c). We have produced a copy of the report, the notice of deposition, the fee schedule, communications that do not involve draft reports, the entire report of Dr. Joel Blackburn, and the medical chronology as the responsive

documents to the notice of deposition.

**Q (By Mr. McDaniels) Dr. Blackburn, would you state your full name for the record, please?**

A Joel M, as in Mary, Blackburn.

**Q Mr. Laramore put an objection on the record here, is it my understanding that you have not brought with you any drafts of your report today?**

A Correct.

**Q Were there drafts of your report?**

MR. LARAMORE: I'll just object to the extent that it calls for work product and I'll instruct the witness not to answer.

MR. MCDANIELS: He can't tell me if there were drafts? That would probably lead to whether or not -- we can decide if there is something to pursue there. I would think whether or not there were drafts would be reasonable thing for him to answer, not the content of those drafts which I do not plan to ask.

MR. LARAMORE: I appreciate that. Under the rules we are not required to disclose any information or communications regarding any draft reports. We are only required to disclose the final report, which we have done here today and we did prior to the deposition today in our disclosure. I will stand on my objection and I will instruct Dr. Blackburn not to answer the question.

Q (By Mr. McDaniels) Dr. Blackburn, are you refusing to answer that question on the advice of Mr. Laramore?

A Yes.

Q I'm going to go ahead and certify that question and we'll take it up if we need to later. You have -- I have been provided with some documents here today and I was also provided with some documents related to your report previously. Have you reviewed the documents that have been given to me today by Mr. Laramore?

MR. LARAMORE: What's in the binder?

A Yes, yes.

Q (By Mr. McDaniels) Do you want to look at the documents that I have in front of me to make sure that they are the same as what's in the binder?

A No.

Q Do you know what was provided to me by Mr. Laramore as part of your report?

A Yes.

Q Okay. Are those all the documents, other than the drafts that we have talked about today and communications related to those drafts that would be responsive to my notice of deposition that I served in this case?

MR. LARAMORE: I will just object to the

vagueness of the question. Are you saying in addition to the documents that my office served many weeks ago that included thousands and thousands of patient documents that related to this case?

MR. MCDANIELS: Correct.

**Q (By Mr. McDaniels) So there were a number of documents that you had listed in your report?**

A Uh-huh.

**Q Is that a yes?**

A Yes.

**Q And those were, I believe the documents that were provided to me previously, and then you had provided some additional documents today. Do you believe there are any other documents, other than the drafts for which there is a pending objection currently and communications related to those drafts, that are responsive to my notice of deposition that you have not provided today?**

A No

**Q So I should have everything other than those drafts and correspondence related to those drafts?**

A Yes.

**Q Thank you. And you have given a deposition before, correct?**

A Yes.

**Q And how many times have you given previous use**

depositions?

A Approximately five.

**Q Five times. Have you ever given trial testimony?**

A Yes.

**Q When was that?**

A 2005.

**Q What kind of case was that?**

A It was a molestation case.

**Q Okay.**

A It was in Randolph County.

**Q Okay. Were you a treating physician in that case?**

A Yes.

**Q Okay. So not expert testimony in the sense of a retained expert in that case, correct?**

A Correct.

**Q You mentioned you have given five depositions. I understand that you have -- you do provide retained expert services from time to time; is that correct?**

A Correct.

**Q And any of those five depositions that you've given, have those been as a retained expert?**

A No.

**Q Okay. Have you ever given a deposition**

**related to an inmate?**

A No.

**Q Okay. Were you involved in a case by the name of Derek Houstin versus Boone County?**

A Yes.

**Q Did you give a deposition in that case?**

A No.

**Q Okay. Let me show you -- I'll mark this as Exhibit A. I will ask you if remember giving a deposition --**

A Are you talking about Boone County?

**Q Derek Houston versus Boone County?**

A Yes, that was when I was medical director.

**Q I will show you Exhibit A, does that appear to be your deposition in that case?**

A Yes.

**Q Okay. I will take that back from you.**

MR. LARAMORE: That was not as an expert; is that true?

A Correct. I was the medical director of the facility.

**Q (By Mr. McDaniels) And you were the medical director of Boone County Jail until, what, 2016?**

A Yes, 2004 to 2016.

**Q And you did give a deposition in that case?**

A Yes, a video deposition.

**Q Any other depositions that you have given related to inmates or claims by inmates?**

A No.

**Q So that's the only one?**

A Correct. Thank you for reminding me.

**Q Okay. You have produced a curriculum vitae here today or previously to make sure that we get that marked. I will mark this as Exhibit B. Can you review that and tell me if that's your up-to-date curriculum vitae?**

A Yes.

**Q I note on there you do not have a law degree; is that correct?**

A Correct.

**Q And in your report you are planning to give opinions related to ministerial duties; is that correct?**

A Yes.

**Q And you are planning to give opinions with regard to deliberate indifference; is that correct?**

A Yes.

**Q And you understand those are legal terms and they are used in the legal community?**

A Yes.

**Q What specific training, or knowledge,**

**background do you have with regard to defining a ministerial duty?**

A My -- what would you say, my 12 or 13 years of correctional medicine and medical director of a department for which I had two trained officers to talk to them about risk management.

**Q During that training and experience, you're telling me that you specifically understood the legal definition of the term ministerial duty?**

A I don't know it as well as an attorney does, but yes.

**Q What did you do to make that determination?**

A What do you mean?

**Q To figure out what ministerial duty meant?**

A Online research for myself for educational purposes.

**Q So you are basically in that regard a lay witness that's done some research with regard to what ministerial duty is?**

A Uh-huh.

MR. LARAMORE: I'm just going to object, that misstates his testimony. He said that he was the director --

MR. MCDANIELS: You don't need to make a speaking objection, you can just objection.

MR. LARAMORE: Well, I'll object to it. It misstates his testimony and I would appreciate it if you would characterize his testimony correctly when he told you that he was the medical director of medicine at Boone county and he was doing this to train correctional officers.

**Q (By Mr. McDaniels) Your medical degree does not give you any insight as to what is a ministerial duty, does it?**

A My medical degree, does it give me any insight to ministerial duties? Yes, I believe it does give me some insight.

**Q Okay. What is that?**

A Insight as to how to appropriately handle patients in regard to policies, protocols, procedures and how to -- and what officers should do in order to administer those.

**Q Let me ask this differently though, as to the legal definition of what is a ministerial duty, your medical degree did not train you in that?**

A Correct. I learned that after I obtained my degree.

**Q And that was through online research you did on your own?**

A Yes, and work with attorneys.

**Q Would you agree that the attorneys would be in a better position to determine what a ministerial duty is?**

A I believe that their training would train them better in what a ministerial duty is, yes.

**Q Same with regard to what is deliberate -- what is or is not deliberate indifference under the eyes of the law is?**

MR. LARAMORE: Well, which attorney are you talking about?

MR. MCDANIELS: It really doesn't matter. He can answer the question.

MR. LARAMORE: So is the question does any attorney know better what deliberate indifference is than the former medical director of Boone County Jail?

MR. MCDANIELS: I think you know that he can't offer this opinion and I'm trying to figure that out at this point in time.

A I think that I have a pretty good idea for a physician and an officer as to when they screw up whether they engaged in deliberate indifference. I don't need to be an attorney to determine that.

**Q Well, you understand that under the law there is a difference between negligence and making a mistake?**

A Yes, but I'm not going to court and explaining that to a jury. What I'm trying to do is I'm trying to

train officers and physicians as to not be biased when they take care of someone and to pay attention to their illnesses.

**Q I understand that. You are attempting to go to court and tell the jury with your report and apparently your opinion today what is or is not deliberate indifference?**

A Yes.

**Q What I'm saying is you just said you're not going to court to do that and what I'm trying to figure out is whether or not you have the background, education, and experience that would allow you to make that decision and give that opinion before a judge and jury?**

A Are you asking me if I have the legalese to determine if I can go to court for that?

**Q No. I'm trying to figure out your background and you just said you are not going to court to try to tell --**

A As an attorney.

**Q Right. A judge or a jury what deliberate indifference is. Do you -- you don't have a law degree, correct?**

A Correct.

**Q All right. We'll just leave it at that. Those other five depositions that you have given, is it six**

**actually as a result of the one that I showed you today?**

A Correct.

**Q What are the other five cases that you have given depositions in?**

A It would be this one.

**Q This counts as one?**

A Uh-huh. I did a deposition in Columbia on two children who had been domestically abused and starved, the molestation deposition in Randolph County.

**Q Okay.**

A A deposition that had to do with an incident at Cole County, she was an inmate and she was sent to the emergency room at Capital Region, I was the physician that took care of her. I can't even remember what that case was, but.

**Q So there was another inmate case?**

A She was an inmate but I was the emergency room physician.

**Q But it was with regard to an inmate?**

A Yes, but I wasn't at the jail. I wasn't the correctional physician taking care of her.

**Q Did you testify as to the care she received at the correctional facility during your deposition?**

A No. I testified to the degree of care that she might have had at the emergency room. They asked me

opinions about whether her care might have been appropriate at the Cole County Jail. Some of that I felt I could attest to, some of it I felt I could not because I wasn't there.

**Q Okay. Did you in that case determine that the jail officers, guards, et cetera did you give any opinions that they failed to meet the standard of care?**

A No.

**Q What's your other case that you gave a deposition in?**

A I think that's it.

**Q So we've got four counting this one now?**

A Yes, so that's the fifth one.

**Q Yes.**

A So four then.

**Q Do you know what the name of the Cole County case was?**

A No, I do not. I know that Gabe Harris was involved with it. He's at Carson and Coil at this point in time, but he wasn't with Carson and Coil at the time.

**Q Was he with -- I know Gabe, was he with Hanrahan & Nacy?**

A I don't know.

**Q How many cases have you been involved in as an retained expert whether or not you gave a deposition?**

MR. LARAMORE: You can feel free to look at your CV, Doctor, it's all on there.

A Well, this one, one with Smith & Lewis, with Gabe Harris and one with Wrights.

**Q (By Mr. McDaniels) And is the one with Gabe Harris different from the Cole County case that you gave a deposition in?**

A Yup.

**Q Have you ever provided expert witness services to Mr. Anthony Laramore outside of this case obviously?**

A No.

**Q What about Cyrus Dashtaki, he's co-counsel in this case?**

A No.

**Q I'm going to mark the notice of deposition as Exhibit C, have you seen the notice of deposition in this case?**

A Yes.

**Q All right. You have -- if you would turn to it for me, I would appreciate it. We'll just run through the documents real quick. You have provided me with a copy of your most recent CV, correct?**

A Correct.

**Q You have provided me with some correspondence, though not all, and it's subject to objection, correct?**

A Correct.
Q Other than correspondence related to the drafts of the reports, have you provided me with all correspondence between you and Plaintiff's counsel?
A Yes.
Q And that would be in the stack that I received today, correct?
A Correct.
Q You provided me with any and all documents and materials provided to you by Plaintiff or her attorneys other than maybe if they help draft part of the report?
A Say that again.
Q No. 3, have you provided me with all of those documents, other than those that are subject to Mr. Laramore's objection today?
A Yes.
Q There were -- No. 4 asked for treatises, other documents that you relied on. There were a couple of documents provided to me with your report. Specifically I believe the Missouri Jail Standards and Training and I think that there was one additional, it looked like an article possibly, Mortality in State Prisons. Aside from those, are there any other learned treatises, publications, or scientific literature that you relied upon in coming to your decisions today?

A Yes.

**Q What were those?**

A Articles from Correct Care.

**Q Article from Correct Care; did you produce a copy of that article from Correct Care to me?**

A No.

**Q Do you have a copy of that?**

A No, it's in the Correct Care magazine. It's in my report, it's documented in my report.

**Q You cite to it?**

A I cite to those things, I'm not going to copy them all off.

**Q Well, and I've asked you for documents that you relied upon and you did not bring that document today?**

A No.

**Q Did you make any notes in preparation for your deposition today?**

MR. LARAMORE: I will just object. Are you talking about outside of the context of draft reports?

MR. MCDANIELS: Yes.

MR. LARAMORE: So outside of the context of draft reports, Doctor, you can answer the question, did you make any other notes?

A No.

**Q (By Mr. McDaniels) Have you published any**

articles or books or authored any, I guess, any articles?

A No.

Q And you didn't bring with you any copies of your prior deposition testimony in any case or anything like that, have you?

A No.

Q And you did not bring with you a fully itemized billing statement, but it is my understanding that you have worked 12 hours on this case at a rate of $300.00 per hour?

A Approximately, yes.

Q Is that what you plan to bill Mr. Laramore at this time?

A Approximately, yes.

Q Have you brought with you the contents of your file or have are you produced the contents of your file in this case to me?

A I don't have a file.

Q Have you, other than obviously there is the Correct Care article that you cite in your report, are there any other documents upon which you rely that you have not produced to me today?

A No.

Q How much were you making working at the Boone County Jail?

MR. LARAMORE: I'm going to object. How much was he making?

MR. MCDANIELS: Yes.

MR. LARAMORE: No, that's an entirely improper question.

MR. MCDANIELS: It is not.

MR. LARAMORE: You can ask him what percentage of his income was derived from expert witness testimony and things like that. The doctor does not have to --

MR. MCDANIELS: Are you telling him not to answer?

MR. LARAMORE: I am. That's an entirely improper questions. You don't have to answer the question of what your salary is at the Boone County Jail.

**Q (By Mr. McDaniels) Are you going to answer the question?**

A No.

**Q If I told you it was about $56,000.00 according to your deposition testimony; does that sound right?**

MR. LARAMORE: I'm going to object again. This is an entirely improper question. Like I said, if you want to ask him percentages of income derived from expert testimony.

MR. MCDANIELS: You can state your -- I was

very calm during your depositions and made reasonable objections. If you want to make those objections, that's fine, make them for the record. You can tell the witness whether or not you want him to answer.

MR. LARAMORE: It's entirely invasive and outside the scope of acceptable discovery and you know that. Doctor, I will give you the choice, you can answer the question or not, but this is an entirely improper line of questioning.

**Q (By Mr. McDaniels) Are you going to answer the question?**

A Ask the question.

**Q It's my understanding you made about $55-56,000.00 working at that time the Boone County Jail?**

A Yes.

**Q How many hours a week were you working at that facility?**

A I was contracted for up to eight hours.

**Q And you were probably working more than that?**

A Yes.

**Q And on an average week, how many hours a week were you working at the Boone County Jail?**

A 10 to 12.

**Q And were you working 50, 52 weeks a year?**

MR. LARAMORE: Can I have just have a running

objection to every question regarding his employment, his finances that have nothing to do with his involvement in the case?

MR. MCDANIELS: Yeah, you can have a running objection.

MR. LARAMORE: I will have a running objection just so I don't have to continue to interrupt.

**Q (By Mr. McDaniels) Were you working 50 to 52 weeks a year there?**

A I worked there every day.

**Q Every week I should say?**

A I was on call every week at least once a week unless there was an emergency.

**Q Okay. All right. So when did you resign at the Boone County Jail?**

A I believe it was June of 2016.

**Q When did you begin doing expert cases, taking cases to review as an expert?**

A Prior to that time.

**Q Is that a yes?**

A It's not a guess.

**Q No, is that a yes?**

A Yes.

**Q I have to for the record. Would you agree with me that you are making more per hour doing retained**

**expert work than what you were making at the Boone County Jail as a medical director?**

MR. LARAMORE: Same objections. You can go ahead and answer if you would like to.

A Well, I guess that would be dependent on how much work I get as a retained expert. If I --

**Q (By Mr. McDaniels) I'm sorry --**

A If I do one case a year as opposed to -

**Q Per hour though, would you agree that $300.00 per hour --**

A It was pretty close. I figured out mine was about $250.00 an hour if you consider the eight minimum and then you figure the amount per hour, that's how I figured it out. I figured out how much I wanted to be paid per hour and I figured I wanted to be paid $250.00 per hour in the Boone County Jail.

**Q If you were working 52 weeks a year at eight hours a weeks, that's 416 hours; $55,000.00 divided by 416 is $133.00 an hour.**

A Okay.

**Q Have you taken any cases --**

A Just to comment on that, they were going to increase me to $75,000.00 per year and I told them no and that was just before I resigned.

**Q Have you taken any cases on behalf of a jail**

**to review as the attorney hiring you as a retained expert?**

A Say that again.

**Q In your work as a retained expert, have you been retained by a jail or jail administrator for the attorneys for a jail to review a case?**

A No.

**Q So all your work related to jails been on behalf of plaintiffs?**

A No. On jails, yes. Prisons, Smith & Lewis was a prison.

**Q Okay. And with regard to the prison, were they on the defense side of that case?**

A Defense, yes.

**Q Have you given any testimony on that case?**

A I did not do a deposition.

**Q Is that case still ongoing?**

A No, it was settled.

**Q Doctor, you have experience, you have worked -- where are you currently employed?**

A Currently I am working at Center Point Hospital.

**Q When did you begin at Center Point?**

A About one month ago.

**Q Okay.**

A And I will start in one week at Kirksville.

**Q KCOM?**
A Yes.
**Q Kirksville College of Osteopathic Medicine?**
A Yeah, it will be at the hospital.
**Q Is that AT Still?**
A Yes.
**Q I went to Truman, so.**
A Okay, yes. In November I will be starting as the medical director of the ED department at Capital Region Medical Center.
**Q So you are going to be working in Columbia, Kirksville, and Capital Region the same time?**
A I'm just working in Kirksville until I start my director job.
**Q So are you still providing ambulance services through the Randolph County Ambulance Service?**
A Yes.
**Q And what about through the Monroe County Ambulance Service?**
A Yes.
**Q Are you still working as an emergency room physician at St. Mary's in preparation for my director position.**
A No, I just resigned there.
**Q When did you resign there?**

A About three weeks ago.

**Q Okay. And what was the reason for your resignation there?**

A Just wanted to take the opportunity at Capital Region.

**Q And apparently A.T. Still too, correct?**

A Yes. While I'm working at A.T. Still in order to make money while I start the director position.

**Q Is that a locum tenens position?**

A Yes.

**Q And you worked at Cap Regional, correct?**

A Correct.

**Q And that was until January of 2017, correct?**

A Yes, which is when I then went to St. Mary's.

**Q What caused you to want to make that change?**

A It was -- I'm a nocturnalist. I work weekend nights. It was extremely busy and I was getting burned out. I felt I needed to dual coverage at nighttime and I wasn't getting that, so I decided to leave and go to the St. Mary's because it's a private group and we can make decisions quicker, as well as they had dual coverage for me until 1:00 or 2:00 in the morning.

**Q And you also worked as the medical director at the Boone County Jail from April 2004 to June 2016; is that correct?**

A Yes.

**Q During that time I know that Derek Houston filed a lawsuit related to his -- I don't -- his time at the jail; is that correct?**

A Uh-huh.

**Q Yes?**

A Yes, his injury, yes.

**Q Any other jail inmates that you're aware of from April 2004 to June of 2016 that filed claims against the jail related to injuries suffered at the jail?**

A No.

**Q It's my understanding that the Plaintiff in this case, Cassandra Cox, was an inmate at the jail sometime in 2015?**

A At Boone County Jail?

**Q Correct.**

A Okay. I wasn't aware of that.

**Q That's what I was going to ask, do you remember providing her medical care in any way, shape, or form related to her stay there?**

A No.

**Q Have you ever met Cassandra Cox?**

A Yes.

**Q You have?**

A Uh-huh.

**Q And that was for your evaluation in this case?**
A Yes.
**Q How many times have you met Cassandra Cox?**
A Once.
**Q When was that evaluation? Your report doesn't give me a date I don't think.**
A I got to look at my phone and tell you by my schedule.
**Q It was August 30?**
A August 30.
**Q August 30?**
A Yes.
**Q Of this year?**
A Yes.
**Q When were you initially contacted about providing expert services in this case? And if you want to look at the communication, I don't know if it was via e-mail or -- just trying to get a figure on this.**
MR. LARAMORE: Here is when you sent me your billing information.
A That must have been in June then. I know it was Wrights Law Firm that they sent me an e-mail. It had to be in June.
MR. LARAMORE: Yes, he can look though the e-mail.

A I know it wasn't May, so -- it was the month of June.

**Q (By Mr. McDaniels) So how were you initially contacted about this case?**

A Initially I received -- I'm trying to remember and I can't say I'm completely accurate on this, but I believe it was the attorneys that had asked me to provide a medical opinion for them, Wright.

**Q And that's on your CV; is that correct?**

A Milligan & Wright asked if I would be willing to speak with someone else, who was Mr. Laramore about a case and I told them I would.

**Q And we have been produced thousands of pages of documents, including depositions, exhibits; you know the documents I'm referring to, correct?**

A Yes.

**Q Specifically the documents referenced in your report?**

A Uh-huh, yes.

**Q Is it your testimony that in these 12 hours that you have worked on this case, you reviewed all of those documents?**

A Not every single page.

**Q All right. I'm going to just for purposes of identification, I have referenced it a few times, but I**

**haven't marked it. I'm going to mark as Exhibit D the documents that have been produced to me today.**

MR. LARAMORE: Do you want to mark his binder, too? I don't know if they are originals or not.

MR. MCDANIELS: It looks like he may have some highlighting on your copies over there. I don't know if that's also on mine.

MR. LARAMORE: It might not be a color. That's why I said you might want to mark his binder. That's fine, we have extra copies.

**Q (By Mr. McDaniels) Let's mark, if we could mark your binder.**

A Did you want to mark the whole binder?

**Q Yes, if you don't mind me stealing your whole binder, I'll do that. Have I marked your binder at this point?**

A Yes.

**Q I have marked it as Exhibit D and we may have to put some tape on it.**

A That's fine.

**Q And in that you have brief binder index here, correct?**

A Yes.

**Q And included in your binder is one notice of deposition?**

A Yes.
**Q Two is your CV, which we've already identified, correct?**
A Yes.
**Q Three is your fee schedule?**
A Yes.
**Q Four is the communications that you've provided today; it's not all of them but it's what you're providing today?**
A Yes.
**Q And that's communication between you and Mr. Laramore, correct?**
A Yes.
**Q Five is your report?**
A Yes.
**Q Is that the same report that I received?**
A Yes.
**Q And six is a medical chronology that was provided to you by Mr. Laramore; is that correct?**
A Yes.
**Q Did you create the medical chronology in any way, shape, or form?**
MR. LARAMORE: I will stipulate that my office created the medical chronology, supplied it to him, including the highlighting that's there was from our

office.

**Q (By Mr. McDaniels) I noted that other documents have highlighting on them. Did you do that highlight?**

MR. LARAMORE: I will stipulate that's our highlighting as well.

**Q (By Mr. McDaniels) Did you use that highlighting to guide your attention in this case?**

A No, I look at everything that I think is going to help me to make a unbiased opinion.

**Q Okay. And did you rely on this medical chronology in making your opinions today?**

A I look at the medical chronology to help me make a decision, but it's not the sole information to use, that would be inappropriate.

**Q Did you go through the hundreds of pages of the medical records in this case, personally?**

A I went through quite a few pages. I went through nearly the entire P&P Manual.

**Q That's the Policy and Procedures Manual; is that correct? At the Callaway County jail?**

A Yes.

**Q But with regard to the medical records in particular?**

A From you mean the University of Missouri and

so on or when she went to the hospital?

**Q There are a number of medical records in this case, correct?**

A Correct.

**Q And one of the things that I think you're here to testify to is that her medical condition as it is today was caused or contributed to be caused by the actions or inactions of the Callaway County Jail; is that correct?**

A Correct.

**Q So I would assume in that review you would need to review her medical records after she left the Callaway County Jail, correct?**

A Yes, I reviewed all of those.

**Q You reviewed all of those, wonderful. Are your opinions to the best of your ability included in your report that you have provided to me?**

A Yes.

**Q Are there opinions outside of that report that you intend to give here today or at trial?**

A Well, I'm not sure what you mean by that. I do have a lot of opinions. I think it would be a book if I wrote them all in my report. So I tried to provide the salient information in my report to summarize what I feel happened and should have happened.

**Q You would agree that you have never worked as**

**a correction officer; is that correct?**

A Correct.

**Q You have never worked as a jail administrator; is that correct?**

A Correct.

**Q You have never had the duty to schedule correction officers for shifts or coverage or anything like that; is that correct?**

A Not entirely. I did work with Captain Hoskins and Captain Warren Brewer of the jail regarding shifts, not only as officers but of nurses.

MR. LARAMORE: Was that Boone County?

A Yes, at Boone County Jail.

**Q (By Mr. McDaniels) Would you agree with me though that your role as the medical director at Boone County Jail is different than being at corrections?**

A As an officer, yes.

**Q Okay. And you have different things that you're looking at as a medical director than what the correction officers are dealing with, correct?**

A Yes.

**Q And the stresses and/or -- withdraw that. I'm going to jump right in here. If an inmate -- I'll just give a hypothetical here -- if an inmate is arrested for drugs, let's say DWI drugs in this case, and is crying on**

**intake, is that sufficient in your opinion to require the jail to send them for a fit for confinement?**

MR. LARAMORE: I will just object that it's an improper hypothetical. I just want to be clear that we are not talking about this case; is that true?

MR. MCDANIELS: I said it was an hypothetical.

MR. LARAMORE: Okay. I'll just object that it's an improper hypothetical. Doctor, to the best of your ability, you can go ahead and answer the question.

A If they are just crying, no.

**Q (By Mr. McDaniels) Okay. What additional information would you need to determine that they need to go to the hospital at that point in time?**

MR. LARAMORE: I will just object. Again, it's an improper hypothetical. I think the question is vague and also ambiguous. Doctor, subject to that -- also calls for speculation -- subject to that, you can answer.

A They would need a report of prior occurrence.

**Q (By Mr. McDaniels) What would that mean?**

A What happened before the patient was arrested and brought in.

**Q Okay.**

A They would -- it would be nice to have past medical history, any type of blood work, prior physician evaluation, and other symptoms that the patient may be

exhibiting other than just crying.

**Q So if in 2015, Cassandra Cox was taken to the Boone County Jail on a drug charge and was crying throughout her stay, that wouldn't be enough to get her sent for a fit for confinement?**

MR. LARAMORE: I'm just going to object that misstates his testimony and now we're off the hypothetical and talking about this case, correct?

MR. MCDANIELS: He can answer the question. He heard what I asked.

MR. LARAMORE: I'm going to object and ask for clarification because you're jumping from a hypothetical situation to this case now.

MR. MCDANIELS: Mr. Laramore, you are speaking objections and talking and instructing your witness through your speaking objections. If you want to make objections to my questions, that's fine.

MR. LARAMORE: I'm not instructing anybody. I'm trying to clarify your question.

MR. MCDANIELS: He can answer or he tell me that he needs further verification.

A Repeat the question, please.

**Q (By Mr. McDaniels) Yes. Ms. Cox, in 2015 was arrested and brought into the Boone County Jail on a drug charge and was reported to be crying throughout her stay at**

**the Boone County Jail. Would that be sufficient for a fit for confinement?**

MR. LARAMORE: Are you talking about 2016?

MR. MCDANIELS: No, 2015 in Boone County Jail.

A Just crying, no.

**Q (By Mr. McDaniels) And she had a drug charge is what got her there?**

A A drug charge, no.

**Q Okay. Now, is it your understanding that prior to February of 2016 when Ms. Cox was brought to the Callaway County Jail that she had a prior history of methamphetamine use?**

A Say that again.

**Q Prior to February of 2016 --**

A Okay.

**Q Which is when she was brought to the Callaway County Jail, correct?**

A Okay.

**Q Is that correct?**

A It was in February of 2016, yes.

**Q Prior to that, was -- is it your understanding that Ms. Cox was a prior methamphetamine user?**

A Yes.

**Q And as a matter of fact in 2015 she was arrested for methamphetamine; is that correct?**

A I don't know if she was arrested prior to 2016 for methamphetamine. I don't know her prior history.

**Q Did you read Bruce Cox's deposition?**

A Yes.

**Q Do you remember him testifying that she was arrested and brought to the Boone County Jail in 2015?**

A I read a lot of it. I don't have a photographic memory, so I don't remember it all. If I was to review it then, yes, but I did review his deposition. I don't recall it at this point in time, no.

**Q Okay. Bruce Cox testified that she was arrested in 2015 and brought to the Boone County Jail with regard to methamphetamine.**

A Boone County?

**Q Boone County.**

A Yes.

**Q Do you have any reason to disagree with that?**

A I don't have any reason to disagree with it, but I don't recall.

**Q As an emergency you have experiences as emergency room doctor, correct?**

A Yes, for almost 20 years.

**Q And you see folks that are on methamphetamine come into the emergency room on a regular basis?**

A Absolutely.

Q Do you have an understanding of the effects of methamphetamine on the body and brain; those sorts of things?

A Of course I do.

Q And that's part of your medical training and experience?

A Yes.

Q Do you have an understanding of smoking on the body and the brain as part of your medical training?

A Smoking what.

Q Cigarettes?

A Yes.

Q What about marijuana?

A Yes.

Q And with regard to Ms. Cox, you personally evaluated her, did you not?

A Yes.

Q And that was in August, correct?

A Yes.

Q And in your report you note that she had used methamphetamine the day before; is that correct?

A Yes.

Q And she is an -- did you say intermittent methamphetamine user?

A Yes.

**Q What does that mean?**

A It means that she intermittently uses. She doesn't use on a daily or regular basis.

**Q So did you ask her how often she uses?**

A I don't recall asking her anything.

**Q You don't recall asking that question?**

A No.

**Q Methamphetamine can significantly shorten a person's life, can it not?**

A Depending on how often they use it.

**Q One who uses methamphetamine regularly or is a heavy user could have what, five to ten year life expectancy?**

A I think that's a presumption. It depends on what other co-morbidity issues they have.

**Q Well, you're here to offer opinions related to Ms. Cox --**

A Yes, but I'm not going to presume anything.

**Q Okay.**

A And I want to finish my question. You're here to offer opinions related to Ms. Cox today, correct?

A Correct.

**Q And you're here to offer an opinion regarding her medical outcome, I assume, related to her care at the Callaway County Jail and the effects, I believe you're**

going to say she had a cardiac event as a result of that?

A That was one of the things that happened, yes.

Q And I believe your testimony is also going to be that she suffers from some issues that relate to that cardiac event; is that correct?

A Yes.

Q And wouldn't it be important to note whether or not any of those issues might also be caused by her intermittent methamphetamine use?

A Yes.

Q In that regard, wouldn't it be important to note how often she uses methamphetamine at this time?

A I thought we've been addressing that.

Q Did you ask her how often she uses methamphetamine at this time?

A I don't recall. Look at my physical exam and history.

Q I can tell you all it says is it's intermittent use and she used the day before.

A Yes.

Q And I'm asking --

A I didn't ask her -- apparently you have read it. Apparently I did not ask her how often. I don't think that that's going to play into much of what her sequelae is going to be.

**Q You don't believe that her methamphetamine mean use prior to and at this time affects her outcome in this case?**

A I didn't say it doesn't affect it. The argument would be how much is it going to affect it. I testified that it's going to affect but it depends on whether someone has other co-morbidities; are they diabetic, do they already have coronary artery disease, do they use alcohol, do they smoke tobacco or do they do other things. There is many conflicting or confounding issues.

**Q And the amount of methamphetamine and how often she uses it with would be important too, correct?**

A Yes, it would be.

**Q And that's not a question that you asked?**

A I didn't ask her in the history and physical.

**Q And she does also smoke; is that correct?**

A Tobacco, yes.

**Q She also smokes marijuana, does she not?**

A Correct.

**Q Do you know does she have a guardian or conservator?**

A I do not know.

**Q With regard to methamphetamine usage, did you discuss with her -- she had mentioned she had mentioned that she uses marijuana when she is coming off of**

**methamphetamine; do you remember that?**

A Yes.

**Q Or when she can't use methamphetamine; is that correct?**

A She uses -- if I remember correctly, she tells me that she uses marijuana to withdraw from meth if she is not going to have meth.

**Q In your experience with methamphetamine users -- and you have experience with methamphetamine users in your line of work, correct?**

A Correct.

**Q Is that a drug that is easy to quit?**

A No, it's a very addictive.

**Q Extremely addictive, correct?**

A Yes.

**Q And if someone is a user and has the money to purchase more, they will get more won't they?**

MR. LARAMORE: I'm going to object. That calls for speculation and completely improper question. You can answer the question.

A Again, I think it depends on the person.

**Q (By Mr. McDaniels) But if someone is addicted to methamphetamine, until they get treatment and quit, they are looking for their next hit of methamphetamine?**

MR. LARAMORE: Maybe she can use the money

from this case to go to treatment, Doc.

A I don't know that.

**Q (By Mr. McDaniels) Has she been to treatment?**

A Has she been in treatment? Yes, she has tried treatment.

**Q And she is still using; is that correct?**

A Are you trying to compare her to every other methamphetamine addict?

**Q You can answer my question, is she still using today?**

A Yes.

**Q How long does a high from methamphetamine last?**

A A high from methamphetamine? Are you talking about the high --

**Q That's what I asked.**

A -- or are you talking about the come down or the withdraw?

**Q I'm asking how long does a high from methamphetamine last?**

A That's going to depend on how much methamphetamine they take.

**Q How long does methamphetamine remain in a person's system?**

A In their system, it can last several days.

**Q How long will methamphetamine continue to have effects on the body?**

A The effects on the body as far as what type of effects?

**Q Well, that's going to be my next question to you, so what effects does a person experience after taking methamphetamine?**

A After taking methamphetamine, they experience intense focus, alertness, awakeness. They can become diaphoretic, their heart races, they experience a sense of euphoria feeling like they can do anything, they are very active and energetic.

**Q What would cause a person after taking methamphetamine to pass out?**

A If they take enough that is going to decrease their respiratory symptoms and they are going to not be breathing well and then they can pass out.

**Q So can you -- are you able to tell me based on a person's weight or anything like that how much methamphetamine they would have to ingest in order to pass out?**

A I can't.

**Q And it's not like alcohol where we can sort of get some gauge, right?**

A That I don't know. Yes, alcohol has a gauge

as to elimination period of time, et cetera based upon your weight and so on.

**Q But you're telling me with regard to meth, if there is one you don't know about it?**

A Correct.

**Q So you couldn't tell me when or how much methamphetamine Cassandra Cox had ingested in order to be on February 25th or 26th in order to be passed out in a parking lot on the morning of the 26th?**

A Well, I can tell that if she was passed out that she had used a significant amount in order to make her pass out.

**Q And I'm sorry I, don't know anything about methamphetamine, what is a significant amount?**

A Well, she had taken enough just to not make her high, but to make her go unconscious.

**Q Is that an ounce, a gram; do you have any idea?**

A That amount I don't know.

**Q So when you say a substantial amount, you don't have a weight for me?**

A But from an emergency medicine standpoint when I see someone who is high on meth and I have been told that they were unconscious, then that concerns me.

**Q And if a person was high on methamphetamine to**

**the point of being unconscious, does that give you some indication of how long that methamphetamine will continue to affect that person after their initial ingestion?**

A Yes, because the peak amount is going to be much higher. So how long it takes for that to get out of the body to be eliminated is going to take longer.

**Q So do you have an estimate of how long that would be?**

A No, I do not.

**Q Would you agree with me that symptoms of methamphetamine ingestion would be at their highest in the four to six hours after ingestion?**

A It would be the highest within the first two to four.

**Q Okay. And then slowly tapering off as the methamphetamine leaves the system; is that correct?**

A Correct.

**Q What time of day, do you know, was Ms. Cox arrested by the Fulton Police Department?**

A It was Friday morning.

**Q Do you know what time of day?**

A It was, I think, about 6:00 or 7:00 in the morning.

MR. LARAMORE: You can refer to your report too, Doctor.

**Q (By Mr. McDaniels) Your report says 4:37 a.m.**
A Okay.
**Q Does that sound right?**
A Yes.
**Q Did you review the deposition of Shawn Wisswell with the Fulton Police Department?**
A Yes.
**Q Do you have any criticisms of Mr. Wisswell with regard to this case?**
MR. LARAMORE: Objection, are you asking him for opinions?
MR. MCDANIELS: Sure.
MR. LARAMORE: I will just object. That's not why the doctor has been produced today. He has been offered to give opinions regarding the Callaway County Jail and the correction officers that work at the Callaway County Jail. Subject to that, you can go ahead and answer to the best of your ability, Doctor.
A Was Officer Wisswell the Fulton Police officer?
**Q Yes.**
A And you're asking me if I have some criticisms of him?
**Q Yes.**
A Of him personally or of his care regarding

Cassandra?

**Q The later?**

A Yes, I do.

**Q Okay. What specifically do you believe that Officer Wisswell could have done differently?**

A I think that rather than he just having Cassandra obtain a legal blood draw, he should have allowed her to see -- or he should have had her obtain a medical evaluation.

**Q Okay. And he actually took her or had someone at Fulton Police Department take her to the Fulton Medical Center; is that correct?**

A Yes.

**Q And while she was there -- while she was there, she consented to a legal blood draw; is that correct?**

A Correct.

**Q But as far as we can tell, a fit for confinement was not done at that time?**

A Correct.

**Q Do you know what was actually done during that visit?**

A As far as I know the only thing that was done was the blood draw.

**Q Okay. What is the standard of care for one of**

**those blood draws in your opinion?**

A The standard of care for a blood draw? I don't know the standard of care for a blood draw is, we are not involved in them.

**Q Have you ever had an officer come to you and say here is a patient?**

A They have to have a warrant and I am not involved in those.

**Q So you wouldn't know whether or not they have to at least --**

A A physician does not have to view them or look at them or anything. It's a legal blood draw.

**Q My question, just so we are clear, with regard to those legal blood draws who does those?**

A Sometimes the officer, sometimes they bring their own nurse; it depends on the county. Sometimes the nurse at the facility does it.

**Q So the nurse performs that. If they come to the facility, it's likely the nurse in the facility performing that?**

A Nurse, but I have seen other counties where the officer or someone they have trained to do it will do it themselves.

**Q So have you witnessed one of these legal blood draws before?**

A I have seen them do it, yes
**Q Does the nurse check the heart rate before she takes the blood draw?**
A No.
**Q Does the nurse take a blood pressure?**
A No.
**Q Any other diagnostic testing before sticking the needle in the arm and pulling blood?**
A It's not a requirement.
**Q Okay. And you don't believe -- you don't know what the standard of care for those because you have never done one?**
A I don't think there is a standard of care. I don't think any facility has. I have been to dozens of facilities and every policy and protocol is different to every one of them.
**Q How many inmate patients have you taken care of in an emergency environment?**
A In an emergency environment, hundreds.
**Q Have you ever actually been employed directly by a jail as opposed to an independent contractor?**
A I have been employed by Correctional Medical Services before they joined Prison Health Services and became Corizon.
**Q My question was specific, have you ever been**

**an actual employee of a jail?**

A Of a jail, no.

**Q Or employee of a prison?**

A I have been an employee of a prison.

**Q Okay. When?**

A At Moberly Correctional Center, I was a physician there employed by Correctional Medical.

**Q You were directly employed by them?**

A Yes.

**Q So you employed by Correctional Medical Services, CMS?**

A CMS.

**Q And was CMS contracted with the jail to provide services?**

A They were contracted with Moberly Correctional Prison, they had the DOC contract.

**Q So you were an actual employee of Correctional Medical Services?**

A Yes.

**Q You were not a DOC employee?**

A No, I was not a DOC employee.

**Q That was my question.**

A Correct.

**Q Have you ever had an inmate at one of the facilities, prison or jail, while you were providing**

**medical services at that prison or jail had what would be considered a bad outcome?**

A Have I ever taken care of an inmate whose had a bad outcome?

**Q Well, any facility that you have worked, whether as a contractor -- it sounds like as a contractor basically, a medical contractor. Has an inmate had a bad outcome while you were working in that regard?**

MR. LARAMORE: I will just lodge an objection and I know that you haven't asked specifically anyone by name, but I just want to point out, Doctor, you're not required to give any names and HIPPA prevents you from doing that. You can answer his questions to the best of your ability without disclosing any patient information.

A Yes.

**Q (By Mr. McDaniels) And I know about Mr. Houston?**

A Yes.

**Q Are there any other others?**

A Yes, I know of others. I just can't recall any cases.

**Q And have any of them -- has anyone at any of those facilities that you're talking about had cardiac arrest or a cardiac event?**

A Yes.

**Q And would you agree with me that cardiac arrest and cardiac event don't always have symptoms that precipitate the cardiac arrest or cardiac event?**

MR. LARAMORE: Objection. I think it calls for an improper hypothetical, calls for speculation. Doctor, subject to that you can go ahead and answer.

A Repeat the question, please.

**Q (By Mr. McDaniels) Let me ask it a slightly different way, tell -- let's back up and we'll define some terms and then I will get back to my question. I think you used the term cardiac arrest in your report; is that correct?**

A Yes.

**Q Can you tell me what cardiac arrest is?**

A It's when the heart stops beating or starts beating improperly to where it's not circulating blood appropriately.

**Q Can you also call that a cardiac event or are those two different things?**

A Well, cardiac arrest leads to cardiac event. A cardiac event is just kind of a lay term to say that somebody has had a heart attack or someone has had a heart attack. Someone can have a heart attack and you can not even know it and you would call that a cardiac event.

**Q Thank you. And then heart attack is also a**

**lay term, right?**

A Correct.

**Q But that's commonly what we people, general people, know to be a cardiac event basically, correct?**

A Yes.

**Q And there are gradations of heart attacks that exist?**

A Yes.

**Q You can have a mild heart attack; is that correct?**

A A heart attack is a heart attack, but how badly it affects the heart, those can be mild, moderate, severe and so on.

**Q I appreciate you clarifying that, that's what I'm getting at. Are there different -- this is just my lack of knowledge -- are there different ways or different types of heart attacks?**

A Are there different ways or different types of heart attacks. Yes, there are different types of heart attacks. There are heart attacks that occur to blockages. There are heart attacks that occur due to stress. There are heart attacks that occur due bruises on the surface of the heart, such as a direct trauma in a car accident and their heart stops. There are heart attacks that occur due to just a congenital problem in the vessels of the heart.

**Q And there are, with regard to stoppages or blockages, you can have multiple vessels or arteries blocked, correct?**

A Yes.

**Q And that could determine whether the severity of the heart attack potentially?**

A It could, yes.

**Q So now that we have defined those terms out a little bit, with regard to, obviously, if you have a car accident that causes a heart attack, you probably didn't know the day before that you were going to have that car accident, obviously?**

A Yes.

**Q So setting aside the direct impact to the heart type heart attack, can you have the other types of heart attacks without having signs or symptoms 24 hours in advance?**

MR. LARAMORE: I will just object. I think it calls for speculation and improper hypothetical. Go ahead and answer, Doctor, to the best of your ability.

A I've had had -- let me answer it this way if you may allow me to. I have had patients who had heart attacks that had blockages in their vessels and said they had no fatigue, no chest pain, no shortness of breath. I personally find that hard to believe, but I suppose it's

possible.

**Q Have you had people that have actually had heart attack that didn't know they had a heart attack?**

A Yes. Diabetics would be an example.

**Q And what about drug users?**

A Who had heart attacks and not known it?

**Q Yeah.**

A Yes.

**Q In your experience, it is possible for a person -- I mean, at least you hear stories of it, you tell me whether or not in your experience you have seen this, where a person believes they are 100 percent healthy and then out of nowhere has a heart attack?**

A Yes.

**Q If that person who believes they are 100 percent healthy and has a heart attack, if 24 hours before their heart attack they just happen to go to the doctor, okay, and they have been put on the right test, what test would it be that would show that they were going to have a heart attack in 24 hours?**

MR. LARAMORE: I will just object. It's an improper hypothetical and calls for speculation. You can go ahead and answer his question to the best of your ability.

A Well, the main one -- the test of choice would

be a cardiac catheterization, but an indirect test would be a stress test.

**Q (By Mr. McDaniels) if they had a stress test -- we know working backwards basically -- so we are 24 hours before their heart attack, they don't know they are going to have a heart attack, but for someone reason they're doing the right test. If they had a stress test, is it your testimony that it would show they were going to have a heart attack in the near future? Maybe not the next day but --**

A In a certain percentage of people. There are some stress tests that are false negatives.

**Q So what percentage of people would it show that?**

MR. LARAMORE: Same objection.

A It would show -- I believe, I can't remember the exact number, but I believe it misses about 35 percent of people -- so 70 percent of people it would catch.

**Q (By Mr. McDaniels) I assume if we back out further from that heart attack, the percentage of people that it would miss would go up; is that correct?**

MR. LARAMORE: Same objections.

A If you back up further?

**Q (By Mr. McDaniels) So now we are 48 hours before the actual heart attack, would our correct catch**

**rate drop?**

MR. LARAMORE: Can I just a have a running objection.

MR. MCDANIELS: Yeah.

MR. LARAMORE: These anonymous people, it's an improper hypothetical and calls for speculation.

A I'm presuming. I don't really know if it would go down or not.

**Q (By Mr. McDaniels) Okay. All right. Going to your report, if you would go to Page 2 for me. There are number of questions, three questions listed there; do you see those?**

A Yes.

**Q Who asked you to answer these questions?**

A Who asked me to answer them?

**Q Yes.**

A Well, I attempt to answer these questions in every case that I look at. I answered these questions in the case that I reviewed with Smith & Lewis. I think that part of reviewing a report is to determine if I do believe that something occurred and if so, then these are the questions that I attempt to answer.

**Q So Mr. Laramore didn't give you a list of questions and say these are the things that I need to answer?**

A He did not give me specific questions to answer.

**Q Okay. All right. What was the reason you left employment or stopped working at the Boone County Jail?**

A I was tired of working there. I was burnt out.

**Q Okay. What is this prior case review for Bennett versus Haus, what was involved in that case?**

A That's on my CV, right.

MR. LARAMORE: That's the one for Smith Lewis.

A Oh, Haus, you're asking me what that case was?

**Q (By Mr. McDaniels) Yes.**

A It was an inmate who had been -- who ended up having some spinal compression and had some neurological complications from it and Smith & Lewis wanted me to see if Dr. Haus had caused or contributed to cause any of those issues.

**Q Did you find that Dr. Haus had caused or contributed to cause those issue?**

A I did not feel he had.

**Q Okay. Have you ever been retained in a case or asked to review a case in which you determined that the party that had asked you to review the case was at fault?**

A That I felt that the case that I reviewed

that -- ask that again. I'm not sure I understand what you're saying.

**Q So in order to be retained you have to be contacted usually by an attorney, correct?**

A Yes.

**Q Have you ever found or come back to that attorney and said I can't give you the opinion that you're looking for in this case?**

A Well, I don't find -- I don't try -- the only way I can answer this that I try to be non-biased. If I don't think there is a case, I'm going to tell them that.

**Q Has that ever happened though?**

A Yes, with Gabe Harris.

**Q Okay. This one that you're reviewing for him?**

A Yes. The initial way that he looked at it, I told him there was no case there with what occurred at JCCC, but I did not have the records from Morgan County. So he had obtained those records and I felt there was some negligence that occurred there, but before that there was no case at all.

**Q So you're still going to provide expert services?**

A I'm still providing expert service for him.

**Q So you note in your report here that it is not all-inclusive and it's Page 4 at the top.**

A Yes. It's not intended to be construed as all inclusive. That's just gives me an out that if there is something I missed, something I didn't review, something that wasn't put in the report, or that I can't remember every single word or document, that's just what that is implying.

**Q And you have been designated in this case though to provide opinions consistent with your report. That being said, to the extent there are opinions that you don't believe are fully encompassed in your report, I'm going to ask you as we go through this today to give me those opinions today as well, okay?**

A Yes.

**Q Because this is my one chance prior to a trial in this case to learn what it is you believe you're going to testify to in this case, okay?**

A I understand.

**Q You have 19 depositions here and I think you list plaintiffs as No. 13, is that Cassandra and Bruce Cox?**

A Yes.

**Q You understand Bruce Cox is not an actual plaintiff in this case, correct?**

A Correct.

**Q But you did review his deposition?**

A Yes.

Q So you have actually reviewed 20 depositions in this case; is that correct?
A Yes.
Q Did you read all of those?
A Some of them I skimmed except for the officers, I read those through pretty closely. The plaintiff's depositions, I skimmed through.
Q Okay. Now, we were talking about officer Wisswell, he arrested Cassandra Cox at 4:37 a.m.; is that your understanding?
A Yes.
Q And he took her to Fulton Medical Center at 5:07, so 30 minutes later; is that correct?
A Yes.
Q And you say at approximately 8:00 a.m. she was taken to the Callaway County Jail; is that correct?
A Yes.
Q So three and half hours later; is that correct?
A Yes.
Q And during that time is it your understanding that she was solely in the custody of the Fulton Police Department?
A Yes.
Q And they would have had the opportunity to

interact with her and review her state at that point in time; is that correct?

A Yes.

Q And they actually had her at the Fulton Medical Center for a period of time, too?

A Yes.

Q And a Drug Recognition Expert, according to your report, visited with her for a time at 5:41 a.m., correct?

A Yes.

Q Have you ever been part of a drug recognition review?

A No.

Q Did you look at the Drug Recognition Expert's report in this case?

A Yes.

Q It looks like he had to go through quite a bit of detail in observing her; is that correct?

A Yes.

Q Would you agree with me that during that time where Fulton PD had custody of her and was reviewing her, they would have had a good opportunity to review her symptoms and discuss with her her cognition and those sorts of things?

A Yes.

**Q And that's part of what he is doing as part of that drug recognition evaluation, is it not?**

A Yes.

**Q And at least from what we have here, it appears that they either decided she didn't need or decided not to have her do a fit for confinement before taking her to the Callaway County Jail?**

MR. LARAMORE: I will just object. I think that -- I'm sorry, calls for speculation. Subject to that you can answer, Doctor, to the best of your ability.

A Repeat the question, please.

**Q (By Mr. McDaniels) So let me ask this, they did not get a fit for confinement for her before bringing her to the Callaway County Jail?**

MR. LARAMORE: Same objection.

A No, they didn't.

**Q (By Mr. McDaniels) You don't see anywhere in the record that they had her --**

A Fulton County Police Department did not do a fit for confinement or have her obtain one.

**Q Based on your review of this case, do you believe that they should have got a fit for confinement before they brought her to the Callaway County Jail?**

MR. MCDANIELS: I'm just going to object. That's beyond the scope of what you've been designated to

testify to here today. He is not designated as an expert witness in relation to the Fulton Police Department. I think it also calls for speculation. Subject to that, Doctor, you can answer is question.

A I emphatically believe they should have.

**Q (By Mr. McDaniels) And what is it at the point that Fulton Police Department had custody of Cassandra Cox that led you to the belief that they should have taken her to a fit for confinement? You can have the same objections.**

MR. LARAMORE: Same objections. Running objection

A Based upon the initial report that the patient was in a car that was still running with the tires over the curb and she is unconscious and is then found to be positive for methamphetamine.

**Q (By Mr. McDaniels) Did they know she was positive for methamphetamine at the point they had custody of her?**

A No, but I don't think that matters.

**Q So you say she was positive for methamphetamine as part of your reasoning why she needed to go for a fit, but they didn't know that at that time?**

A Correct.

**Q So the fact that she was in a car that was**

**still running and unconscious and they suspected drugs, is that sufficient to take her for a fit for confinement?**

A Yes. I feel anyone who is unconscious should have a medical evaluation.

**Q Can you tell me, have you ever done a fit for confinement examination?**

A A lot of them.

**Q How many have you done in your career?**

A Hundreds.

**Q What is the standard of care for a fit for confinement?**

A There is no standard of care.

**Q There is not?**

A No.

**Q The standard of care would be any standard of care, I presume, that would be done by a competent physician usually in an emergency room.**

**Q Well, if a person is brought in for a fit for confinement examination, what test are going to be run?**

A It depends on the patient.

**Q Okay.**

A It may just be a physical examination, but you're definitely going to have vitals done and you're going to have a physical examination done by a physician. If he feels that more needs to be done, he may do

diagnostic studies, x-ray, EKG and he might do blood work and urine. He might do a toxicology screen.

**Q So are you able to tell me if the Fulton Police Department had taken Cassandra Cox for a fit for confinement prior to her entry into the Callaway County Jail, would her cardiac arrest two days later on Sunday have been avoided?**

MR. LARAMORE: Same objection. Calls for speculation and beyond the scope of his designation today, but, Doctor, feel free to answer the question.

A It certainly would not have hurt.

**Q (By Mr. McDaniels) But can you tell me to a reasonable degree of medical certainty that if she got a fit for confinement before she entered the Callaway County Jail, at least according to your report at 8:00 on Friday morning, correct?**

A Yes.

**Q If she had gotten a fit for confinement between 4:30 and 8:00 a.m. on February 26, 2016?**

A Yes.

**Q Would her heart attack, I'm going to use the term heart attack.**

A But you're making a presumption that her heart attack occurred -- that's not why her heart attack occurred.

**Q Well, we'll get to that. I'm asking you a question though.**

A Would it have prevented the heart attack, possibly.

**Q How?**

A Because if they would have noticed that she had any electrolyte abnormalities, if she was tachycardiac. If they confirmed that she was intoxicated on methamphetamine, they would have observed her in the emergency room, hydrated her, possibly gave her appropriate nutrition and increased her low fluid replacement and it definitely probably would have helped to prevent the incident.

**Q Can you tell me though to a reasonable degree of medical certainty that if she had gone for a fit for confinement before 8:00 a.m. on February 26, 2016, her cardiac event on Sunday, the 28th, would not have happened?**

A I cannot tell you with a reasonable degree of medical certainty because that's called a guarantee and in medicine there are no guarantees.

**Q So that's what you believe to a reasonable degree of medical certainty is, is a guarantee?**

A That's my opinion of reasonable certainty. You're asking me in my opinion can I guarantee that it would have prevented her heart attack.

**Q You have restated it. I've asked you -- you've told me that and you've expressed your opinions in your report to a reasonable degree of medical certainty.**

A Yes.

**Q And to you that apparently means a guarantee; is that correct?**

A I'm not saying that I get -- a guarantee means that you know 100 percent about everything.

**Q I'm not asking you for a guarantee. What I'm asking you is you have written in your report that your opinions are to a reasonable degree of medical -- ?**

A You're making snapshots of things.

**Q And I have to. We are going to have to go through this piece-by-piece because you have specific policy violations here that you claim.**

A But you're not asking you about those.

**Q I will be. We are going to work through it. I'm getting there. But I guess we need to define a term because you say that your opinions in your report are given to a reasonable degree of medical certainty; did you say that in here?**

A Yes.

**Q What does that mean to you?**

A To me it means that based upon the information and such that I have and what I have reviewed that I make a

decision.

**Q Okay.**

A And now you're asking me an opinion about something for which I don't have the information or the lab work and you're asking me to give you a certain medical certainty upon that and I don't have that.

**Q That's my point though, because --**

A She was not evaluated, so it's a moot point.

**Q It's not a moot point.**

A Absolutely it is. In my opinion, it is.

**Q Your testimony is going to be as to causation of the event on Sunday, I assume.**

A But we don't have that information.

**Q Correct.**

A I can only make a decision with a reasonable degree of medical certainty when I have that information and I don't have that information.

**Q So at any point from February 26 when she gets her drug evaluation until February 28 when she has her heart attack, she doesn't go get any medical testing during that time; is that correct?**

A Yes. If she had had someone intervene somewhere along the line, it certainly would have helped.

**Q Is that correct she did not have medical treatment from 2/26 to 2/28 at the time of her heart**

**attack?**

A Yes.

**Q So are you going to be able to tell me at any point from the time she enters the Callaway County Jail to the time she has her heart attack to a medical certainty that if she had been taken for a fit for confinement, her heart attack would not have happened?**

A Yes.

**Q You will?**

A Yes, because she didn't have coronary artery disease.

MR. LARAMORE: I think we are talking over one another here. I'm sorry, I'm a little confused here.

A There is no blockage in her heart. She has stress cardiomyopathy which is brought on by her ventricular fibrillation, which is due to metabolic acidosis and poor nutrition and dehydration.

**Q (By Mr. McDaniels) Is that your diagnosis or is that somewhere in the medical records?**

A That's based in the record.

**Q Which record?**

A From the University of Missouri.

**Q Do you have a specific page that it says the acidosis?**

A Of course I can't tell you a specific page.

**Q Well, you do cite the pages on certain things in your report and not on others.**

A Okay.

**Q So was that during her initial treatment or was it weeks later? When did they make that diagnosis?**

A No, when she went to the emergency room she had metabolic acidosis.

**Q And would that metabolic acidosis have been caught if she had been taken to the hospital?**

A If they had taken her to the hospital and had a fit for confinement before booking her into jail, they would have noticed that.

**Q So you can tell me that if they had taken her on February 26, 2016, Friday morning, before booking her into the jail, she would have avoided the heart attack?**

A You're wanting me to give you an absolute yes or no, yes.

**Q Okay. So you believe that if she had been taken for a fit for confinement on Friday morning, first thing 8:00 a.m. as soon as she comes to the jail and they say, nope, you have to take her for a fit for confinement, that examination alone would have caught what ultimately causes her heart attack later?**

A It would help prevent it, yes.

**Q To a reasonable degree of medical certainty**

**would she have had the heart attack on Sunday?**

A Yes.

**Q She would have still had the heart attack?**

A No. You asked me would it have prevented it, yes.

**Q And then I asked a second question and you just kept saying yes, so.**

A Your questions are still going on and on and you're asking me in circles.

**Q I'm sorry you don't care for my questions, but I do have to get to the bottom of your opinion. We have to have a causation between the policy violation that you're claiming --**

A Those are two separate incidents. Just, you know, someone -- you're trying to place the blame all on one thing and you can't. It's a systematic failure.

**Q Okay. But there are only --**

A It's not an event. Having a heart attack is not an event, it's a process. Getting high blood pressure is not an event, it's a process.

**Q Okay. And but I asked before that there a times where a person with a heart attack, it happens without having symptoms beforehand, correct?**

A Yes, but I don't sew see how that relates.

**Q And --**

A It certainly wouldn't have related in her case.

**Q Okay. We'll get into that. I'm trying to get there, you just have to listen to my questions and answer my questions.**

A I'm trying to be patient, but I'm losing it. I'm losing my patience with the questioning, but go on, because I don't see where they are going.

MR. MCDANIELS: We have been here an hour and a half, do you want to take a break?

MR. LARAMORE: Let's take a restroom break.

(A recess was taken.)

**Q (By Mr. McDaniels) So when with left off, I think what we had established is that it was your belief and opinion in this case that if upon at the time that Cassandra Cox was presented to the jail by Fulton Police Department, if the -- I said Fulton Jail, Callaway County Jail, you understand what I'm talking about?**

A Yes.

**Q If the jailor said no, she needs to go for a fit for confinement, that fit for confinement, would have caught symptoms that could have prevented her heart attack on Sunday?**

A Yes.

**Q Is that correct?**

A Yes.
**Q And that opinion you're offering is to a reasonable degree of medical certainty?**
A Yes.
**Q And you have testified in this case a few times and I want to get to that now, the mechanisms of her heart attack, correct?**
A Yes.
**Q You understand that, obviously?**
A Yes.
**Q And we have talked about there a different types of heart attacks, right?**
A Yes.
**Q Can you explain to me what happened in her heart attack?**
A In her specifically?
**Q Yes,**
A You want me to tell you what I believe led up to it?
**Q No, I want to know about the heart attack and then I want to back up to symptoms if that's okay.**
A Well, first of all to take the big picture, her heart attack was called a stress cardiomyopathy.
**Q Okay.**
A So her heart attack, her heart attack occurred

because she went into an irregular rhythm.

**Q Okay.**

A And that was called ventricular fibrillation. According to the EMS report she had some PEA as well.

**Q Can I stop you right there? PEA, can you define that term?**

A Pulseless electrical activity.

**Q What does that tell you?**

A That means that somebody may appear to have a pulse on the heart monitor, but the heart muscle is not contracting enough to circulate blood.

**Q Okay.**

A So, for example, anyone who takes the person's pulse might feel a heartbeat or feel one now and then, but it's not enough to circulate blood.

**Q So it's an incredibly weak pulse, if anything?**

A Yes.

**Q And we talked a little bit about different types of heart attacks and we said there could be a irregular heartbeat that causes one. Are all heart attacks a complete seizing of the heart muscle to where it stops?**

A No.

**Q So with that understanding, did Cassandra Cox's heart completely stop during her heart attack?**

A No.

**Q There was this PEA or was there some other rhythm her heart at that point in time?**
A She had the bottom part of her heart, her ventricles, were just fluttering or what we call fibrillation.
**Q Okay.**
A Because it's in the ventricles, we call it it ventricle fibrillation.
**Q So what's the top of the heart?**
A The atria.
**Q And bottom of the heart?**
A The ventricles.
**Q So the ventricles were still working or fluttering?**
A Yes.
**Q But the atria was not doing anything?**
A Correct. Most of the time the atria is not doing much of anything.
**Q From the point of her heart attack until she regained a pulse or an actual pulse --**
A Yes.
**Q -- blood would not have been pumping correctly through her body, correct?**
A Yes, it would not have been circulating.
**Q What is your opinion as to the cause of that**

**heart attack?**

A My opinion is the cause of her heart attack were multiple contributory factors. I feel that prior to the incident on Friday -- and this is just my speculation -- is that she could have been using some methamphetamine for a few days to the point that on, you know, not having proper nutrition and so on to the point that on Friday, she used enough that it made her unconscious. Then when she was presented to the jail, she was intoxicated. She was becoming what we call metabolic acidotic. It's when the PH of the blood is starting to change, so when someone is getting sicker.

**Q Okay.**

A And then for a period of time, two days, she continued to have poor hydration and nutrition, so this continues to affect her metabolism and the nutrients which supply the heart. She was under additional stress because of her anxiety and depression and the methamphetamine, that stress causes an increase in cortisol and adrenaline and those place additional stresses on the heart. As the heart continued to have that additional stress, it eventually was overwhelmed and it started not beating well and she went into ventricular fibrillation and sopped breathing.

**Q Can a person with this line of symptoms appear outwardly to be okay?**

A No.

**Q No?**

A No.

**Q Would it be obvious to someone looking at them?**

A Someone trained, yes.

**Q Someone trained?**

A Yes.

**Q Medically trained?**

A Yes.

**Q So someone medically trained would be able to pick up on this?**

A Yes.

**Q To the layperson, and I will call myself a layperson.**

A But can I interrupt there. I know some lay people that are really good. I don't think you have to have a license for everything. I have some nurses that are far brighter than doctors are.

**Q Sure. Absolutely.**

A But, yes. To answer your question, proper training is necessary or proper exposure.

**Q Would there be something -- and maybe you can't answer this, because like you said lay people differ and if you can't answer it, that's fine. But if we pick a**

**member of our jury, a random member, would that random member of the jury, what would they see that might be a sign to them that this person is in distress? And let me specify, from the time she came into the jail until 30 minutes before her heart attack?**

A Some anxiety.

**Q Okay.**

A Some panic, some agitation, possible shortness of breath.

**Q Possible?**

A Yes.

**Q Okay.**

A Some sweating, tremors.

**Q Are the sweating and tremors also possible or are they going to happen?**

A In her case, she would have definitely had some sweating and tremors. Then feelings that the patient expresses feelings -- what we call feelings of doom.

**Q Okay.**

A Like you feel like something bad is going to happen and they might even say, "I'm going to die" or "I feel like I'm going to die."

**Q Anything else?**

A You know, lack of appetite, depression, those types of things.

Q Now, would you agree with me that prior to her admission to the Callaway County Jail, Cassandra Cox had issues with depression?

A Yes.

Q Would you agree with me that methamphetamine usage can cause a lack of appetite?

A Yes.

Q In and of itself, right? Without a related heart issue?

A I agree.

Q Did she have issues with anxiety pre-dating?

A Yes.

Q Can anxiety and panic appear to be the same or somewhat the same?

A Yes.

Q Those symptoms mimic each other, don't they?

A Yes, they can.

Q Have you done intakes at a jail or prison facility?

A Yes, at the county jail.

Q Is it in your experience, is it normal for folks that have just been arrested or brought to a jail to be anxious?

A Yes.

Q Depressed?

A Yes. Many complain of some depression, yes.

**Q Feelings of doom? Not that they are going to die, but they are pretty upset, right?**

A They are upset, yes.

**Q In that first day or so regardless of drug usage, is it normal for them to have a lack of appetite?**

A No.

**Q If you're incredibly stressed or worried or anxious, it is it normal to skip a meal at that point in time?**

A No, not necessarily. Some people who are anxious eat more.

MR. LARAMORE: Hi.

MR. MCDANIELS: Really. Just off the record for a second.

(A recess was taken.)

**Q (By Mr. McDaniels) All right. So some of the symptoms that you have listed here that a -- what we'll call a layperson, just an average person, might notice that would be associated with what Cassandra Cox would have exhibited prior to her heart attack might also be symptoms that you would see in a regular person who has just been arrested and brought into jail?**

A Yes, they are what we call nonspecific.

**Q They are nonspecific?**

A Yes.
**Q They don't point to a specific outcome?**
A A specific issue, yes.
**Q And you would agree with me that as a medical director of Boone County, if someone was anxious, panicky, or agitated, or a combination of those, and maybe even had feelings of depression, that wouldn't necessarily be a reason to send them to the hospital?**
A Correct.
**Q All right. Would that be a reason that they would have to see the nurse?**
A No.
**Q Okay. The shortness of breath problem?**
A Yes.
**Q Sweating, maybe?**
A Not necessarily.
**Q Right. Tremors, I would think you would want to see a nurse if you had tremors?**
A Yes.
**Q Is there any document in what we have here that shows Cassandra Cox had sweating or tremors on the 27th or the morning of 28th?**
A No.
**Q I understand that you are saying that you would expect those; did she -- while I do agree that she**

**said she wanted to die at some point, did she express, other than that, any statements or feelings of doom or that she was going to die?**

A Not that we have recorded, no.

**Q Does "I want to die" qualify as one of those feelings of doom or is it a feeling that it's going to happen?**

A I'm not sure I understand.

**Q Yes. And I'm trying to understand what you're saying here. You said something about a feeling of doom that she might have had, correct?**

A Yes.

**Q And I think that was a possibility, not a guarantee that that happened.**

A Let me add -- this might help some. For example, when I've had people come to the emergency room and they are having a heart attack, and then they have -- their heart has gone into ventricular fibrillation, they feel like they are going to die. In fact they have said -- looked at me and said, "Doctor, please don't let me die" and then they have gone unconscious. So they just feel this sense that something bad has happened.

**Q I guess I was trying to figure out is it different -- there is suicidal ideations saying "I want to die", and then "I'm going to die" and those are two**

**different things?**

A Correct. Those are two different things, I agree.

**Q So would what she said on Friday, as it's noted in the record that "I want to die," would that be a feeling of doom that you would associate with this condition?**

A I don't think so. I don't think that was her sense in that particular situation.

**Q Right. Okay. So is it the lack of nutrition combined with the meth usage that you believe ultimately leads us to the heart attack -- and I may be oversimplifying it, if I am please let me know.**

A That is my opinion. My opinion is that she was already on a reserve when she arrived.

**Q Explain that.**

A Meaning that she was already malnourished. She uses methamphetamine, so she is not going to have proper nutrition and such anyway. So she is -- by the time she arrives at the jail and then continues to not have proper hydration and nutrition, that just continues to get worse.

**Q So is it the skipping meals, the lunch, and the dinner on Friday, that set in course the heart attack on Sunday?**

A I think, yes, that was part of it. But I think part of it as well was that she wasn't getting proper hydration.

**Q What do you have that indicates -- what led you to that conclusion?**

A Some of it is her electrolyte issues and one of the main ones is her CO2 or carbon dioxide. CO2 is a product of kidneys in trying to normalize -- the kidneys and lungs work together to help normalize the pH of the blood.

**Q Let me ask you this: Would she have had a heart attack on Sunday the 28th of February 2016, if she had not that taken methamphetamine either on Thursday or Friday whenever she took it prior to coming to the Callaway County Jail?**

A That's a good question. I can't say for sure, but I can say it would have been less likely just because I think then she would have wanted more to eat and to drink.

**Q Okay.**

A Because part of the comedown from meth is having poor appetite.

**Q And she says in her deposition that her experience with meth was that she usually high for about four hours and then she would get sleepy and hungry.**

A Okay.

**Q Do people experience the come down differently?**

A Yes, but I think in her case when she is able to do that, she had exposure to marijuana so she was self-treating herself for withdraw and of course marijuana is going to make you hungry.

**Q So you believe as she was coming down she used marijuana on the come down?**

A To help with her symptoms, her anxiety and her stress, and then that would help control her symptoms and then she would also improve her appetite.

**Q Is it your opinion and maybe you can't answer this either, that if she had not been arrested on the morning of February 28th of 2016 that she would not have had the heart attack on Sunday?**

A I think that's -- of course, I think it be presumptuous for me to say whether or not that would or would not have occurred, but I think it might have been less likely if she would have been able to self-treat. I think part of the come down or withdraw at home, she is able to self-treat. If she would have had treatment at the hospital prior and then of course now she is incarcerated and she can't treat.

**Q So if somehow she had marijuana at the jail --**

A Or something to help.

**Q That would have made a difference?**

A Something would have helped definitely. And I think she needed a lot of IV fluid and hydration.

**Q Handing her water alone wasn't enough?**

A No, she wouldn't have been able to properly orally hydrate.

**Q Did the jailors in your review of the records on February 26 of 2016, did they know what Officer Wisswell had encountered that morning?**

A Wisswell?

**Q So Officer Wisswell made the arrest. He is with Fulton Police Department.**

A Uh-huh.

**Q Is that a yes?**

A Yes.

**Q Did the jailors that received Cassandra Cox from the Fulton Police Department, did they know what Officer Wisswell had encountered with Cassandra Cox that morning?**

A The intake correctional officer according to Wisswell's report, he said that he had told them.

**Q He said DWI drugs?**

A Drugs and I believe -- I can't recall for sure without looking at it -- but I believe they were told that she was positive for meth.

**Q If my review of that deposition suggests otherwise, do you know one way or the other?**

A Yes, I can't remember.

**Q Because you note here that in your record -- and I'm looking at Page 6 on the bottom paragraph --**

A Page 6?

**Q Yeah. "Cassandra Cox was received by CCJ" and that's Callaway County Jail, right?**

A Yes.

**Q "By Sergeant Skylar Kenny, who was made aware that Ms. Cox had been arrested for DWI secondary to methamphetamine and marijuana." Is that correct?**

A Yes.

**Q At that point did they know for sure that she had been arrested for methamphetamine and marijuana by the Fulton Police Department?**

A I can't recall.

**Q And you say it was normal procedure to inform receiving officers if an arrestee was intoxicated; is that correct?**

A Yes.

**Q But Fulton PD on their intake form that they filled out checked a bunch of no's, did you see that?**

A Yeah. They also say that on seven, on that paragraph, I do state that, "According to the deposition,

Sergeant Kenny relayed information concerning Cassandra Cox to correctional officer Glen Ripsch who was aware that ms. Cox was under the influence of an illicit drug."

**Q Okay.**

A But being under that influence, they had to know that she was positive for meth.

**Q Did they need to know it was meth?**

A I don't think they need to know it was meth just to know that she was high on something.

**Q If she was high on marijuana though, would that have the same characteristics and concerns for you as a doctor if she was high on methamphetamine?**

A No.

**Q Or if she was --**

A Or heroin.

**Q I was going to go to heroin next and I was going to say high, but I don't think -- you don't get high on heroin, do you?**

A Well, yeah you can get high.

**Q They do call it high still? It's a downer, isn't it?**

A Heroin, yes. It's an opioid.

**Q I didn't know if they call it a high or a low or what you call it at that point time. But the actual drug itself, for your inquiry, for purposes of making this**

decision that she is going to have this heart attack two days later, what drug she was on is important to that decision, is it not?

A I think so. It's a stimulant.

Q And you would also agree with me that in the records that you reviewed, Plaintiff's Exhibit 2-1, and I'm specifically looking at Page 13. It's not what you have there. This is Exhibit 2-1 that you all produced. There is a highlighted section which I believe Mr. Laramore highlighted for you which asked if In the past 24 hours she had taken and ingested any illicit or prescription or non-prescription drug; you see that, correct?

A Yes.

Q And as far as we can tell, this was filled out by Officer Wisswell upon depositing Cassandra Cox at the Callaway County Jail; is that correct?

A Yes.

Q There is Skylar Kenny's receiving right? And there is Wisswell?

A Yes.

Q And Officer Wisswell checks "no" to all of these questions up here; is that correct?

A Yes.

Q And the only information on this document, with regard to her charges, is DWI drugs, right?

A Yes.
**Q It doesn't tell us what drug?**
A Yes, correct.
**Q And that she had possession of a controlled substance, correct?**
A Yes.
**Q From this document we don't know the mechanism of the arrest?**
A Correct.
**Q That she was unconscious in a car that morning, correct?**
A Right.
**Q And from this document we don't know or at least Officer Wisswell had told us he doesn't know if she has taken drugs in the last 24 hours?**
A According to that document, yes.
**Q Is that what it says?**
A Yes.
**Q We do know she was arrested for DWI drugs though, correct?**
A Yes.
**Q I believe it's your testimony that upon Cassandra Cox being presented to the jail, she should have been sent for a fit for confinement?**
A Yes, that is my testimony.

**Q Is part of that opinion the fact that she was on methamphetamine?**

A Yes. That's a part of it, yes.

**Q If the jail guards, officers, did not know she was on methamphetamine, they just knew she had been arrested for DWI drugs, does that change your opinion in any way?**

MR. LARAMORE: I will just object. I think that misstates the record. I understand we are looking at the document, but I think that misstates the record overall and the testimony, but Doctor, you can go ahead and answer to the best of your ability.

A I'm sorry, say that again.

**Q (By Mr. McDaniels) If the jailors did know that she was on methamphetamine, just that she had been arrested for DWI drugs when she was presented to the jail on February 26, 2016, does it change your opinion as to whether or not she should have been sent for a fit for confinement at that time?**

A Yes, that would make a difference.

**Q Okay. And do you believe that if they did not know that it would have been okay to admit her at that point in time into the jail?**

A Not entirely because part of my testimony is based upon the screening document done by the intake

officer.

Q And I don't want to parse too much here, but it's my understanding that there is a decision made outside basically -- for our purposes -- outside of the jail as they are presented, basically, and then the intake document is done once inside?

A Yes.

Q So I'm trying to get while we're still at that gatekeeper function. I think it's your opinion that at that moment, she should have been sent for a fit --

A Yes.

Q Fit for confinement, correct?

A Yes.

Q And I'm just trying to push on that a little bit.

A Okay.

Q If we didn't know, if the Callaway County Jail officers were not told that she had methamphetamine in her system at that point in time, does that change your opinion that she should have been sent for a fit for confinement?

MR. LARAMORE: I will just object. I think that misstates the record, so it calls for an improper hypothetical, but go ahead and answer.

A Based upon that question, yes.

Q (By Mr. McDaniels) It does change your

**opinion?**

A Yes.

**Q And is your opinion then that she would have been okay to be admitted under that set of circumstances?**

A She would have been okay to continue screening.

**Q Okay. So then we can bring her into the booking room basically?**

A Yes.

**Q Now you note that Officer Ripsch, Glen Ripsch, R-i-p-s-c-h, right? He did the screening?**

A Yes.

**Q And he filled out an intake form, did he not?**

A Yes.

**Q And in that intake form you note that he found signs of anxiety, shame, fear, and depression; is that correct?**

A Yes.

**Q Now, he has noted specifically what those signs of anxiety, shame, fear, and depression did he not on that form?**

A What's your question again?

**Q Let me show you the form and we'll -- I could be better organized.**

MR. LARAMORE: I think it's Exhibit 1-1. Want

me to pull it up on here?

MR. MCDANIELS: I prefer the paper.

**Q (By Mr. McDaniels) There it is right in front of me. So Glen Ripsch did the medical information form that I'm handing to you, which if you flip to the last page is marked Exhibit 1-1 to your report up in the top left-hand corner underneath the paperclip; is that correct?**

A Yes.

**Q Okay. And on that, that's where you're getting this Officer Ripsch observed that Ms. Cox was showing abnormal signs anxiety, shame, fear and depression; is that where that comes from?**

A Yes.

**Q And he specifically notes what he saw; is that correct?**

A Yes. He is just marking on here what he saw.

**Q What does he write though just below anxiety, shame, fear, and depression?**

A He doesn't write anything. Just on the form, I don't see handwriting.

**Q He's asked to describe, is he not?**

A Okay.

**Q And he writes, "Head on counter, not being cooperative with questioning." Do you see that?**

A Yes.

Q **And so if those are the signs --**

A He typed it in.

Q **Right. I said write but you understand what I'm saying. If those are the signs of anxiety, shame, fear, and depression that he noted?**

A Yes, okay.

Q **And that's what got him to check "yes" here.**

A Okay.

Q **And there may been more, I don't know, but this is what he's got on the form, correct?**

A Okay.

Q **Are those specific, you know, head on counter, not being cooperative with questions; are those atypical in your experience for a soon-to-be inmate of a jail?**

A I wouldn't say typical for a soon-to-be inmate.

Q **For a person arrested and brought to jail?**

A This is typical for a soon-to-be inmate, but it's atypical for these questions up here.

Q **But you specifically hit on signs of anxiety, shame, fear, and depression in your report?**

A Yes.

Q **And the signs of anxiety, shame, fear and depression were head on counter and not being cooperative with the questionnaire?**

A And I don't think that those correlate.

**Q Oh, you don't?**

A No.

**Q Did you review his deposition with regard to that?**

A Because these are nonspecific symptoms.

**Q Did you review his deposition?**

A I know he believes that, but he doesn't have appropriate training to determine.

**Q I agree.**

A He is just putting what he sees.

**Q Right.**

A But then these symptoms, shame and fear -- anxiety, shame, and fear can come from multiple issues.

**Q Okay. But he is the one who also decided that she had signs of anxiety, shame, and fear?**

A Yes.

**Q And that's how we get the "yes" here?**

A Yes.

**Q And so he checks "yes" because she has her head on the counter and not being cooperative with questions?**

A Yes.

**Q And those are normal things for an arrestee, aren't they?**

A They are upset, yes.

**Q Right.**

A They don't want to be arrested.

**Q It's not abnormal for that to happen?**

A I agree.

**Q Even people that are not on drugs?**

A Yes.

**Q Right?**

A Well, I presume so.

**Q Well, presumably you have seen people that have come into the jail that have been arrested that were not on drugs?**

A I imagine that there are some people that come into the jail who really don't care and they are not interested at all and know they have a great attorney and they are going to be bailed out soon.

**Q I don't mean to suggest all, but I'm saying it is possible, regardless of being on drugs, to be upset about your circumstances?**

A I would presume that the majority of individuals have some of those symptoms.

**Q Great. Now, Ms. Cox with regard to her jail record, you note that she refused meals on 2/26 of 2016; is that correct?**

A So are you talking about Page 7?

**Q I am, Paragraph 3. Do we have any meal refusals for 2/27, the next day?**

A I don't see any.

**Q Okay. And I don't believe there are any in the record. She did also refuse a meal on 2/28, correct?**

A Yes.

**Q The breakfast that morning, correct?**

A Yes. My question would be, though, how much she really ate on 2/27 or consumed because there is no documentation of that.

**Q And there is no order in this case that you're aware allowing the Callaway County Jail to force feed Ms. Cox?**

A Correct.

**Q The next paragraph, I believe, goes in somewhat of what happened as part of her heart attack. I'm just going to leave it open to you, can you just explain the terminology and wording you use in that paragraph?**

MR. LARAMORE: I'm sorry, which paragraph?

MR. MCDANIELS: I'm on Paragraph 4 -- it's the third full paragraph I should say.

A So I'll just read it and then I'll explain the words. So approximately 7:30 in the morning a.m. Ms. Cox became unresponsive, which means she wasn't awake and alert, in her cell and was found by EMS, Emergency Medical

Services, to have agonal breathing. Agonal is a term for someone who essentially is not breathing and is not taking in oxygen. To be an atrail fibrillation, which is an irregular heartbeat. It's fibrillation of the atria -- actually that is a typo. It says atrial fibrillation, it was ventricular fibrillation.

**Q So it is what we talked about before?**

A Correct, yes.

**Q Is atrial fibrillation a possibility?**

A Atrial -- people live every day with persistent atrial fibrillation.

**Q Ventricle fibrillation is what she had?**

A Ventricle fibrillation is what she had, yeah. So that's the type. Her systolic blood pressure was 80 millimeters of mercury, so that's the top number.

**Q And can I stop you there for just a second, what does that tell you?**

A That tells me she was hypotensive and not circulating blood. Her blood pressure was too low.

**Q Tell me what hypotensive means?**

A Hypotensive means the blood pressure is low enough that it's either not circulating appropriately or -- and when it's low, someone will pass out

**Q Okay. Didn't mean to interrupt you.**

A You can have low blood pressure from a whole

host of things such as dehydration, could be medication induced and so forth. She received lifesaving measures, meaning that she was evaluated by EMS, she was placed on a monitor, she obtained shock, she obtained medication, chest compressions and they intubated her, which is putting a tube down her throat and gave her oxygen. She was transported to Fulton Medical Center for further care.

**Q Fulton Medical Center they found her positive for methamphetamine your report says, correct?**

A Yes.

**Q That note is from February 28, 2016, so that is Sunday, correct?**

A Correct.

**Q And we believe she last ingested methamphetamine either Friday --**

A At least Friday.

**Q And maybe Thursday, we don't know, right?**

A Correct.

**Q We don't know when she passed out that day, correct?**

A Correct.

**Q And can you -- I think I have asked you this question, but I want to make sure, from that she still has methamphetamine in her system on February 28 or the findings there, can you back up and tell me how much**

methamphetamine she would have had to have taken at that point?

A No, I can't.

Q No opinion to be offered there?

A No.

Q And then you go through her care from then on, correct?

A Correct.

Q I believe Page 8 begins your opinions in this case; is that correct?

A Correct.

Q And I want to go through those and I want to ask you some specific questions with regard to each one.

A Okay.

Q You suggest that the Callaway County Sheriff Office policies were adequate in this case; is that correct?

A Correct, I believe so.

Q And you say that each of the violations of those policies resulted in delayed care of Ms. Cox, I should say?

A Yes.

Q I'm going to go through each one of those in a very systematic fashion, so I'm going to ask a number of questions on each one. First policy that you note is 2.045

and 12.05, correct?

A Yes.

**Q And you say that this policy requires that that a correctional officer who encounters an inmate who is acting bizarre due to drugs, to contact the EMS, correct?**

A Yes.

**Q So there is a few determinations that have to be made there, correct?**

A Yes.

**Q A: The policy doesn't define bizarre behavior, does it?**

A No.

**Q I don't believe it does either.**

A Okay.

**Q Is bizarre behavior a medical term?**

A No.

**Q And so a correction officer reading that policy and interpreting it and applying it has to use some sort of decision making on their part to determine what is bizarre behavior?**

A I would agree.

**Q Then they have to determine that bizarre behavior is caused by drugs in order for this policy to apply due to drugs.**

A I disagree with that. I don't think it has to

be necessary. Although I know that says "acting bizarre due to drugs," but I think bizarre in itself, depending on whether the person is being psychotic or something else, you know, that's where the -- again, bizarre is a general term.

**Q Right.**

A Which can apply to a lot of different things.

**Q Not trying to argue with you here, but we're talking about a very specific policy. I think it's your opinion that they violated this policy?**

A Yes, I agree.

**Q That's part of your criticisms of them.**

A Okay.

**Q Just looking at that policy, you would agree with me that it has to be bizarre behavior due to drugs?**

A Okay.

**Q Is that correct?**

A Correct.

**Q Okay. So first the correction's officer has to determine what bizarre behavior is and make a decision along those lines?**

A Yes.

**Q And then they have to connect that bizarre behavior to drug intoxication; is that correct?**

A Yes.

**Q So there is a couple decisions that have to be made in the process there, correct?**

A Yes.

**Q And is there guidance in that policy of how a correction's officer is to determine what is bizarre behavior?**

A No, they do not have guidance or proper training on it.

**Q And is there guidance for them to determine whether or not that bizarre behavior is due to drugs?**

A No, they would have to know that she is on methamphetamine or some other --

**Q Or some other drug, right?**

A Yes.

**Q And so each of those requirements, a decision on the part of the individual correction's officer to determine whether or not this policy applies in whatever they are presented; is that correct?**

A Yes.

**Q And it's not enough to know that there is bizarre behavior and that the person is on drugs, they have to tie those together?**

A Yes.

**Q And because a person could be on drugs and not act bizarrely at all?**

A Yes.
Q And a person could be act bizarrely and not be on drugs?
A Yes.
Q And a person could potentially act bizarrely while on drugs, but it not be caused by the drugs?
A Yes.
Q And so you note that CO Ripsch testified at least at one point that he thought her behavior was bizarre?
A Yes.
Q And it's your belief that he knew she was under the influence of methamphetamine or another similar drug?
A Yes.
Q And now is there any testimony in this case where a correction's officer specifically says that they believe her bizarre behavior was due to her intoxication on drugs?
A I don't recall reading it.
Q Okay. Now, if they had made that connection, it's your belief that the policy required them to take her to the emergency room; is that correct?
A Yes.
Q When -- so I think you've timed that on 2/26

of '16; is that correct?

A Yes.

Q So that's Friday?

A Yes.

Q And I'm assuming that's during that intake process that Glen Ripsch is doing with her; is that correct?

A Yes.

Q So at that time, if they had taken her to the emergency room, would it have been again for a fit for confinement?

A Yes.

Q Okay. Would that examination have shown to a doctor, to a reasonable degree of medical certainty, symptoms or signs that she would have a heart attack two days later?

A No. Like I said, I think the definition is in the type of heart attack that she had.

Q I understand that and I need to ferret that out a little bit, but I think what you told me is that at this point that nutritional deficiency -- and I don't want to put words in your mouth, so correct me if I'm wrong -- but later lack of meals is what helps to cause the heart attack on 2/28?

A Yes.

**Q So what I'm trying to get at is these fits. If she's sent for a fit for confinement upon entry or at the time of this initial review, right, at either of those points, she hadn't those additional lost nutrients and additional time for the day that ultimately, you say, causes her heart attack on Sunday, right?**

A Yes.

**Q So we wouldn't have had the full picture even if she went for a fit for confinement and they didn't find everything?**

A Correct.

**Q And if they sent her for a fit for confinement, do think they would have had evidence to tell the doctor -- the doctor or nurse, whoever does these -- would have evidence that she was going to have a cardiac event in two days?**

A They would have evidence that she was sick.

**Q Sick.**

A But at that point in time because she had a stress heart attack it wasn't from coronary artery disease. So I think what they would have seen during that fit is that she was sick enough to either receive further treatment in the emergency room or get admitted to the hospital for observation.

**Q What symptoms would she had at that point that**

**would cause them to provide additional treatment or admit her or keep her at the hospital?**

A It would have been her mental status. I'm pretty sure she probably would have been tachycardic.

**Q How do you determine tachycardic?**

A If it's over 100 beats per minute, her heart rate.

**Q Is that just a stethoscope?**

A That and they would have had her on a monitor in the emergency room and they would have done an EKG. They would have done blood work and the blood work would have helped them determine that based upon her blood work that she was sick enough to either have a period of ER observation for treatment, or if that was going to take longer than what they could do in the emergency room they would admit her to the hospital.

**Q So either of those two spots, you think that's basically what they would have come up with?**

A Yes, I do because that's what I would have done.

**Q So that's what you would have done?**

A Yes.

**Q Her mental status would have been -- I mean, tell me during that initial blood draw that was done with Fulton PD, that mental status issue, would that have been**

**apparent to a nurse or do you know?**

A I think that it would have been.

**Q Should that nurse have inquired further about her at that point in time about Cassandra Cox?**

MR. LARAMORE: Objection. Improper hypothetical. Again, it's beyond the scope of what he's been designated to testify about here today. Doctor, subject to that, you can go ahead and answer that to the best of your ability.

A My personal opinion as far as how people should be taken care of, yes, I think a nurse should. Do they all do that, probably not.

**Q (By Mr. McDaniels) But just in caring for people?**

A Yes. In terms of properly caring for people, they should.

**Q When drawing blood are you able -- I know you haven't done it, but if you're just doing a blood draw, would there be outward signs at that point in time that a person is tachycardic?**

MR. LARAMORE: Same objection. I think it calls for speculation and improper hypothetical. Subject to that, you can go ahead and answer.

A It can if they are short of breath or breathing rapidly.

**Q And that is -- shortness of breath or rapid breathing would go hand-in-hand with tachycardia?**

A Yes.

**Q And generally do you see those two symptoms side-by-side?**

A Yes, the majority of the time.

**Q What is your opinion of outward symptoms that -- if you have any -- that Glen Ripsch saw or should have saw in Cassandra Cox based on her medical record that you're aware of at this point in time at the point that he was doing the intake?**

A My opinion at that intake?

**Q Yes.**

A So my opinion at the intake isn't that -- I do have of course some concerns about how the questionnaire itself is worded, but my opinion at the intake is based upon her being booked as a DWI, having been unconscious, and then regardless of whether she had nonspecific symptoms of anxiety and such, I believe that Glen should have asked her to be sent back to the hospital for a fit for confinement.

**Q And you believe that would have ultimately resolved the future issues here?**

A I think his thoroughness and his attention to the questionnaire has some minor issues. I don't think

those are the major issues. I think some of it is attention and some of it is how the questionnaire is worded. But I think the major issue in most intakes is just having a healthy degree of suspicion. If he would have had a healthy degree of suspicion, then he would have sent her back to the hospital for a fit for confinement and refused to book her in until then.

**Q Okay. Do you like the term fit for confinement?**

A No, I do not.

**Q Why not?**

A Because I think it is a general term that makes a lot of assumptions. No. 1, fit what does that mean?

**Q Right.**

A I'm not a fan of confinement. It's a general term that doesn't really mean much and then it presumes that when someone has a fit for confinement, that is a warranty or a guarantee for that individual to not be sick or to not get sick. Is there an expiration date on fit for confinement? And then depending on who did the fit for confinement, how good is it? I see emergency room physicians that just cursively do it. It's an inmate and they don't seem to care. They just go,, yeah, they are fine and send them away.

**Q Let me ask you about that. Have you -- you've never worked at Fulton Medical Center?**

A No.

**Q And so their procedures or the doctors that were working that day on February 26 of 2016, you wouldn't know what their standard is for doing a fit for confinement?**

A Absolutely. And I apologize when I interrupt, that's what bothers me is that for a fit for confinement, there is no guideline as to what has to be done and accomplished in that. It just depends on the provider.

**Q And I think that's important.**

A I do too.

**Q Because I think part of your testimony here is that if she had been sent for a fit, she would have gotten interventional medical care at that point in time, correct?**

A Yes.

**Q But we don't know who it is that would be doing the fit for confinement?**

A Correct.

**Q And we don't know the attention to detail that they would provide while doing that fit for confinement given this situation?**

A I agree.

**Q I'm going to ask you a hypothetical and I will**

**agree it's a hypothetical.**

A Okay.

**Q If she had been sent for a fit on 2/26/2016 and she got sent back from Fulton Medical Center with the she is fit, right?**

A Uh-huh.

**Q In your experience as a doctor working at Boone County Jail and other jails, does that generally suggest to the officers, if you know, that this person, at least for the next few days, is good to go?**

MR. LARAMORE: I will just object. It calls for speculation.

MR. MCDANIELS: I understand.

A Can I say that most of the time it doesn't. I base that on my experience and interaction with officers. I base that upon my experience as medical director at Boone County Jail. I base that on risk management lectures that I have given to the officers at the Boone County Jail, as well as lectures that I have attended and put on by Advanced Correctional Healthcare in their Sheriff Summit that they have every year.

**Q And I want to make sure I understood because I think your answer may have been a yes whenever I'm not 100 percent sure?**

A It is yes that they believe that fit for

confinement is a guarantee that that patient is okay.

**Q And that is part of the reason why you don't like the term fit for confinement?**

A Correct.

**Q Right?**

A Yes.

**Q And as you sit here today, you cannot -- it's your testimony that you don't know for sure whether a fit for confinement, what would have been during that procedure had she been sent, and I believe the general rule is she is sent to Fulton Medical Center; you don't know what they would or would not have done there?**

MR. LARAMORE: I'll just object. I think the standard you're asking about is improper.

MR. MCDANIELS: I'm going to ask a follow-up to clean it up.

**Q (By Mr. McDaniels) You don't know what they would have actually done?**

A Correct.

**Q But you believe the standard, or at least the standard that you provide, would have required more -- enough to get her either admitted or further treatment?**

A Correct. And can I say what my policies were at the Boone County Jail?

**Q Sure.**

A Because I gave training on the officers and we talked about that very thing was fit for confinement because that was their perception what a fit for confinement is because I had cases where the next day I saw patients and I thought they should have sent back. So I try to educate the officers that just because you get them, you need to be alert and if you still see a problem, you send that patient back to the emergency for a repeat evaluation. So those evaluations are not events. They are things that occur over time.

**Q Sure. So in this case if upon presentment by Fulton PD, I believe it was Skylar Kenny, said get her a fit.**

A Yes.

**Q Sent her off for a fit for confinement and Fulton Medical Center sent her back and said she's fit.**

A Uh-huh.

**Q Right?**

A Correct.

**Q Is it your testimony then that Glen Ripsch should have sent her again for a fit for confinement based on the additional information he received during that?**

A It was my opinion that if that -- regardless of whether he had a fit or not, if he had concerns, he should have sent her back and I felt there were concerns.

Q So that would be a second attempt at that?
A Yes.
Q And I realize you're saying she probably wouldn't have got sent back for a fit, but I'm asking you to assume something here. Let's go off the record.
(A recess was taken.)
Q (By Mr. McDaniels) All right, Doctor. Have we talked about, I believe your opinions with regard to the Policies and Procedures, 2.045 and 12.05 were that they violated them, they were mandatory and that should sent her at least for a fit for confinement or to the hospital basically; is that correct?
A Yes.
Q And I believe your other opinion related thereto is that if they had sent her, your standard of care or the standard of care that you're applying in this case, would have required whoever reviewed her to either provide some interventional care or admit her at that point in time?
A Yes.
Q And from there, I believe your testimony is also that the heart attack on Sunday would not have happened?
A Yes.
Q Okay. Have we talked about that section of

your report at this point in time in sufficient detail and any opinions you're going to give with regard to Policy 2.045 and 12.05?

A Yes.

Q Is there anything you want to add with regard to that specific section?

A No.

Q Okay. Moving onto CCJ Policies and Procedures 10.02. This deals with persistent refusal of meals; is that correct?

A Yes.

Q And you believe that the Callaway County Jail also failed to comport with this policy; is that correct?

A Yes.

Q It's your belief that that is a mandatory policy as well?

A Yes.

Q Would you agree with me that the term "persistent" or "persistently" refusing meals is not defined in the policy itself?

A I would agree.

Q Okay. And while there may be some testimony in this case as to what persistent means, I think it's sort of all over the place, would you agree with me?

A Yes.

Q Some people say two; apparently Ms. Caroff said that, right, according to your report. Others say it's got to get into the next day, correct?

A I agree.

Q A correctional officer reviewing that would have to use their own decision making to determine what persistent meant; is that correct?

A I agree.

Q And then they have to apply that decision to Ms. Cox's specific situation, correct?

A Correct.

Q And then from there follow the policy that if they determine or decided that the policy had been met, make the decision or follow the policy to take her over to the emergency room or get a fit for confinement?

A Correct.

Q Is it your testimony that after the first meal refusal that was violated, this policy was violated?

A No.

Q So only after that second refusal that day, do we get to persistent in the your mind?

A I would agree, yes.

Q At that point, if she were sent for a fit for confinement, what is your opinion about the effect of that examination or -- withdraw the question. If after she

**refused dinner, a correctional officer had looked at this and said this is persistent, we need to follow the policy, we are going to send her to the Fulton Emergency Room; that's what you think should have happened in this case, correct?**

A I think after the second, they should have contacted somebody.

**Q They should have contacted?**

A A medical authority.

**Q So the physician on staff would have been sufficient?**

A Whether it was the nurse or a physician on staff.

**Q And what is your opinion -- withdraw that. What is the standard of care, what would the standard of care require of that medical professional, nurse or doctor, to do when presented with that information?**

A They -- the nurse or physician should old come in and evaluated the patient, and if they cannot, they should send that patient for evaluation.

**Q Assuming they sent them off to the Fulton Medical Center at that point in time, what would the standard of care require in this situation for evaluation of Cassandra Cox at that point in time?**

A It would be a complete valuation, including

triage, vital signs, physician evaluation, and diagnostic studies and laboratory work.

**Q Which of those items would have told that doctor that this patient was going to have a heart attack in two days?**

A I think her general appearance.

**Q I'm sorry?**

A Her general appearance.

**Q Her general appearance would have done it?**

A Her general appearance would have been one.

**Q What about her general appearance at that point in time?**

A She would have had a disheveled appearance.

**Q Can I just pause you there and we'll get back to the others. Is there any evidence in the record that you saw that can indicate on the evening of February 26th after her refusal of dinner that she had a disheveled appearance at that time?**

A No, there was not documentation of it.

**Q As a matter of fact, she was in a green smock at that point; is that correct?**

A Yes.

**Q Okay. What else would have --**

A Her mental status, she would not have been as alert and I'm presuming at this point in time she should

have been confused.

**Q So her cognition could have been impaired at this point in time?**

A Yes.

**Q Is there anything in the record that documents impairment to her cognition on the evening of February 26th?**

A It does not document anything from the jail that she was confused, just that she was anxious and upset.

**Q And that is from Glen Ripsch intake; is that correct?**

A Yes.

**Q But beyond that, nothing else in that realm, correct?**

A Correct.

**Q All right.**

A And if I may add, I'm not sure that it's the officer's job necessarily to, you know, they are not medical personnel.

**Q Right.**

A So they are not keeping any detailed reports. If a nurse had come and reported it and had not documented any of that, I would be kind of upset about that.

**Q What I'm just trying to do is ferret out and**

**make sure that I understand all of the basis for your opinion here. What you're saying is based on your experience with a person -- or your medical training -- this is what she should have had at this point in time, correct?**

A Yeah. Because officers are very -- their's is just to kind of be eyes and ears. I don't expect them to know a lot of medical stuff. That's the point of having things that are very vague. They need to have a broad leeway about when they call somebody. They should not be required whatsoever to determine whether anyone -- to diagnose or to treat, they should just be involved with corrections.

**Q So she would have had a disheveled appearance you said, cognition problems, and I think you mentioned alertness as well?**

A Not very alert.

**Q Would she have been oriented times three at this point?**

A We would have to make presumptions based upon that.

**Q And what is oriented times three?**

A That means to herself, person, to place, where she is, the location, and to time, what the date is, day and month and so on.

**Q And you can't tell me to a reasonable degree of medical certainty based on what you've seen in this case that she would have been lacking times three?**

A Correct.

**Q Anything else that would have presented at that point in time?**

A She would have been tachycardic with her heart rate over 100.

**Q And that would have been something that a medical professional would have seen?**

A Yes. Anyone who has a rapid heartbeat, even if they look okay, it just perks our ears. It may be okay for a patient, but a rapid heartbeat should never go unevaluated.

**Q And the rapid heartbeat is caught by a stethoscope or just taking a pulse?**

A Yes.

**Q And so any -- I think would it be your testimony that anyone doing even the most cursory examination would catch that?**

A Yes.

**Q All right. Anything else that would have presented?**

A Well, if she did have an EKG, then he would have noticed her heartbeat being a little fast and then of

course he did blood work, would have noticed that metabolic abnormalities.

**Q So you believe that those metabolic abnormalities that ultimately tie to the heart attack on February 28th, would have been present on the evening of February 26th?**

A Yes, I do.

**Q And --**

A In fact, it's my opinion that she probably was becoming having metabolic abnormalities when she was booked on Friday.

**Q And so let me --**

A I have no way to prove that, but I presume she was.

**Q But based on your medical training, is it true that the just missing those two meals, along with the ingestion of methamphetamine that morning, if she had been eating a normal, healthy three squares prior to Thursday the 25th of 2016, missing those two meals on Friday wouldn't have put her in that acidosis, would it?**

A No, just those two wouldn't.

**Q She had to have had a poor diet --**

A Prior.

**Q How many days prior?**

A I don't know. I don't know what her baseline

was.

**Q Okay. Would one day of not eating get you there?**

A No.

**Q We would have to have a couple days probably?**

A Yes.

**Q Is it safe to say that in order for her to be in this spot on Friday, February 26 of 2016, she was not taking care of herself prior to coming to the Callaway County Jail?**

A That would be fair to say that her health was poor prior to being booked in, yes.

**Q Is there anything in the record that tells us one way or the other whether or not Cassandra Cox had eaten that week?**

A No.

**Q Other than what's in the jail records, right?**

A Correct.

**Q She doesn't have any memory of what occurred that week?**

A Not that I saw in the record.

**Q And her father doesn't offer anything along those lines either, correct?**

A Correct.

**Q And those two meal refusals on February 26 of**

**2016 alone were not sufficient to create the acidosis situation that led to her heart attack?**

A Correct. It didn't help any, but they wouldn't have caused it in and of itself.

**Q Correct. I understand. If Cassandra Cox had followed the same course of -- did she overdose on February 25 or 26, 2016?**

A It's my belief that she was unresponsive and unconscious in the car at the time that of Officer Wisswell found her because she had overdosed on methamphetamine.

**Q So I'm going to use the term overdose if that's okay. Is it reasonable to say that if she had, just like she did, overdosed on February 25 into 26 of 2016?**

A Uh-huh.

**Q Had not been arrested and followed the same course of not eating or eating that she did in the jail, would she have had the heart attack outside of the jail?**

A Yes, that's my opinion.

**Q Did you see any evidence in the record that any jail officers or employees withheld food, nutrition, or drink from Cassandra Cox?**

A No.

**Q Okay. Have you talked about the persistent mean refusal policy and your opinions related to it?**

A Let me check here if there is anything that

prompts my thinking.

MR. LARAMORE: Are we on Page 9 now?

MR. MCDANIELS: Moving slow.

MR. LARAMORE: Moving nonetheless though.

MR. MCDANIELS: Correct.

A Yes, we have sufficiently covered that the.

**Q (By Mr. McDaniels) Have I ferret out all of the opinions you have related to that?**

A Yes.

**Q Moving on to CCJ Policies and Procedures 13.04. This Policy and Procedure deals with -- what does it deal with, why don't you tell me?**

A This deals with her monitoring.

**Q Okay.**

A And whether she was monitored appropriately based upon their protocol. According to their own policy and protocol, they had certain levels of observation and how often they need to recheck people based upon their symptoms.

**Q So as I asked you with the other ones, we've got to get to the causation here, obviously. She said she wanted to die sometime on February 26 of 2016; is that correct?**

A Yes.

**Q You would agree with me she was placed in an**

isolated cell at that point in time, correct?

A Yes.

Q They don't have suicidal cells necessarily, but she was placed in her own cell, correct?

A Yes.

Q And she was given a green suicide smock; is that correct?

A Yes.

Q And that's used so that she can't tear up her clothing and attempt to hurt herself; is that correct?

A Yes.

Q That leads us to 15-minute monitoring, correct?

A Yes.

Q And can you tell me to a reasonable degree of medical certainty where along that line of 15-minute monitoring on February 26th or 27th, or the morning of 28th, there would have been sufficient information for jail officers to note that something was going on? Some medical emergency was occurring or going to occur with regard to Cassandra Cox that would have required them to send her off to Fulton Medical Center?

A I believe that within the first 24 hours they would have noticed something if she would have been continuously monitored according to the protocol.

**Q And she was monitored sporadically during that time, correct?**

A Correct.

**Q What is it that you believe that that additional monitoring would have caught?**

A Well, it's not just them doing a cursory look to make sure she is still alive. They need to ask her questions. At some jails, including Boone County, patients were required to have their vitals taken and some of our cells had cameras. So I think that at the minimum they should have at least eyeballed her, according to their protocol, more frequently if they felt they needed to.

**Q Is your criticism, though, the nature and interaction of their --**

A Yes. If I might get to the bottom of it. I feel that there was a bias.

**Q And I want to talk about that, but I don't want to talk about it at this moment. I do not plan to ignore that.**

A Okay. So leaving that part out, I feel that there was just, maybe -- was it a disregard, I don't know. I think that it was just a lack of attention to detail.

**Q So --**

A Or attention to the importance of their protocol.

**Q And if their protocol was just simply eyeball the person?**

A Yes.

**Q And make sure they are still alive?**

A Yes.

**Q Okay. Do you believe that if they had done every single 15-minute monitoring, there would have been a point, just doing that, that they would have been alerted to something that suggests she was going to have a medical emergency on February 28, 2016?**

A Well, that is more difficult for me to say because just eyeballing, I don't know. They may just assume that someone is asleep. I think that she would have had to have some vitals taken as well.

**Q So with regard to this, it sounds to me that your criticisms is of the nature of the evaluation as opposed to the failure to do the evaluations every 15 minutes?**

A I would agree with that. That's a fair assessment.

**Q So you believe to the extent that the procedure or policy of the Callaway County Jail is simply 15-minute or five or ten-minute evaluation is just simply peak your head in, make sure they are alive and their chest is going up and down; your criticisms is, that's not**

**enough?**

A Yes.

**Q Does that fairly encompass your criticism related to Policy 13.04?**

A Yes, I would agree.

**Q All right. If they had done that further evaluation that you're talking about, you believe within the first 24 hours they would have noticed something?**

A Yes.

**Q And what is it you think they would have noticed or to a reasonable degree of medical certainty would have noticed during those first 24 hours that would have been send her off to the Fulton Medical Center?**

A I think they would have noticed her heart rate and blood pressure changing.

**Q If they would taking vitals?**

A If they were taking vitals. And I think they would have been able ascertain her mental status and whether she was talking to them inappropriately, whether she was oriented, whether she was in more distress. I think those things would have then made them think there is something I'm uncomfortable with about this. I don't know what it is, but I'm uncomfortable and it would have prompted them to call someone.

**Q With regard to her mental status, there is**

**some testimony that on the morning of February 28th she was actually on the phone talking to someone; you're aware of that, correct?**

A Yes.

**Q How does that affect your opinion about her mental status in this case?**

A It doesn't. I will have people that are psychotic, so-to-speak, who were talking. You know, I think that the fact that she was talking to her father and able to talk doesn't change anything. But the content of that conversation and whether she was confused or not in her conversation would make a difference. So let me use an example, if I may.

**Q Sure.**

A So if someone has liver disease, alcoholic liver disease, then their ammonia levels rise. They are awake, they are alert, they are not oriented but they are able to carry on a conversation with me but they make no sense. I think she would have had some of those issues.

**Q So is there any indication in this case that that conversation she had on February 28, 2016 her discussion or answers or responses were somehow inappropriate or making no sense?**

A I don't know about her -- to answer your question, no, I don't have information in regard to the

actual conversation itself, just the report that her dad was worried.

**Q Okay. Got it. And her dad seemed to be concerned even before that conversation; is that correct?**

A Yes.

**Q Right. And her dad also thought, at least at some point that with regard to her methamphetamine usage, some time spent in jail might have been the best thing for her?**

A Yes.

**Q He wanted her to get cleaned out basically?**

A Yes.

**Q You note that during the time of February 26, 2016 and I guess 27th and 28th, that with regard to her overdose of methamphetamine she should have been exhibiting certain signs or symptoms related to that?**

A Yes.

**Q And that would be musculoskeletal pain?**

A Yes.

**Q Anxiety, lethargy?**

A Yes.

**Q Depression, suicidal thoughts, poor appetite and psychosis?**

A Yes.

**Q Is there any evidence in the record to suggest**

**that she was suffering from musculoskeletal pain on 2/26, 2/27, 2/28?**

A Just prior to her -- on 2/28, if I remember right, she was complaining of some pain and discomfort and then screamed out in pain just before she became unresponsive.

**Q Where did you pull that from, if you know?**

MR. LARAMORE: In Brittney Caroff's deposition.

**Q (By Mr. McDaniels) So as far as you know was that Brittney Caroff's deposition that you pulled that from?**

A As far as I know.

**Q Now, that was the screaming out in pain --**

A I think she was probably experiencing some chest pain at the time she screamed out in pain.

**Q Do you think at that point there was sufficient time -- if they had just that and they said we have to get her out of here, would there have been sufficient time to get her to the hospital before her heart attack?**

A No, she was having a heart attack right there.

**Q Okay. The only evidence that we have of that musculoskeletal pain, at least in the record, is that incident?**

A Yes.

**Q Moments before or during her heart attack?**

A Yes.

**Q Anxiety, we know she had some anxiety coming into the jail, correct?**

A Yes.

**Q Do we have any other evidence of anxiety during the course of her stay?**

A During the course of her stay, no.

**Q Lethargy; any evidence of that during the course understand of her stay?**

A Other than her just sleeping all the time.

**Q There is notes that she was sleeping all of the time?**

A That she was sleeping all the time, refusal of meals. Her not wanting to get up to get meals, that would indicate to me that someone is lethargic and they don't have much energy and they just want to sleep.

**Q Does a person absent drug use that is depressed or having -- that is depressed, have abnormal or higher levels of lethargy in your medical opinion?**

MR. LARAMORE: Calls for speculation and improper hypothetical.

A Many people, but not all people who are depressed have fatigue and lethargy.

**Q (By Mr. McDaniels) We know she had a suicidal thought at least on Friday or at least expressed one, correct?**

A Yes.

**Q And poor appetite, we noted that methamphetamine usage can also cause a poor appetite, correct?**

A Yes.

**Q And does that continue even through the comedown period?**

A The comedown is poor appetite. Then withdraw sometimes, they can have an increased appetite, but it depends on the person.

**Q And then you mentioned psychosis, what does that mean to you?**

A Psychosis just means some confusion as to where someone is.

**Q Okay.**

A And then they also may be either seeing or hearing things or voices.

**Q Got it. Is there any indication that she was seeing or hearing things, voices, or had confusion that she was in the Callaway County Jail?**

A I have no report.

**Q And, again, it's your testimony that if the**

Callaway County Jail officers had done the monitoring the way you suggest, they would have noticed something within the first 24 hours, but definitely during her stay that would have gotten her to the Fulton Medical Center, correct?

A Yes.

Q And once there, she would have been provided some interventional care and?

A Yes.

Q Now, you would agree with me though at the point that she screamed out with musculoskeletal pain, she was going to have a heart attack regardless of what they did?

A Yes.

Q Have we talked about your opinion related to the monitoring under section 13.04?

A Yes.

Q Is there anything else that you would like to add with regard to the monitoring or the procedure for monitoring under Section 13.04 that we have not discussed at this point in time?

A No.

Q Moving onto CCJ Policy and Procedure 22.01. You say that there is no alcohol or drug screening in the record from the Callaway County Jail?

A Correct.

**Q There is however on the intake from some questions about alcohol and drugs; is that correct?**

A Yes, it's on the screening.

**Q If that is the alcohol or drug screening, okay, is your testimony then or your opinion is that is simply inadequate as an alcohol or drug screening?**

A I think what I was presuming on that is no alcohol or drug screening, per se, as any type of blood work or urinalysis was performed. She had no diagnostic study done there at the jail.

**Q Do you believe that Policy 2.01 actually requires the jailors to do a drug and alcohol screening in the form of urinalysis or something like that?**

A No, but it's what I believe should happen after someone has been cleared and then screened is if they have any issue, then they need to have medical called and defer them.

**Q So your opinion in this regard is simply that the policies and procedures of the Callaway County Jail are insufficient?**

A They have some questions regarding it on the questionnaire, but I think the training isn't the best on that. But how those questions are worded are not open-ended enough. I think they need to be open-ended

questions in order to catch more symptoms and problems, but there needs to be more done than just a questionnaire.

**Q Okay. So your criticism there though is that the alcohol and drug screening is just insufficient; is that correct?**

A Yes.

**Q What would an alcohol or drug screening have shown the officers at the Callaway County Jail?**

A They would have been able to confirm that she was positive for meth, which then could have potentially changed their viewpoint as to how she was observed and treated, and they would have been able to tell that was the only thing that was causing her symptoms and not a urinary tract infection or an infection such as sepsis that could change your symptoms and mental status.

**Q Have you worked in a jail that does this urinalysis?**

A We did at Boone County.

**Q How long does it take to get those results back?**

A Well, for us we had nurses all day, especially on weekends and we could send STAT orders. So we could send a urine dip right then, do blood work, and then we would have Boyce & Bynum come and pick it up and I could get it within a few hours.

**Q Even on a Friday, Saturday, or Sunday?**

A Yes, we had a contract with them, with Quest and with Boyce & Bynum.

**Q So in this case your criticism here with the alcohol and drug screening is that Callaway Jail didn't do a urinalysis?**

A Correct.

**Q And they didn't have a contract -- they would also had to have a contract to have that urinalysis tested by a third party presumably and returned within the time that she would have had her stay there, correct?**

A Yes.

**Q If they had known those things, I guess it would be speculation on your part what they would have done with that information?**

A But they didn't. They didn't have it before she got there and then there is none of that done when she is there. It makes it more difficult, she is there on the weekend and they have no nurses there on the weekend.

**Q CCJ -- moving onto the next page, CCJ Policy and Procedure -- before I move off of 2.01, is there anything else you want to tell me about the policy failure under 2.01 that we haven't discussed at this point in time?**

A No.

**Q CCJ Policy and Procedure 2.02, I believe your**

**concern there is she was not seen by the nursing staff; is that correct?**

A Yes.

**Q Tell me about your opinions related to that?**

A Well, I believe that when she had the questionnaire performed -- and this was on the Friday -- and her symptoms that she was exhibiting and there was a nurse that's there, that they should have instead of just filled out a form and put it in a medical box for someone to see, which would have not occurred all weekend, they should have called the nurse right then at that point in time.

**Q Do you know is that nurse an employee of the Callaway County Jail?**

A I don't know, but I doubt it because Advanced Correctional Healthcare has the contract and they always employ theirs.

**Q And I will tell you that's the case here. Now the medical clearance defines fit for confinement as not exhibiting symptoms of serious injury, serious illness, or serious intoxication; you read that, correct?**

A Yes.

**Q And medical clearance is a determination by a medical professional that an individual is fit for confinement?**

A Say that again.

**Q Medical clearance is determination by a medical professional that an individual is fit for confinement?**

A Yes.

**Q Can you tell me what Nurse Gilmore, in your opinion, would have found had she evaluated Cassandra Cox before leaving on 2/26 of 2016?**

A I think she would have -- the patient then would have had some basic vitals down.

**Q Would she have been tachycardic at that point?**

A Yes.

**Q Even though we're not at the point where she refused two meals or anything like that?**

A Yes.

**Q So she came into -- it's your opinion that she came into the Callaway County Jail tachycardic?**

A Yes.

**Q Is it also your opinion that she would have been tachycardic at the time of arrest?**

A Yes.

**Q And typically with tachycardia we see shortness of breath or panting?**

A Depending on how fast the heart is beating, yes.

**Q And am I saying that right when I say panting?**

A Panting, yes. It's just rapid breathing.

**Q Okay. Got it.**

MR. LARAMORE: Tongue is not necessarily hanging out.

**Q (By Mr. McDaniels) Yes, I don't want to overstate it obviously.**

A Are you okay if I expound on that?

**Q Go ahead. yeah.**

A So what I would like to see done is that when Nurse Gilmore saw them, then the jail needs to have a way to treat people who are intoxicated, whether it's drugs or alcohol, you have to be able to treat symptoms of intoxication and withdraw. For patients who are on stimulants or who are on narcotics, those people -- and it's becoming the standard now to be treated with medication to help with that. So if somebody is real jittery, they are shaking and they are tachycardic, you might give they Clonidine to help with those withdraw symptoms, you might give them some Benzodiazepine, like Ativan Valium. We were doing that the entire time I was medical director of Boone County Jail.

**Q Do you believe it was the standard of care on February of 2016 for any patient or are any inmate that came into a jail that was intoxicated on alcohol or drugs**

**to be seen by a medical professional?**

A I do. NCCHC is their recommendation regardless of whether the jail is NCCHC certified or not, they should be following the guidelines.

**Q Who is NCCHC?**

A National Commission on Correctional Healthcare.

**Q And do you believe -- do you have any information to suggest that their guidelines are authoritative or required of the jail officers at the Callaway County Jail?**

A I don't.

**Q You believe that sets the standard of care though?**

A Yes. We also follow policies based upon the Federal Bureau of Prisons and those types of things.

**Q And you reference those, too, correct?**

A Yes.

**Q But again, the policies of the Federal Bureau of Prisons are not mandatory upon Callaway County Jail employees; is that correct?**

A Correct.

**Q You believe that at a minimum when Ms. Cox came into jail, she should have been evaluated by the nurse and failure to do that is a violation of Policy 2.02; is**

**that correct?**

A Yes. I feel that based upon even the minimal symptoms that she had, that medical should have been consulted. The fact that when she came in there was a nurse there present, it would have been an easy call for the nurse to come over and see her.

**Q You believe that fit for confinement examination by the nurse would have caught the tachycardia?**

A Yes.

**Q And what would have happened then?**

A I believe that would have found the tachycardia and I would presume then the nurse would call -- either follow their protocol or talk to a physician. I know Advanced Correctional Healthcare, the nurse cannot do any orders without permission from the physician. She would have given the appropriate medications to help with any comedown or withdraw, which there would have then increased her appetite, made her want to eat or drink, and then she would have been -- the nurse, because of that, would have known that she had come in to see someone to re-evaluate them the next day.

**Q So she wouldn't necessarily have sent her off to the emergency room?**

A Not necessarily. That's not the requirement necessarily. That's the requirement necessary by

performance for a medical clearance and screening, but Cassandra had never been cleared by any medical authority.

**Q Do you know if the correctional officer that received Cassandra Cox into the Callaway County Jail were aware that she had been to Fulton Medical Center that morning?**

A I don't remember.

**Q Just like with the fit for confinement, is it your experience that jailors or people working in correctional facility, if they are aware that somebody has been to a hospital recently, that that affects their decision making with regard to sending them back to the hospital?**

MR. LARAMORE: I'll just object. That calls for speculation and improper hypothetical.

A In my experience at Boone County Jail, just my experience there, it does help them decide whether they are going to send someone back or not.

**Q (By Mr. McDaniels) And they probably would be less likely, wouldn't they?**

A Once the patient already had a fit, yes, they are less likely.

**Q And we talked about these symptoms that you note on Page 11 that you believe she would have been suffering from and where they are or are not in the record;**

**is that correct?**

A Yes.

**Q Those are the same symptoms we talked about previously, correct?**

A Yes. May I also add though, too, that even though it wasn't documented she had musculoskeletal pain, the reason I believe she would have had before February 28th, Sunday, was because when she went to the hospital she had elevated muscle enzymes indicative of rhabdomyolysis, which is breakdown of muscle.

**Q Can you spell --**

A It's r-h-a-b-d-o-m-y-o-l-y-s-i-s. That occurs from poor nutrition, dehydration, infection, and methamphetamine. So you can't get rhabdomyolysis and not have pain.

**Q Okay. Can rhabdomyolysis, can it occur from trauma?**

A Yes.

**Q Specifically?**

A Crush injuries.

**Q Can it occur from like a taser?**

A Yes.

**Q But how early would she have been noticing pain?**

A By Saturday or Saturday evening she would have

had some discomfort, but she didn't develop rhabdomyolysis just on Sunday.

**Q How long would it have taken?**

A For her to develop it? In her case, I really don't without knowing what her baseline and those types of things. But I think she was developing it from the period of time that she was booked and within 24 hours she was developing that. That's what I think was leading to some of her increased feelings of wanting to harm herself and so on. Then on Sunday, it just continued to get worse.

**Q I just want to make sure, you're assuming she had increased feelings of depression and wanting to harm herself based on where she ends up on 2/28?**

A Based on where she ends up, but also, too, we know that based upon her conversation or concerns with her father. Then her father coming back that he's gone from from thinking that well it's okay for her to be there to, you know, I think she needs to be sent out.

**Q You're speculating as to what Bruce Cox was thinking and the reasons for it?**

A The reasons as to why he would say that.

**Q You're filling in those blanks right now?**

A I'm filling in the blanks.

MR. LARAMORE: I think that's in his deposition, that's not an objection.

**Q (By Mr. McDaniels) I understand what he testified to, but ultimately you're filling in the reasons why?**

MR. LARAMORE: That not an objection.

A But if he's changing his mind that she needs to be sent out, he's worried she is getting worse.

**Q (By Mr. McDaniels) And you believe he's doing that based upon something he heard in a conversation?**

A Yes.

**Q And is that in a deposition?**

A No.

**Q Okay. All right. That's what I was trying to get at. Pain is subjective?**

A Yes.

**Q In order for me to know that you are in pain, you need to tell me or express is it somehow; is that correct?**

A Yes.

**Q It could be a grimace, right? I could know you're in pain by looking at you potentially, right?**

A Yes.

**Q In the alternative, though, if you're in pain, you have to tell me you're in pain, correct?**

A Yes.

**Q If Ms. Cox was in pain from rhabdomyolysis,**

**but did not tell anyone until she yelled out on 2/28 of 2016, other than through observation there would have been no way for the correctional officers to know she was in that pain?**

A Correct.

MR. LARAMORE: I will just object to the extent that it misstates the record, but go ahead and answer, Doctor, you already did.

**Q (By Mr. McDaniels) I'm not going to keep asking this over and over again, so I'm going to just do it once and think I will probably be -- if at any point, any of these policies required the Callaway County jailors to send her for a fit for confinement over to Fulton Medical Center, it's your testimony that fit would have prevented her heart attack on February 28 or the course of care she would have received thereafter?**

A Yes.

**Q So if we get to a fit, the rest of your testimony is and that would have stopped basically the heart attack?**

A Yes.

**Q Okay. I'm going to quit asking that over and over again. Have we currently talked about Callaway County Jail policy and Procedure 2.02 now?**

A Yes.

**Q Callaway County Jail Procedure -- Policy and Procedure 6.02, this is again with regard to monitoring; is that correct?**

A Yes.

**Q Is your criticism here the same as it was before with regard to the 15-monitoring; is that correct?**

A Yes. It's just appropriate monitoring and not having her symptoms assessed frequently, a good quality of assessment. I think the quality of assessment --

**Q It's with regard to the quality of assessment mostly, correct?**

A Yes.

**Q Same with regard to CCJ Policies and Procedures 6.04 and 13.03, which might suggest a more frequent monitoring?**

A Yes.

**Q Again you -- your concern there is not simply they didn't pop their head in every five to ten minutes, it's that they didn't do a thorough enough evaluation?**

A Yes. Can I expound on that?

**Q Yeah.**

A So I feel that the officers would have had appropriate training not only in what they should do with policy and procedures, but if they had appropriate training as to what to do and what to look for by the competent

medical authority, which would be Advanced Correctional Healthcare, as to what is expected of them, that the process would have been different.

**Q Do you believe that Advanced Correctional Healthcare and/or Nurse Gilmore have some fault in this case?**

A I don't think they have fault, I think the training is at fault.

**Q Did Nurse Gilmore also fail in failing to evaluate this individual?**

A No, because nobody told her.

**Q As far as you know, she didn't see the form on her desk?**

A Correct.

**Q Got it. Again, the next Policy and Procedure is 13.02. That again deals with monitoring?**

A Correct.

**Q Same concerns?**

A Yes.

**Q Nothing additional that you want to add with regard to that specific policy and procedure?**

A Right.

**Q You then talk about the medical intake form?**

A Yes.

**Q Which is Exhibit 1-1?**

A Yes.

**Q You had specific concerns there with regard to the medical intake form, correct?**

A Yes.

**Q However your concerns there do not relate to a specific policy or procedure, they relate to the nature of the form itself, correct?**

A Correct.

**Q And if the training was to fill out the form, that's the policy or procedure, your concern is not so much with that, but that form is bad in and of itself, correct?**

A Correct.

**Q Go ahead and tell me your opinions with regard to the form if you would.**

A Well, I think that the form, the questionnaire, which is a screening, it should -- in order to properly screen somebody, especially when the screening is being done by someone who is not trained in medicine, it needs to have more open-ended questions for the opportunity for that. So as opposed to just asking yes or no questions, then it -- if it is a yes or no question, then there needs to be a follow-up question to that. So for example, one of her questions was, "have you used illicit drugs?" and she answered -- or "Do you use illicit drugs frequently?" Where was that one because I had a problem

with that question. Where is it? "Are you a regular user of alcohol and/or are drugs?" It provides a lot of interpretation for the person answering that. It provides a lot of inference. Then, you know, define what regular user is for that individual. The way that I would have asked that is to just ask, "Do you use alcohol or drugs?" And if the answer is yes, then what do you use. Then if they say well alcohol or drugs, then it should lead to how often you use and how much.

**Q Is there a policy or procedure at Callaway County Jail that required them to ask those additional questions?**

A No.

**Q Do you believe that --**

A That's why I think because they don't have that, they need to change the screening.

**Q Do you believe that the individuals that created that form intended to for anyone to be hurt as a result of the use of that form?**

A I don't think that did it to be malicious and they don't intend for anyone to be hurt, but, you know, hindsight is they need to change this form.

**Q Do you believe the manner in which Glen Ripsch and/or Sergeant Kenny used that form or created that form or carried information to one another to use that form, was**

**intended to harm in way shape or form Cassandra Cox?**

A No.

**Q Do you think they understood that failing to ask those additional questions would result in Cassandra Cox having a serious medical emergency on February 28 of 2016?**

MR. LARAMORE: Objection. Who are we talking about specifically?

**Q (By Mr. McDaniels) So Glen Ripsch filled out that form, correct?**

A Yes.

**Q Sorry, I get to get your answer for the record.**

A Yes.

**Q Do you think that at the time he filled out that form he understood that failing to ask those additional questions that you're talking about, those open-ended questions, would result in her having a medical emergency later on at the Callaway County Jail?**

A No, I don't believe he understood that.

**Q Do you believe that anyone at the Callaway County Jail understood that any of their actions --**

A No, because they are not appropriately trained.

**Q And let me finish my question. Do you believe**

**anyone at the Callaway County Jail understood that their actions towards Cassandra Cox would ultimately result in her having a medical emergency?**

MR. LARAMORE: I'm just going to object that it calls for speculation. Doctor, subject to that, you can answer.

A I don't believe -- say that again.

(The question was read back.)

A I don't believe that's a result. I don't feel that -- I don't feel they were necessarily trying to harm her, but they knew she was having a problem and they continued to not contact medical.

**Q (By Mr. McDaniels) Do you think they understood though that that would result in a medical emergency subject to Counsel's previous objection?**

A Correct. I don't think they understood that, but it would be like a teenager not understanding the ramifications of their decisions. I'm not being derogatory with that. They are not the medical authority and so the reason -- the purpose for them contacted medical and having a low threshold for that is that any symptoms concerning, which I felt she had some concerning ones, was to contact the medical authority. But whether when they made that decision, they thought I want her to really get hurt, I don't think they are maliciously thinking that or

misleading to that.

**Q I want to make sure I put a point on my question. Did they have sufficient knowledge of her medical state to know that if they did not do these things, she would have a medical emergency?**

A No, they didn't have that sufficient knowledge.

**Q And that's what I thought you were telling me. I don't want to keep dragging this out, but if we can go off the record for just a minute.**

**(A recess was taken.)**

**Q (By Mr. McDaniels) Have we talked about your concerns, issues with regard to specifically the CCJ Policy and Procedures 13.02? I don't think we have actually. You talked about her being -- the form itself needs to be updated, obviously; is that correct?**

A Yes, but we didn't talk about passing on the information.

**Q And you have concerns that they failed to pass on information, too; is that correct?**

A Yes, because in some of their depositions they state that they didn't know that she was supposed to be on watch and they didn't know about her condition or symptoms on booking.

**Q Is there a policy or procedure that you point**

**to that -- is that the 13.02?**

A Yes.

**Q Do you know what 13.02 actually requires?**

A I don't recall. I don't know if it is exactly passing on, but I think it has something to do with monitoring. But I think the point is that they didn't pass on information, they didn't know to properly monitor her.

**Q So 13.02 is regard to intoxication; is that correct?**

A Yes.

**Q It deals with booking and close monitoring; is that correct?**

A Yes.

**Q It does necessarily talk about -- it does say all pertinent information concerning prisoner should be shared with the next shift on duty; is that correct?**

A Yes. I had forgotten that, but yes.

**Q And there was testimony in this case that though sometimes paper documents do not record exactly what is going on with each inmate, there is a conversational pass-on between shifts; is that correct?**

A Yes.

**Q And we don't know what happens during those conversational pass-ons; is that correct?**

A Yes.

**Q And the term pertinent information, though we might assume that whether a person is intoxicated or not might be pertinent, that is also not defined in this policy; is that correct?**

A Correct.

**Q So it's sort of up to the individual officer to determine what is pertinent to pass on to the next shift; is that correct?**

A Yes.

**Q Did the fact they didn't pass this on alone result in her not getting medical treatment?**

A Not in and of itself, it's part of it.

**Q Part of the larger picture is what you're saying?**

A Yes.

**Q You believe that that combined with other things may have led them to call for medical care or should have?**

A Yes, or to be monitored more closely.

**Q Or more thoroughly, too?**

A Yes.

**Q You then have concerns about a lack of training; is that correct?**

A Yes.

**Q And with regard to that lack of training, do**

**you believe that -- what are your opinions with regard to the lack of training?**

A Well, my opinion on that is, again, based upon, partly based upon the questionnaire, it's based upon their depositions and them personally stating that they hadn't had proper training in the policies and protocols, that they would just sign it, but they never monitored as to whether they read it. I feel that they did not have proper training in the recognition of certain medical problems. I felt that they have also not had proper training in guidance as to when to contact the appropriate medical authority.

**Q And that would make it difficult for the individual officer to understand that failing to -- failing or not contacting medical might result in a medical emergency for this individual; is that correct?**

A I agree.

**Q You talk about Officer Ripsch and the reasons for his termination in here?**

A I don't recall if I did or not.

**Q Page 14, second paragraph. Discussion of his contraband and that sort of thing.**

MR. LARAMORE: What page are we on?

MR. MCDANIELS: Page 14, second paragraph. It beings with Officer Shane Stokes.

MR. LARAMORE: I'm sorry.

**Q (By Mr. McDaniels) Were the reasons for Officer Ripsch's termination known in February of 2016?**

A No.

**Q I'm sorry?**

A No.

**Q Okay. Is it fair then to draw -- I mean, is it fair to base an opinion -- do you base your opinion on that?**

A No. It just makes me concerned that there was an individual who has had those offenses and that that individual was someone who was evaluating Cassandra.

**Q But as for creating an opinion as to what the jail should or should not have done, they can only know what exists as of the date in question, correct?**

A I agree.

**Q So if we didn't know that this was going on in February of 2016 or it was not going on in February of 2016, the jail can't be held accountable for that -- for failing to know something that would happen in the future?**

A I agree.

**Q That was a bad question. Did you understand what I'm saying?**

A I understand what you're trying to say.

**Q Hindsight is 20/20 is what I'm trying to get**

**at?**

A I agree. I think the third paragraph kind of outlines a little bit of what I was thinking as well. Many officers were not aware of many of the monitoring or medical emergency policies or how they applied to the situation.

**Q And does the third and fourth paragraph sort of adequately summarize your opinion in regard to training?**

A Yeah, because it does talk about the system of communication between the officers regarding any inmate medical condition. So I do feel that that hand-off, as a physician would hand-off to another physician, it makes a big difference when I come in and, you know, a physician either doesn't tell me, leaves out some information, or alerts me to important information that I need when I take a patient from them at shift change.

**Q I'm going to move on to Page 15 with regard to CPR. Can you tell me to a reasonable degree of medical certainty with regard to if Brittney Cramer had performed CPR, that Ms. Cox's outcome would have changed?**

A Yes.

**Q It would have changed?**

A Yes.

**Q How would it have been different?**

A It would have changed her anoxic brain injury.

**Q She would not have it?**

A She would not have it.

**Q Was the anoxic brain injury caused by the heart attack or the subsequent seizure?**

A No, it was caused by the heart attack by not circulating blood good.

**Q And is CPR, you believe that you can say to a reasonable degree of medical certainty that if she had performed CPR, she would not have had that anoxic brain injury?**

A Yes, because the amount of oxygen that stays in the system for the time that it took for EMS to get there, whatever oxygen she had would have been circulating through her brain by them doing manual compressions. That's why BLS doesn't recommend supplemental oxygen, they only recommend chest compressions.

**Q Did a policy at the Callaway County Jail require Ms. Caroff to use -- to perform CPR on Ms. Cox?**

A They had reports of when they were supposed to do first aid in their policy and procedure.

**Q I couldn't hear you.**

A In their policy and procedure, it gave them training and told them when they were supposed to do first aid.

**Q Was that a mandatory policy as you're aware?**

A It should be mandatory. If somebody is having a first time aid problem, I don't care if they have to be told or not; they would do it on a family member.

**Q Doesn't that require a decision on the part of the individual jailor as to whether or not it's appropriate to do CPR?**

A Yes, but basic life support is basic. Basic life support is meant for someone lay, whether it's an officer or not. If someone at home, for you, for me, it's just chest compressions. If someone is not breathing well or they have a weak pulse, BLS states that you are required to -- that you should do chest compressions.

**Q What is BLC, Basic Life Support?**

A Basic Life Support.

**Q The policies that you're talking about with regard to basic life support, the policies that you reference in this section with regard to failing to provide CPR, are any of those authoritative as to the Callaway County Jail requiring them to do something?**

A Yes. I understand your question and, no, it doesn't require them.

**Q I understand that you think they should have?**

A But they should adopt those things. That's just putting everybody at risk.

**Q But your concern there is that the policies**

**maybe are inadequate with regard to -**

A That and definitely inadequate training. There is no reason they should have not recognized -- she even said and mouthed, Ms. Caroff -- or Officer Caroff -- that she is having guppy breathing, that means agonal. The definition of it is you're not breathing.

**Q And I guess it's your testimony that it wouldn't require a medical opinion, such as yours, to understand that that required CPR in that moment?**

A Absolutely. And it would not because and I have patients that come into the emergency room and family members have started chest compressions on them and they have no medical training.

**Q So ignoring all other failures that you're alleging occurred at the jail prior to Ms. Cox having her heart attack on February 28, 2016, if Ms. Caroff had performed CPR, what difference would there have been in her outcome?**

A She would not have anoxic brain injury and she would not have had the prolonged medical stay and prolonged stay at Rusk Rehab. Her rehabilitation would have been much belter and would have been shorter.

**Q She still would have had a heart attack?**

A She still would have had a heart attack. My other complaint about that, too, wasn't just the

compressions, but their PAP Manual states they are supposed to have easy access to first aid equipment; they are running around trying to find and it and it's nowhere to be found.

**Q You're not aware of a policy and procedure that required in this specific situation the use CPR by the Callaway County Jail?**

A No, I don't think they need one.

**Q I understand you don't think they need one, I'm asking a very specific question though.**

A No.

**Q Failing to alert medical staff and pass along important medical information is your next topic area, correct?**

A Yes.

**Q Have we talked about your opinion with regard to failing to alert medical staff?**

A Yes. It never happened and was an ongoing problem for two days.

**Q And have we talked about the failure to pass along important medical information, specifically there was a policy violation, at least in your opinion, that they should have from shift to shift passed on this pertinent information; is that correct?**

A Yes.

**Q All right. With regard to the next topic area, which is inadequacies of the screening questionnaire, have we talked about the issues that you have with Exhibit 1-1?**

A Yes.

**Q All right. Are there any other opinions you want to give me with regard to this screening questionnaire in and of itself?**

A No.

**Q Does that include the medical clearance portion, which is step one down at the bottom left of your page?**

A Yes, because I feel that this does not address step one, which is medical clearance. The medical questionnaire, which is the screening, should be step two.

**Q Okay.**

A The clearance is step one, which is just observation, information you obtain on an inmate when they come in -- inmate/patient -- and that information right there should be passed onto medical who then clears the individuals whether they can go to step two, which is the questionnaire.

**Q The actual screening itself?**

A Yes.

**Q And during that actual screening, you**

**reference, which in this case did not occur, correct?**

A Yes.

**Q So any opinions you have there are merely hypothetical as to what could have happened?**

A I agree.

**Q And you reference a correct care narrative there, and that's what you talked about and you have not provided that today?**

A Correct. I can provide it. I can get the magazine to you and send it to you.

**Q Ultimately that magazine is not authoritative or a policy of the Callaway County Jail?**

A The magazine itself is not, but it quotes an authoritative group, the NCCHC.

**Q But ultimately those are not requirements of the Callaway County Jail unless adopted by the Callaway County Jail?**

A Correct, I agree.

**Q And then I believe it's your opinion that if the actual screening had been done correctly, she would be sent off to an emergency room?**

A There is no question in my mind that would have happened.

**Q Regardless of the time period?**

A Correct.

**Q Step three is documentation and follow-up, again we never got that far, correct?**

A Correct.

MR. LARAMORE: Are we on Page 17?

MR. MCDANIELS: Yeah.

A Third paragraph.

MR. LARAMORE: I'm trying to follow along.

**Q (By Mr. McDaniels) You state in the bottom of paragraph -- of Page 16 the last paragraph that her mental health issues were not taken seriously; is that correct?**

A Correct.

**Q You agree with me, though, they did put her in -- after she said that she wanted to commit suicide or wanted to die, they put her in an isolation cell?**

A Correct.

**Q They put her in a green smock?**

A Yes.

**Q I think they gave her suicide proof bedding, if that's a phrase?**

A Yes.

**Q They put her on 15-minute monitoring?**

A Yes.

**Q You note at the bottom of that page she tested positive for methamphetamine during a legal blood draw, that was not known during her stay, the outcome of that**

**blood draw was not known?**

A According to the officers. We just have to go by Wisswell saying that he did relay that information.

**Q And if his deposition testimony says otherwise, you're referring to his deposition testimony; is that correct?**

A Yes.

**Q Going on to Page 18, I think this is where you get into implicit bias; is that correct?**

A At the bottom of 18?

**Q No, the totality of 18. It may be, you tell me. I don't want to skip ahead here.**

A Let me read here.

**Q I think it is the bottom of 18. Let me ask you a question before we go forward because I do have questions about the top of the page before I get to the bottom of it.**

A Okay.

**Q Do you believe that the Callaway County Jail failed Cassandra Cox in not having a nurse or doctor do the initial evaluation?**

A Yes, I do.

**Q Okay. Now you note that while -- I think your testimony previously was that the intake form is improper because it says regular user of drugs?**

A Yes.

**Q It uses that term regular and that's subject to interpretation basically?**

A Yes.

**Q And you give Cassandra the benefit of the doubt that she was not lying when saying no to that question?**

A Based upon my evaluation of her and how she answered my questions during her physical examination.

**Q She knew the purpose of your history and physical examination; is that correct?**

A Yes.

**Q She also knew that answers that she might give to the Callaway County Jail might be used against her in a subsequent prosecution presumably?**

A Presumably, yes.

**Q Presumably I'm going to ask you a question: If she had told -- do you have an opinion one way or the other, if she had said I am a regular user of methamphetamine and as a matter of fact I used it last night, do you have an opinion one way or the other how her outcome might have changed?**

MR. LARAMORE: I will just object to the extent it calls for speculation and calling for how Officer Ripsch would have interpreted and applied that information.

A I agree with the objection in that it is speculation. My hope would be is that it would have him be more urgent in contacting medical.

**Q (By Mr. McDaniels) You would agree with me that if Officer Wisswell had hit "yes" on that form that says has she used in the last 24 hours, that would have required her to be sent for a fit for confinement?**

MR. LARAMORE: Objection, calls for speculation. Go ahead and answer, Doctor.

A I agree that would have required him to send her for a fit for confinement and it was an improper response.

**Q (By Mr. McDaniels) You believe that was the wrong answer?**

A Yes. Well, he knew she was intoxicated. He knew based upon the individual who did the toxicology screening, the other officer that came and evaluated her and showed she was positive for meth. Officer Wisswell knew she was on meth.

**Q And that's about 8:00?**

A Yes.

**Q That he has taken her to the Callaway County Jail?**

A Yes.

**Q At that point she would have been tachycardic?**

A Yes.

**Q And if taken for a fit, anybody, any doctor doing a fit for confinement at that point in time, or nurse, would have caught the tachycardia?**

A Yes.

**Q No doubt in your mind about that?**

A It would have been an objective finding. It would have been based on vitals and telemetry.

**Q Vitals are going to be taken in very fit for confinement regardless of who is doing them?**

A Yes, they have to be otherwise it's in total violation because it's not an appropriate screening.

**Q And it's your opinion that catching the tachycardia then prevents the heart attack on February 28, 2016?**

A Then that would have been one symptom that would have alerted them to do a more thorough workup.

**Q I'm not trying to oversimplify.**

A I understand.

**Q But it sounds to me like the most obvious thing that you're telling me that would have come out of a fit for confinement is that she was tachycardic?**

A Someone who is intoxicated, yes, on a stimulant.

**Q Cassandra Cox on February 26, 27, or 28 if she**

**goes for a fit for confinement, we might not know exactly what they are going to do in the way of testing, but we know the one thing they are definitely going to catch is the tachycardia, right?**

A Yes.

**Q And that will then lead them to further care?**

A Correct.

**Q And that further care, in your opinion, would then prevent the heart attack on February 28?**

A Yes.

**Q Do you believe that inmates are sometimes -- are often more truthful than people on the street?**

A No.

**Q Have you ever testified to that?**

A No. I don't recall testifying to that.

**Q You gave a deposition in that Houston matter, correct?**

A Yes.

**Q Have you ever were thought that some inmates are more honest than people on the streets?**

A I guess it depends on the person. Some of them when they come into the jail are definitely or when they are in prison, they realize that they have been caught, the gig is up, so they are very open and blunt. Others of them are very manipulative and because of that,

it's a high risk population. You always have to be on the alert and you have to give them the benefit of the doubt. If you feel like everyone is faking it, then you're going to miss something. That's what gets you in trouble. That the proper training of officers.

**Q Is that the proper training of officers or is that the proper training of doctors or both?**

A Yes, that's why I do lectures on implicit bias and cognitive biases.

**Q And that's what you're talking about when you say implicit bias is that guards, correctional officers, may believe that because a prisoner is in prison in front of them, they are lying or otherwise being untruthful?**

A That's what led to that. Implicit bias is a subconscious action. These are things that help determine how we act. It's a big problem in corrections and emergency medicine because we are involved with people who maybe are not nice people. They maybe are not necessarily good people, but we are required to give them medical care. So we have to make sure that we don't focus on one thing too much. It's called an agreed bias. We have to make sure that we, no. 1, learn what our biases are so we know to protect against that and it keeps us from making poor medical decisions and not taking care of people appropriately.

Q You do in the -- you cannot tell me today how often Ms. Cox was using methamphetamine prior to February 26, 2016?

A Correct, I don't know how often.

Q I'm going to use the term regular. How regularly she was using methamphetamine prior to February 26, 2016, you don't know that either?

A I don't know that.

Q So to know if objectively -- if it could be determined objectively -- whether she was a regular methamphetamine user, you can can't give me that at this point?

A I cannot.

Q You note down that bottom of Page 19, it is bold "Impossible for a patient to be assessed as having anxiety, shame, and fear and not suspect in your differential diagnosis that those symptoms could be related psychosis, depression, anxiety, panic, metabolic, alcohol or drug-related issues; is that correct?

A I agree.

Q And that is for a medical professional, correct?

A Yes.

Q Not a correctional officer?

A Correct.

Q You also note that those are vague, nonspecific and can be exhibited by multiple or interrelated problems, correct?
A Yes.
Q So if I go to Page 20, I want to hit on your opinions there. You're talking about the obvious needs for medical intervention, you note the same symptoms that we've talked about a number of times that you expect she would have had, correct?
A Yes.
Q You note also that she was pale. Do you know whose deposition you got that from, if any?
A I don't recall.
Q Okay. I believe there was a deposition that suggests she was pale but they thought that was her normal skin tone. Do you kind of remember that?
A Yes, vaguely.
Q And some people are just pale, correct?
A I agree.
Q Was Cassandra Cox -- and I know it's years later, when you met her, was her skin somewhat pale?
A I don't think it was anymore pale than mine.
Q All right. We don't have a video camera on you, so I can't really quantify that at this point, so. You say that was she was complaining of pain throughout her

**body. Is that the one complaint that we talked about on 2/28 of 2016?**

A Yes.

**Q Specifically her crying out just as she was beginning to have a heart attack?**

A Yes.

**Q And then you also say she was emotionally upset; is that correct?**

A Yes.

**Q And specifically she made a suicide -- said he wanted to die, is that part of the emotionally upset that you're talking about?**

A Yes.

**Q What else are you talking about there?**

A Just that -- what do you mean being suicidal or being emotionally upset?

**Q Well, you say emotionally upset; what else leads you to believe that she was emotionally upset?**

A Just based upon the fact that she was noted to be anxious, that she complained of being suicidal, that she was laying her head on the counter, that she was difficult with cooperation; all of those things would note to me that she was upset.

**Q The intake stuff basically?**

A Yes.

**Q Got it. You talk about a conversation Bruce Cox had with Sergeant Caroff; is that correct?**

A Yes, where are you looking at?

**Q I'm on Page 20 about midway through that bottom paragraph. And Bruce Cox's concern or at least his state of concern in his deposition was trying to get her to a see a psychiatric facility; is that correct?**

A Yes.

**Q Did he have any reason to know or did he know or did he suggest that he thought she was going to have a heart attack or other medical issue as such?**

A I don't think there is any are reason that he would presume that.

**Q Okay. Do you believe that if she had been sent -- if Ms. Cox had been sent to the Missouri Psychiatric Center, MUPC, Mizzou Psychiatric Center, on 2/26, 2/27, or 2/28 as a result of her suicidal statement or her father calling and saying she needed to be committed or something along those lines; do you believe her outcome in this case would have been different?**

A I don't think she would have been admitted to MUPC. I think they would have diverted her to medical evaluation because I think they would have known she was medically unstable to be at MUPC.

**Q You think if she was sent on a commit, like a**

**96-hour commit, if her father had filed that paperwork to try to get that done with the judge or something along those lines, that ultimately the -- what, the initial evaluation at MUPC would have resulted in her being sent to the emergency room?**

A I agree, yes.

**Q Is that what you think would have happened?**

A Yes.

**Q So she would have been -- I guess it's your testimony there that they would have caught something else that just so happens to get her in the right place at the right time?**

A Well, I think then she is being screened for psychiatric issues or depression at MUPC. But part of them admitting to MUPC is that a person has to be medically cleared, whether that's done in an emergency room or prior and she hadn't been medically clear. They would have then obtained records and known that she was unconscious in the car and they would have wanted a more thorough evaluation before they accepted her.

**Q Got it. But ultimately she would have been sent to MUPC for a different issue, but MUPC catches this is what you're saying?**

A Yes.

**Q That's your medical opinion in this case?**

A Yes, and that's been my prior experience with them as well.

**Q CPR, is it hit or miss on whether it works or not?**

A Well, it depends on why you're doing CPR. If if someone has a heart attack from a blocked vessel and you're doing CPR on them, very few of those people survive.

**Q Okay. Did the jail officers know the cause of her heart attack at the time she had the heart attack?**

A They didn't know she was having a heart attack.

**Q Correct. They didn't know.**

A They just knew she was unresponsive.

**Q And there are reasons that a person can pass out that is not a heart attack?**

A Yes.

**Q And be unresponsive and it's not a heart attack?**

A Yes, but they did try smelling salts and that didn't awaken her or alert her. The reason why you do smelling salts is to see if someone just fainted or if someone in a jail setting is faking it.

**Q How many minutes passed from the time she became unresponsive to the time they give her smelling salt?**

A I'm not sure how many minutes passed from the time they gave her smelling salt, but I know because I looked at the time that it was eight minutes -- approximately eight minutes before EMS arrived that she went without having circulation of her blood.

**Q I understand that and what I'm getting at if you are attempting to determine what is the issue, you're saying smelling salts would preclude certain issues, correct?**

A Yes.

**Q That amount of time it took to get the smelling salts would be important?**

A From the video camera, I imagine it was within -- I'm presuming it was within the first two to three minutes because Officer Caroff stated she tried it and then the officer on the video camera, he tried it again and she still did not respond.

**Q And your interpretation or belief that CPR was not done in this case is based on those videos alone; is that correct?**

A Yes. If I don't see it, it didn't happen.

**Q And the metabolic acidosis and went into that cardiac arrest, you note on Page 21 comes from Exhibit 1-2 it appears, and I think from your exhibit list, 1-2 is?**

MR. LARAMORE: What page are we on?

A Page 21.
**Q (By Mr. McDaniels) Callaway County Ambulance District records?**
A Yes.
**Q Ultimately Ms. Cox did not die, correct?**
A Correct.
MR. LARAMORE: We'll stipulate to that.
MR. MCDANIELS: I appreciate that.
**Q (By Mr. McDaniels) What is an anoxic brain injury, Doctor?**
A It means brain injury that occurs to tissue of the brain when it goes without oxygen.
**Q In your medical opinion, what permanent injuries does Ms. Cox suffer from as a result of this heart attack?**
A I have to say that during my physical examination her mental status, her orientation, and her memory seemed to be pretty good at this point in time. I do -- she did have, we know, some ongoing tremors and problems with memory as reported by outpatient neurology clinic from the hospital records and then she stopped going at that point in time was noncompliant with follow-up.
**Q Did you notice any memory or tremors during your evaluation?**
A I didn't see any tremors during my exam. Of

course, I can't compare her to baseline because I don't know her baseline. But at this point in time I don't see any tremors. She didn't appear to have any problems ambulating or walking. At this point in time her memory seems pretty good.

**Q And would you it be true to say that a person who is withdrawing from methamphetamine could have tremors?**

A Sure, yes.

**Q And would a person who is on methamphetamine or withdrawing have confusion or awareness issues?**

A They can but this was noted in her record long after she had left Rusk Rehab.

**Q Understood, but she continues to use methamphetamine?**

A Yes, but not at the time she was seen in neurology outpatient. She starting using later, but for quite some time she was drug-free but continued to have tremors.

**Q Could the tremors be related to withdraw?**

A She wouldn't be withdrawing at that point in time because she was at Rusk Rehab for several days, couple of weeks or so, i can't remember the length of time, and then she was being followed by outpatient neurology so any withdraw would have been gone.

**Q And that's what I was trying to get at. She**

**continues to smoke half a pack a day; is that correct?**

A Yes.

**Q Did you advise her that's probably not good for her?**

A Yes.

**Q What did she say to that?**

A She knows and I told her. We had a frank conversation where I felt that I would like her to get help and assistance and help with drug rehab. I do think that society has failed her in my opinion. I think that society, especially America, has failed a lot of those people. She became very emotional and tearful about that, you know, regardless of what you think about why people do what they do to themselves, it still doesn't preclude that we need to take appropriate care of them.

**Q I understand that. So at your physical evaluation of her, you did not see any lasting effects from this heart attack that you can attribute to the heart attack?**

A No. Most of the -- her heart-related issues because she had a heart attack from stress, cardiomyopathy, which is due to the stress of the incident; most of the time those resolve pretty well. My concern would be any neurological issues, which would occur from the anoxic brain injury. So my recommendation is that she needs to

continue to follow-up, not just with cardiology, but even more so with neurology and have ongoing further evaluations and possible neurology follow-up annually until they feel they can release her and that hasn't occur.

**Q Are you a neurologist?**

A No.

**Q Are you offering a neurology opinion in this case?**

A Just a basic neurology opinion based upon my experience in emergency medicine and with patients I see with stroke and so on, but I don't do any outpatient neurology.

**Q You can't give me at this point how much additional neurology care she is going to need, can you?**

A Correct. And that's why I think she needs to have that done if they feel she is going to have as much as she can get or if there is anything more they can do to help.

**Q Can continued intermittent or whatever methamphetamine use cause neurological deficit?**

A Yes.

**Q It can cause death, too, can it not?**

A Yes.

**Q It's a very real concern with methamphetamine?**

A Yes.

**Q Methamphetamine is a chemical compound?**

A Yes.

**Q That you are ingesting or snorting into your body?**

A Yes.

**Q One website referred to it as poison, would you agree with that?**

A I agree.

**Q While there is addiction issues in play, she is making a decision to ingest poison; is that correct?**

A I agree.

**Q You state here she states she only uses marijuana when she does not have access to meth and needs to control her comedown symptoms?**

A That's what she says.

**Q And so did you further inquire about why or how she does not have access to meth?**

A She seemed to imply it was due to financial resources. The reason why I take that implication, although I did not specifically question her as to why her meth use is intermittent, was that she said that she cannot get proper drug rehab or see certain physicians because she doesn't have insurance and she doesn't have money, so she sees their family doctor when she is able.

**Q And this is probably not important, but did**

you ask if she had -- just for purposes of trying to get her some treatment, did you ask if she applied for Medicaid or anything like that?

A I hadn't.

Q Okay. All right. Is she still working?

A Not currently.

Q She is not working anymore?

A No.

Q Do you know that she was working for a period after this, correct?

A Yes.

Q And about the same job she had been working at prior?

A Yes.

Q You say that she complains of some generalized weakness and feels this is worse since her cardiac arrest at the bottom of Page 22; is that correct?

A Yes.

Q Can that also be related potentially to drug use?

A Yes.

Q Okay. And then she sleeps more often; could that be related to marijuana usage?

A Yes.

Q Probably not methamphetamine usage I would

**imagine?**

A Correct.

**Q On page 23 you note that her heart sounds are clear, heart rate seems within normal rate, no bradycardia and rhythm was regular?**

A Yes.

**Q Does that suggest that her heart has for the most part returned?**

A I believe so. Most patients that I see in the emergency room setting who have a history of stress cardiomyopathy, that they eventually return to their heart being at baseline.

**Q You note that she wasn't in pain when you met with her, correct?**

A Correct.

**Q And her musculoskeletal, she had scoliosis, that predated what we're talking about here, correct?**

A Yes.

**Q Psychiatric, you not a flat affect; what does that mean to you?**

A That just means that she is still depressed.

**Q Her depression predated her issues in coming to Callaway County Jail; is that correct?**

A Yes.

**Q She answered your questions appropriately; is**

that correct?

A Yes.

Q And was corporative with you?

A Yes.

Q Your neurological exam on Page 24, without getting into every word of it, did it suggest that she had a proper neurological function?

A Yes.

Q All right. And then your summary, does that wrap-up things that you have already told me so far in this case?

A Yes.

Q And then your conclusion are your three opinions related to questions that you asked yourself at the beginning of your report; is that correct?

A Yes.

Q Have you covered those opinions in detail at this point in time?

A Yes.

Q I have a follow-up question here. The initial impetus that began what we will call the trap towards a hurricane on Sunday, February 28 of 2016, was a combination of lack of nutrition and methamphetamine overdose that occurred prior to her entering the Callaway County Jail?

A Yes.

**Q That started us on this path; is that correct?**

A Yes.

**Q Your charge for my time today taking your deposition is $300.00 per hour, correct?**

A Yes.

**Q Same as you charge Mr. Laramore?**

A Yes.

**Q Are there any other opinions that we have not talked about today that you plan to express in this case?**

A No.

**Q Have I covered everything that you plan to express?**

A Yes, with the exception I just wanted to add to on Page 20 -- 19 and 20, that the reason that I expressed that these were vague, nonspecific symptoms is that is to point out the fact that because they are vague, nonspecific symptoms, that it takes somebody with a medical degree to determine if someone has a major medical problem going on. So I feel that one of the breakdowns of the system and what's going on in the jail is that the questionnaire is not screening appropriately and that those symptoms are vague and even Glen Ripsch mentioned that those vague symptoms can occur in a lot of different things. That's why physicians fill the deferential diagnosis, which is a list of things that can occur based

upon one symptom. So I feel that because of those vague, nonspecific symptoms, that it would in my opinion require them to contact someone with to obtain a professional opinion as to whether those vague, nonspecific symptoms were just depression, anxiety, her being upset being in the jail, or if there was something more emergent going on.

**Q I understand. Would you agree with me that not every medical incident that occurs in a jail is avoidable?**

A I agree.

**Q Not every heart attack is avoidable?**

A I agree.

**Q You would agree with me that some of the symptoms that Ms. Cox was exhibiting when she entered the Callaway County Jail were nonspecific?**

A Yes.

**Q To a layperson, maybe you can't answer this, but to a layperson, her symptoms did not directly indicate that she would have a heart attack in two days?**

A Correct.

**Q And just to be clear, all of the failures that you place on the Callaway County Jail, all of your opinions of failures of policy, procedure, or just to meet the standard of care; it's your opinion that correcting any one of those would have resulted in her not having a heart**

**attack or not having the damage that she ultimately had?**

A I agree.

**Q And specifically the one that -- all of them, with exception of CPR after she already had the heart attack, it's your opinion correcting any of these would have resulted in her not having a heart attack on February 28 of 2016?**

A I would agree.

**Q And you offer that opinion to a reasonable degree of medical certainty?**

A Yes, I do.

**Q And it's your opinion that CPR, had CPR been administered by Brittney Caroff, appropriately I assume, during those first five minutes after she became -- was found unconscious, that her outcome would have been substantially different?**

A She would not have suffered the anoxic brain injury.

**Q What affect, if any, does the subsequent seizure at the University have on her outcome in this case?**

A None because she was already intubated and on a ventilator and receiving supportive care.

**Q So the seizure did not cause any additional --**

A The seizures occurred because she had anoxic brain jury, that led to the seizure.

**Q It didn't cause any additional damage?**

A No.

**Q It's your testimony that that seizure would not have occurred but for the anoxic brain injury?**

A Correct.

**Q What is broken heart syndrome?**

A That's another word for stress cardiomyopathy.

**Q So whenever Cassandra mentioned broken heart syndrome, that's what that is?**

A Yes. Another word for that is called takotsubo syndrome.

**Q You're going to have spell that for somebody here.**

A I believe it's spelled T-a-k -- let me look it up. They officially call it a stress cardiomyopathy now. It's spelled t-a-k-o-t-s-u-b-o and that's pronounced takotsubo syndrome or cardiomyopathy and that used to be the word for what we now call stress cardiomyopathy. The reason they used to call it broken heart was because they would notice that middle aged or older women who had a death in the family or some type of stress, they would end on in the emergency room because they had a heart attack and then they would do a heart cath on them and they would have no blocked vessels and it just due to this urge of endorphins and elevated cortisol and stressed the heart

enough that it led to the heart attack.

**Q The fact that Ms. Cox was on the phone with her father just before her heart attack and her indicated I think that he was not going to come bail her out, you're aware of that, right?**

A Sure.

**Q Could that have contributed to her stress induced heart attack?**

A I think it could have, yes.

**Q Are there any policies and procedures of the Callaway County Jail that we haven't talked about today?**

A Yes.

**Q That you believe -- yes, I know there are a lot. Are there any other policy violations or procedures of the Callaway County Jail that you believe Callaway County Jail employees failed to comply with that caused or contributed to cause Ms. Cox's heart attack on February 28, 2016 that we have not talked about today?**

A No.

**Q Okay. We have got them all?**

A Yes.

**Q Is there any other failures of the Callaway County Jail that we have not talked about today that in your opinion caused or contributed to cause her heart attack on February 28, 2016?**

A No, I feel I have in general revealed them all.

**Q Okay.**

A Or I have attempted to do so with a reasonable degree of certainty.

**Q While I understand being outside that this will probably catch an objection of being outside the scope of your designation, I'm going to ask it anyway: Are there any other failures of any other person that you believe caused or contributed to cause the heart attack on February 28 of 2016 of anyone outside of the Callaway County Jail?**

MR. LARAMORE: I will just object. Calls for speculation and beyond his designation and beyond his scope of discovery of this deposition.

A Outside of discussing Officer --

**Q Wisswell**

A Outside of him, no.

**Q Okay. What about the drug recognition expert, which was a different person from FPD?**

A I just don't know. He could potentially, but I don't know what his responsibility is to alert somebody that they need a fit for confinement. There is no doubt that Officer Wisswell should have asked for a fit for confinement.

**Q And the only other person I can think to ask you about is the person that did the blood draw at Fulton Medical Center prior to her coming to the Callaway County Jail?**

A Yes. She potentially could. If I can say with all honesty, you know, that when patients come in and they are getting a fit for confinement --

MR. LARAMORE: Same objection.

MR. MCDANIELS: I will stipulate to that.

A -- some of these patients -- depending on the facility, some of these nurses might notice something and just not care because they are busy and they move on and it's inappropriate, it's improper care, but that happens.

**Q And if at some point there is testimony that Callaway County Jail has sent folks for fit for confinements and they have come back within ten minutes or less, you have seen fit for confinements along those lines, have you not?**

A I think that Fulton Hospital needs to improve their screening process. But it still doesn't mean that, for example, when I trained the officers, I would tell them if someone comes back for a fit for confinement and they don't believe in that fit for confinement, they need to still send them back. It's not a guarantee. It doesn't let them off the hook.

**Q Got it. Are there any other opinions related to the care or treatment of Cassandra Cox that you have not told me about today that you hold?**

A No. I would like to emphasize again my feeling that especially in correctional medicine, there is a big implicit bias that needs to be overcome. I think that is just counties getting proper training on an ongoing basis to talk about that and to help people understand that we have it and we just need to be cautious about it. Officers are human and so are the doctors. I have huge implicit biases, but you just have to know what they have are and you have to be cautious and careful. I think there are some big implicit biases that are not being addressed at that facility.

**Q And you testified a little bit in your deposition in the Derek Houston matter about one of your -- not necessarily biases, but tendencies would be just when it doubt, send them out?**

A Absolutely.

**Q And regardless of whether your out counts are high or whatever, that was sort of your --**

A Yes. That's what you should do.

**Q Is that that standard of care for jail medicine?**

A No.

**Q It's not.**

A Unfortunately, they are more concerned about saving money than they are just about being cautious and doing the right thing and sending somebody out cost money and that takes resources.

**Q Is that one of the reasons you sort of walked away from Boone County?**

A That was one of the reasons. Another one was, you know, I wanted to -- I think the problem in solving the issues at a jail is more widespread than that. It's how we are taking care of these people in society itself. Because I got involved with stepping up initiative and seeing the revolving door, patients going in and out, I got involved with county commissioners, we had defense attorneys that were involved, prosecutors, and we were trying to come up with a system and I just got burned out and tired.

**Q You wanted to change --**

A I want to change the entire system and I think that's a problem.

**Q Is that still a passion for you?**

A Absolutely.

**Q At Boone County you ran into some of the same issues of your advice wasn't necessarily followed?**

A Correct. Sheriff Carey, he has called me and asked me to come back but I don't know that I'm ready to do

that.

**Q I understand. Where we were asking for a medical opinion you have given your opinions to a reasonable degree of medical certainty today?**

A Yes, sir.

**Q Have we, other than that article that we talked about that you did introduce here today, are there any other documents that reviewed in preparation for this case beyond that?**

A Just things online. You know, online review of -- I used whatever is in here, but Up-to-Date, which is an ongoing medical resource that is up-up-to-date.

**Q I don't think that was listed anywhere in your report.**

A It could be that sometimes when I look at Up-to-Date, I record the reference at the bottom, because up-to-date is -- it's not a good comparison, but like Wikipedia.

**Q So you have put in your report all the documents that you reviewed?**

A Yes. Like I said, if you want me to pass on that magazine, the Correct Care magazine, but that is just all they are doing is they are referencing the NCCHC guidelines.

**Q If you could get it to Mr. Laramore, I would**

**appreciate it. Then have you ever been allowed by a judge or court to testify as to what is a ministerial duty or not in a jail case?**

A No, I haven't.

**Q Have you ever been allowed by a judge or court to testify as to what is or is not deliberate indifference in a jail case?**

A I have not.

**Q Both of those same questions in any case, ministerial duty or deliberate indifference, have you ever been allowed to testify in those?**

A No, I haven't.

**Q Have you ever been sued for medical malpractice?**

MR. LARAMORE: I will just object. That's an improper question and a whole bunch of case law that says that's not a proper inquiry for an expert. Subject to that, you can go ahead and answer.

A No, I have not. I had an inmate, black inmate, sue me saying I was racist. Smith & Lewis represented me and it was dismissed with prejudice.

**Q (By Mr. McDaniels) What county was that?**

A That was Boone County.

**Q Was that with regard to the Boone County Jail?**

A Yes. My wife and my kids are black, so that

was less likely. Not say I can't be racist, but it was less likely.

**Q The only other thing I want to mark, is this in your binder?**

A Yes, it is.

**Q Okay. Never mind I won't mark that then. Is your expert disclosure in your binder?**

MR. LARAMORE: I don't think it is.

**Q (By Mr. McDaniels) I'm going to go ahead mark that. Just for purposes of the record, I'm going to mark as Exhibit E, Plaintiff's Expert Disclosure disclosing you as an expert in this case and basically saying you are going to testify and provide opinions which are in your report, which is also part of?**

**MR. LARAMORE: D.**

**Q (By Mr. McDaniels) That is a part of D; is that correct?**

A Yes.

MR. MCDANIELS: All right. That's all I got I think.

MR. LARAMORE: I have a few points of clarification.

CROSS EXAMINATION

**Q (By Mr. Laramore) So Cassandra Cox was brought into the jail on 2/26 of '16 by Officer Wisswell and he**

**reported, we know from the documents, to Sergeant Kenny that she was brought in for DUI drugs; is that true?**

A Yes.

**Q And so do you think it was incumbent -- well strike that. Do you think as a correctional officer that Sergeant Kenny would have a responsibility to inquire with Officer Wisswell about what drug they believe she would be intoxicated on?**

MR. MCDANIELS: I'm going to object as being beyond the scope, speculation. If you're able to answer, you can answer.

A I'm not sure he would necessarily be required. Do you I think they should, yes. But, you know, I just think that it should be -- I think that when it comes to an officer booking and questionnaire, I think things should be kept so general that it leaves the catchall at a very low threshold.

**Q (By Mr. Laramore) Well, certainly if Officer Kenney or Officer Ripsch knew that Cassandra Cox was intoxicated on methamphetamine, that's a safety issue in the jail; is that true?**

A I agree.

**Q Not only for Ms. Cox but also for the other inmates and officers?**

A Sure.

**Q That's information that they should be passing on to other officers; is that true?**

A Yes, they should pass on -- at Boone County Jail, they were all required to pass on information about when we had someone booked who was intoxicated on alcohol, and if they were withdrawing from narcotics, then they were required to call medical.

**Q I'm going to read you an excerpt and I know you have reviewed the deposition of Glen Ripsch in this case, this is from Page 14. I just want to read this brief part of the transcript. I'm going to start on page -- Line 14 of Page 14. It says.**

**"Q. So Officer Kenney received this information that Ms. Cox had been picked up for driving while intoxicated on methamphetamine; is that correct." And Mr. Ripsch's response was, "Correct."**

**"Q. So he received Ms. Cox and then Ms. Cox would have been passed to you and my understanding is correct, to do the health screen, correct?" His answer was yes."**

**"Q. So at that time, Mr. Ripsch, you performed this medical evaluation for Cassandra Cox, you knew at that point in time that she had been picked up under suspicion of being intoxicated with methamphetamine?" His answer was, "That is correct."**

**So, Doctor, is there any based upon us looking at this deposition again, is there any doubt in your mind that these officers knew or would have had a strong suspicion that Cassandra Cox was intoxicated on methamphetamine when they were evaluating her?**

A I think they would have had a strong suspicion. Also, based upon their depositions, some of them knew her and knew she was a methamphetamine user.

**Q And then we had talked about -- you were asked some questions about bizarre and how that is a term that isn't defined in the policies and procedures and open for interpretation to the officers; is that true?**

A Yes.

**Q And do you recall in Mr. Ripsch's deposition that he indicated that he believed and had made the determination that Ms. Cox's behavior was bizarre?**

A Yes, I do recall.

**Q And do you -- and I want to read another portion from -- this is from Mr. Kenny -- well, do you recall Mr. Kenny testifying that he also believed that Ms. Cox's behavior was bizarre and he thought that was likely due to drugs?**

MR. MCDANIELS: Objection. Best evidence is the depo. You can answer.

A I don't recall that in the deposition, I would

have to review it.

Q (By Mr. Laramore) And then I also want to just clear up something on Exhibit 1-1 that you were asked about. This is the medical evaluation that was performed by Mr. Ripsch and into the section where it says "Observations" which starts with Question 15. So you understand, Doctor, that these observations -- this is the officer noting on this portion of the form what his observations and beliefs are about the individual inmate, true?

A This is an objective observation, yes.

Q So it wasn't -- so according to Officer Ripsch, who you saw his deposition and you also saw his employee file, you know he had been working at the jail for sometime before doing this evaluation, true?

A Yes.

Q And he actually performed many of these medical questionnaires prior to Ms. Cox. He testified to that, true?

A Yes.

Q And it was Mr. Ripsch's observation that her anxiety, shame, and fear was abnormal; is that true?

A Yes.

Q And this is from a correctional officer who seen inmates come into the jail every day and knows what

**would be a normal -- or presumably would know what normal signs of anxiety, shame, and fear would be and he actually indicates that it's abnormal.**

MR. MCDANIELS: Calls for speculation. You can answer

A I agree on No. 16 on the observation area of the medical information area or questionnaire that he is noticing it to be abnormal based upon him saying her heard is on the counter, not being cooperative; that's the type of abnormal he's talking about. Whether he notices anything outside of that, we don't know because he doesn't talk about it.

**Q But in this question, the question asked "Abnormal signs of anxiety, shame, and fear," that would mean something that's abnormal outside of what Mr. Ripsch would observe in any other inmate?**

MR. MCDANIELS: Objection. Calls for speculation as to what Mr. Ripsch thought or knew when he checked yes on that box.

MR. LARAMORE: I'll withdraw the question. I don't know that he knew anything.

**Q (By Mr. Laramore) You would agree that on 2/26 of '16 that there were indications that Mr. Ripsch should have contacted someone on the medical staff; is that true?**

A Absolutely.

**Q And that him not doing that showed a deliberate indifference to the serious medical need of Cassandra Cox?**

MR. MCDANIELS: Objection. Calls for a legal conclusion to which this witness is not able to testify. You can answer.

A I believe it does because I believe he knew that she had some concerning signs and then he decided not to act upon that.

**Q (By Mr. Laramore) And I just want to be clear because we have -- there is a lot of talk in the deposition so far about should she have been sent to the emergency room, but Mr. Ripsch actually had an entirely separate option to get a medical professional involved in the evaluation of Cassandra Cox because there was a nurse that was right there at the facility at that time, true?**

A Yes.

**Q And instead, Mr. Ripsch's choice was not do anything; is that true?**

A Yes.

**Q Even a simple task like going down the hallway and talking to Tiffany Gilmore about Cassandra Cox, he chose not to do that?**

MR. MCDANIELS: Objection. Argumentative. You can answer.

A Yes, I feel that most of the protocols, even with Advanced Correctional, but and also with ours when I was a medical director is that there were different ways that a patient got evaluated. One would just by a patient themselves putting in a medical request form to be sent. Usually those are non-emergent and it's just a form they fill out and then it's put in the nurse's box. The other would be for a patient to declare a medical emergency. Those individuals would be seen emergently and be seen at that time. If a medical emergency is declared and there is no nurse at the facility, then they are required to call a nurse. The other is at booking, if there is immediate concern instead of taking a paper at putting it in a box at booking, they have to notify medical whether medical is there or not. In my opinion, Cassandra Cox had enough symptoms prior to coming to the jail and concerns that someone should have been called then and not waited until the end of the weekend to be seen.

**Q There was other questions and I have a policy here, Policy 2.01 regarding what was required of the officers regarding the initial screening and health -- or whether the health questionnaire was enough and whether that included an alcohol and drug screening in this one form. But doesn't the policy actually require, Dr. Blackburn, that there be three separate screenings: a**

**health screening, suicide screening, alcohol and drug screening; that's what it requires?**

MR. MCDANIELS: I'm going to object. The policy speaks for itself. He's not in the position to interpret, but you can answer.

A Yes, that's what their policy states.

**Q (By Mr. Laramore) The only screening that we have is a health screening in the form of this medical questionnaire; is that true?**

A Correct.

**Q You had some questions about whether the correctional staff would know that Cassandra Cox was going to go on to have a cardiac event or heart attack on 2/28. I just want to ask you do you believe that the medical -- that the correctional staff at the Callaway County Jail on 2/26 of '16 and 2/27 of '16 had sufficient knowledge and information available to them to know that Cassandra Cox should have been sent to a medical professional for evaluation?**

A I believe that there was sufficient information at the time of booking, just at booking itself, as well as ongoing that someone should been have called.

**Q Okay.**

A Again, my concern -- I think things might have been different if this had occurred during the week because

if she had been booked on Wednesday then there would have been a nurse there on Thursday and this potentially could have been avoided. But we are on a weekend where they don't have someone coming in on the weekend and so their level of concern should be higher because they know there is not going to be anyone to see this patient for at least two days. So because of that -- and Friday is coming on, then in my opinion, geez, we are coming into the weekend, she has some of these symptoms, maybe she seems fine now but what's going to happen all weekend. They should have called medical and said how do you want me to handle this and then push it off on them and let them take responsibility. That is the whole point of these policies and protocols is that officers should not be -- it's not their job to be responsible for medical. They need to pawn that off on the doctors and nurses. They just need to be concerned of keeping people safe and so they should just have a low threshold for calling and notifying people, pawn it off on them and let them take the responsibility. There was plenty of information, in my opinion in this case, for her to obtain a fit even before, at booking, or during her stay for somebody to pick up the phone and call someone.

**Q Did we know that the information regarding Cassandra Cox's medical condition on 2/26 and 2/27, and 2/28, that that information was not passed along to the**

**next shift in the log; is that true?**

A That what was stated in the deposition.

MR. MCDANIELS: Objection. Misstates the record.

**Q (By Mr. Laramore) In fact in the jail log, all that is referenced about Cassandra Cox is she arrived at the jail and she left in an ambulance?**

A Yes.

**Q And then there was something called supervisor log where her medical condition was not documented either; is that true?**

A Correct.

**Q And so when --**

A In fact, the supervisor said she wasn't aware of her prior symptoms.

**Q You were asked a question of whether or not that you believe that if they would have had all the information would the correctional officers have acted differently. Many of the depositions, including the deposition of the Jail Administrator Robbie Harrison, he indicated that if he had known that an inmate came in and it was suspected that she was intoxicated on methamphetamine and answered the questionnaire the way Cassandra had indicated to Officer Ripsch on 2/26, had made a suicidal statement and placed on 15-minute monitoring and**

**had refused two meals, even Jail Administrator Robbie Harrison said knowing those things he would have contacted medical; is that true?**

MR. MCDANIELS: I'm going to object. That's not a question, that's an argument. You can answer.

A Again, we are making a presumption that you would -- I'm not there, but I'm making a presumption that they would do the right thing. They could have had that information. Maybe Robbie Harrison is just saying that to make himself look good, I don't know him. But pending that he would make a proper decision based upon that information, I would hope they would and I would presume they would, but who knows.

**Q (By Mr. Laramore) And so the last thing I just want to ask you about is you have reviewed the deposition of Brittney Caroff. We know that Brittney was CPR trained, true?**

A Yes. They were to have training in first aid.

**Q And so she actually had a certification for CPR training in her personal file; is that correct?**

A I don't recall that, but.

**Q If she was trained in CPR, all of the information that you testified to regarding Cassandra Cox's need for CPR, the intervention and the quick intervention that was necessary by Ms. Caroff, she would have been made**

**aware of all of that information during her CPR training; is that true?**

A Yes.

**Q So if she had been through CPR training and acted the way that she acted in relation to Cassandra Cox's emergency, can you say to a reasonable degree of certainty that Ms. Caroff would have known what to do and just chose not do it?**

MR. MCDANIELS: Objection. Calls for speculation. He can't possibly answer that.

A I feel that she should have and I feel that everyone at the jail should have known. The thing almost even before all of this occurred before she went into ventricular fibrillation is that -- just the most concerning to me is that they are watching her, she is unresponsive and they are using smelling salts, which has never been a life support -- or life-saving, but no one is doing chest compressions. They are giving information to indicate that she has agonal breathing. I don't know, you know, I'm looking at it in hindsight of course and 20/20 hindsight and I'm a physician, you know, so I come with that physician bias and I'm an emergency medicine doctor. So it just seems obvious to me and dumbfounds me that the entire time until the ambulance gets there, no one is doing anything. Not even allowing passive oxygen to go across

her mouth. There is just no chest compression or anything. Even though they state they did them for a while, it's fine you did them for a while, but the BLS guidelines never state that you're supposed to stop until First Responders get there.

MR. LARAMORE: That's all the questions I have.

MR. MCDANIELS: Just a couple.

**Q (By Mr. McDaniels) They do testify that they do chest compression for a time?**

A I know they did.

**Q And then in your evaluation discussion with Cassandra Cox, does she state an intent or plan to get into rehab?**

A She did not.

MR. MCDANIELS: Nothing further for this witness.

MR. LARAMORE: We'll read and sign. Thank you.

(Deposition concluded at 3:46 p.m.)

CERTIFICATE OF REPORTER

STATE OF MISSOURI )
) ss.
COUNTY OF BOONE )

I, Jenna Petree, do hereby certify that the witness whose testimony appears in the foregoing deposition was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Court Reporter

ALARIS LITIGATION SERVICES

September 20, 2019

ANTHONY G. LARAMORE

A G LARAMORE LLC

10024 Office Center Avenue Suite 202

St. Louis, MO 63128

IN RE: CASSANDRA COX v. CALLAWAY CO. SHERIFF'S DEPT. et al.

Dear Mr. Laramore:

Please find enclosed your copies of the deposition of JOEL BLACKBURN taken on September 17, 2019 in the above-referenced case. Also enclosed is the original signature page and errata sheets.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and notarized signature page within 30 days to our office at 229 West Capitol Avenue, Suite B, Little Rock, AR 72201 for filing.

Sincerely,

JENNA PETREE, CCR

ERRATA SHEET

Witness Name: JOEL BLACKBURN

Case Name: CASSANDRA COX v. CALLAWAY CO. SHERIFF'S DEPT. et al.

Date Taken: SEPTEMBER 17, 2019

Page #_____ Line #_____

Should read: ____________________________________

Reason for change: ______________________________

Page #_____ Line #_____

Should read: ____________________________________

Reason for change: ______________________________

Page #_____ Line #_____

Should read: ____________________________________

Reason for change: ______________________________

Page #_____ Line #_____

Should read: ____________________________________

Reason for change: ______________________________

Page #_____ Line #_____

Should read: ____________________________________

Reason for change: ______________________________

Witness Signature: ______________________________

STATE OF _______________)

COUNTY OF ______________)

I, JOEL BLACKBURN, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _______________, 20___, at ___________________________.

__________________________
JOEL BLACKBURN

__________________________
NOTARY PUBLIC

My Commission Expires:

A


A.G 4:5
a.m 50:1 65:9 65:15 66:8 70:19 71:16 75:20 103:23
A.T 28:6,7
ability 35:15 37:9 50:18 55:14 58:20 59:24 67:10 96:12 114:9 221:7
able 47:18 70:3 74:3 82:11 90:3,19,21 91:5 114:17 136:18 137:10 137:18 144:9 144:12 148:13 192:24 208:10 213:5
abnormal 99:11 102:4 140:20 211:22 212:3,8 212:10,14,15
abnormalities 71:7 129:2,4 129:10
above-refere... 222:14
absent 140:19
absolute 75:16
Absolutely 40:25 73:10 82:20 117:8 170:10 203:19 204:21 212:25
abused 16:8
acceptable 23:6
accepted 185:20
access 171:2 192:13,17
accident 57:23 58:10,12
accomplished 117:11
accountable 166:19
accurate 31:6
acidosis 74:17 74:24 75:7,8 129:20 131:1 187:22
acidotic 81:11
act 109:25 110:2 110:5 180:16 213:9
acted 217:18 219:5,5
acting 107:5 108:1
action 180:15 221:10,14
actions 35:7 160:22 161:2
active 47:12
activity 79:7
actual 54:1,17 60:25 64:21 80:20 93:24 138:1 172:23 172:25 173:20
add 87:15 122:5 126:17 142:19 152:5 157:20 196:13
addict 46:8
addicted 45:22
addiction 192:9
addictive 45:13 45:14
addition 8:1
additional 8:13 19:21 37:11 81:17,20,21 112:4,5 113:1 120:22 134:5 157:20 159:11 160:4,17 191:14 198:23 199:1
address 172:13
addressed 203:13
addressing 43:13
adequate 106:16
adequately 167:8
administer 13:17
administered 198:13
administrator 26:4 36:3 217:20 218:1
admission 84:2
admit 96:22 113:1,16 121:18
admitted 98:4 112:23 119:22 184:21
admitting 185:15
adopt 169:23
adopted 173:16
adrenaline 81:19
advance 58:17
Advanced 118:20 146:15 150:14 157:1,4 214:2
advice 7:2 204:23
advise 190:3
affect 44:4,5,6 49:3 81:16 137:5 194:19 198:19
afternoon 3:19
age 5:9
aged 199:20
agitated 86:6
agitation 83:8
ago 8:2 26:23 28:1
agonal 104:1,1 170:5 219:19
agree 14:1 24:24 25:9 35:25 36:14 49:10 56:1 66:20 84:1,5 84:10 86:4,25 88:3 94:5 101:10 102:5 107:21 108:11 108:14 117:24 118:1 122:18,21 122:24 123:4 123:8,22 132:25 135:19 136:5 142:10 165:17 166:16 166:21 167:2 173:5,18 174:12 177:1,4 177:10 181:20 182:19 185:6 192:7,8,11 197:7,10,12,13 198:2,8 208:22 212:6 212:22
agreed 5:1 180:21
ahead 7:5 25:4 37:9 50:17 56:6 58:19 59:23 96:11 97:23 114:8 114:23 148:9 155:7 158:13 175:12 177:9 206:18 207:9
aid 168:20,24 169:2 171:2 218:18
al 1:7 3:11,24 222:11 223:5
Alaris 3:19 4:24 222:1
alcohol 44:9 47:23,25 142:24 143:3 143:5,7,9,13 144:4,7 145:5 148:13,25 159:2,6,8 181:18 209:5 214:23 215:1
alcoholic 137:15
alert 103:25 120:7 125:25 127:17 137:17 171:12,17 180:2 186:20 201:22
alerted 135:8 178:17
alertness 47:9 127:16
alerts 167:15
alive 134:7 135:4,24
all-inclusive 63:25
alleging 170:15
allow 15:12 58:22
allowed 51:7 206:1,5,11
allowing 103:12 219:25
alternative 154:22
ambiguous 37:16
ambulance 27:15,16,19 188:2 217:7 219:24
ambulating 189:4
America 190:11
ammonia 137:16
amount 25:13 44:11 48:11,14 48:19,20 49:4 168:11 187:11
and/or 36:22 157:5 159:2

159:24 222:16 224:8
annually 191:3
anonymous 61:5
anoxic 167:25 168:3,9 170:19 188:9 190:24 198:17,24 199:4
answer 6:12,17 6:25 7:2 14:11 20:22 22:11,13 22:15 23:4,7 23:10 25:4 37:9,17 38:9 38:20 45:20 46:9 50:17 55:13 56:6 58:20,21 59:23 61:14,15 61:17,22,25 62:2 63:10 67:10 68:4 70:10 77:4 82:21,24,25 90:12 96:11 97:23 114:8 114:23 118:23 137:24 155:8 159:7 160:12 161:6 177:9,14 197:17 206:18 208:10,11 209:19,24 210:24 212:5 213:6,25 215:5 218:5 219:10
answered 61:18 158:24 176:9 194:25 217:23
answering 159:3
answers 137:22 176:13
Anthony 4:6
18:10 222:5
anxiety 81:18 83:6 84:11,13 90:9 98:16,20 99:11,17 100:4 100:20,23 101:14,16 115:19 138:20 140:4,4,7 181:16,18 197:5 211:22 212:2 212:14
anxious 84:23 85:9,12 86:5 126:9 183:20
anybody 38:18 178:2
anymore 182:22 193:7
anyway 88:19 201:8
apologize 117:8
apparent 114:1
apparently 15:5 28:6 43:22,23 72:5 123:1
appear 10:14 79:9 81:24 84:13 189:3
appearance 125:6,8,9,10,11 125:13,18 127:14
appears 67:5 187:24 221:6
appetite 83:24 84:6 85:6 89:21 90:11 138:22 141:5,6 141:11,12 150:18
applied 167:5 176:25 193:2
applies 109:17
apply 107:24 108:7 123:9
applying 107:18
121:16
appreciate 6:19 13:2 18:20 57:14 188:8 206:1
appropriate 17:1 71:10 101:9 150:16 156:7 156:23,24 165:11 169:5 178:12 190:15
appropriately 13:14 56:17 104:22 132:15 160:23 180:25 194:25 196:21 198:13
approximately 9:2 21:11,14 65:15 103:23 187:4
April 28:24 29:9
AR 222:19
area 171:13 172:2 212:6,7
argue 108:8
argument 44:5 218:5
Argumentative 213:24
arm 53:8
arrest 55:24 56:2,3,11,14 56:20 70:6 91:11 95:8 147:20 187:23 193:16
arrested 36:24 37:20 38:24 39:25 40:1,6 40:12 49:19 65:9 84:22 85:23 90:13 92:11,15 95:19 96:6,16 100:17 102:3,11 131:15
arrestee 92:19 101:24
arrived 88:15 187:4 217:6
arrives 88:20
arteries 58:2
artery 44:8 74:10 112:20
article 19:22 20:4,5 21:20 205:6
articles 20:3 21:1,1
ascertain 136:18
aside 19:22 58:14
asked 5:14 16:25 19:17 20:13 31:7,10 38:10 44:14 46:16 55:10 61:14,15 62:23 62:24 72:1 76:4,6,21 94:10 99:21 105:22 115:19 132:20 159:6 195:14 201:24 204:25 210:9 211:3 212:13 217:16
asking 15:14 42:5,6 43:21 46:19 50:10 50:22 62:12 71:1,24 72:9 72:10,16 73:3 73:5 76:9 119:14 121:4 155:10,22 158:20 171:10 205:2
asleep 135:13
assessed 156:8 181:15
assessment 135:20 156:9
156:9,10
assistance 190:9
associate 88:6
associated 85:20
assume 35:10 42:24 60:19 73:12 121:5 135:13 164:2 198:13
assuming 111:5 124:21 153:11
assumptions 116:13
ate 103:9
Ativan 148:21
atrail 104:3
atria 80:10,16,17 104:4
atrial 104:5,9,10 104:11
attack 56:22,23 56:23,25 57:9 57:11,11 58:6 58:10,15 59:3 59:3,13,16,17 59:20 60:5,6 60:9,20,25 70:21,22,24 70:24 71:3,25 73:20 74:1,5,7 75:15,23 76:1 76:3,18,22 77:22 78:7,15 78:20,23,25 78:25 79:24 80:19 81:1,2 83:5 85:21 87:17 88:12,24 89:12 90:15 94:1 103:16 111:15,18,24 112:6,20 121:22 125:4 129:4 131:2,17 139:21,22

140:2 142:12 155:15,20 168:4,5 170:16 170:23,24 178:14 179:9 183:5 184:11 186:6,9,9,11,15 186:18 188:15 190:18,19,21 197:11,19 198:1 198:5,6 199:22 200:1 200:3,8,17,25 201:10 215:13
attacks 57:6,17 57:19,20,20 57:21,22,24 58:16,23 59:6 78:12 79:19 79:20
attempt 61:17 61:22 121:1 133:10
attempted 201:4
attempting 15:4 187:7
attended 118:19
attention 15:2 34:8 115:24 116:2 117:21 134:22,24
attest 17:3
attorney 12:10 14:8,13,21 15:19 26:1 63:4,7 102:15 221:12
attorneys 13:25 14:1 19:10 26:5 31:7 204:14
attribute 190:18
atypical 100:13 100:19
August 30:9,10 30:11 41:18
authored 21:1
authoritative 149:10 169:18 173:11,14
authority 124:9 151:2 157:1 161:19,23 165:12
available 215:17
Avenue 4:7 222:7,19
average 23:21 85:19
avoidable 197:9 197:11
avoided 70:7 75:15 216:3
awake 103:24 137:17
awaken 186:20
awakeness 47:9
aware 29:8,17 92:10 93:2 103:12 115:10 137:2 151:5,10 167:4 168:25 171:5 200:5 217:14 219:1
awareness 189:10

B

B 2:8,13 11:9 222:19
b)4 5:19
back 10:17 56:9 56:10 60:19 60:23 63:6 78:21 105:25 115:20 116:6 118:4 120:5,8 120:16,25 121:4 125:14 144:20 151:12 151:18 153:16 161:8 202:16 202:22,24
204:25
background 12:1 15:11,16
backwards 60:4
bad 55:2,4,7 83:20 87:22 158:11 166:22
badly 57:12
bail 200:4
bailed 102:16
base 118:15,16 118:17 166:8,8
based 47:18 48:1 67:21 68:13 72:24 74:20 96:25 97:24 113:12 115:9,16 120:21 127:2 127:20 128:2 129:15 132:16 132:18 149:15 150:2 153:13 153:14,15 154:8 165:3,4 165:4 176:8 177:16 178:8 183:19 187:19 191:9 196:25 210:1,7 212:8 218:11
baseline 129:25 153:5 189:1,2 194:12
basic 147:10 169:7,7,7,13,14 169:16 191:9
basically 12:17 55:7 57:4 60:4 97:4,5 98:8 113:18 121:12 138:11 155:19 176:3 183:24 207:12
basis 5:15 40:24 42:3
127:1 203:8
beating 56:15 56:16 81:22 147:24
beats 113:6
becoming 81:10 129:10 148:16
bedding 174:18
began 195:21
beginning 183:5 195:15
begins 106:9
behalf 1:15 5:9 25:25 26:8
behavior 107:11 107:15,20,23 108:15,20,24 109:6,10,21 110:9,18 210:16,21
beings 165:25
belief 68:8 77:14 110:12 110:22 122:15 131:8 187:18
beliefs 211:9
believe 8:11,13 13:11 14:3 19:20 24:16 31:7 42:25 43:3 44:1 51:4 53:10 58:25 60:16,17 61:20 64:10,15 67:22 68:5 71:21 75:18 78:18 88:11 90:7 91:23,24 94:9 95:22 96:21 103:4,15 105:14 106:9 106:18 107:13 110:18 115:19 115:22 118:25 119:10,20 120:12 121:8 121:14,21
122:12 129:3 133:23 134:4 135:6,21 136:7 143:12,15 145:25 146:5 148:23 149:8 149:13,23 150:7,11 151:24 152:7 154:7 157:4 159:14 159:17,23 160:20,21,25 161:7,9 164:16 165:1 168:7 173:19 175:19 177:13 179:11 180:12 182:14 183:18 184:14 184:19 194:9 199:14 200:13 200:15 201:9 202:23 208:7 213:7,7 215:14 215:20 217:17
believed 210:15 210:20
believes 59:12 59:15 101:8
belter 170:22
benefit 176:5 180:2
Bennett 62:9
Benzodiazepi... 148:20
best 35:15 37:8 50:18 55:13 58:20 59:23 67:10 96:12 114:9 138:8 143:23 210:23 221:7
better 14:2,4,13 98:24
beyond 67:25 70:9 114:6 126:13 201:14 201:14 205:9

208:10
bias 134:16 175:9 180:8,11 180:14,21 203:6 219:22
biased 15:1
biases 180:9,22 203:11,13,17
big 78:22 167:13 180:16 203:6,13
bill 21:12
billing 21:8 30:20
binder 7:11,15 32:3,9,12,13 32:15,15,21,24 207:4,7
bit 58:9 66:17 79:18 97:15 111:20 167:3 203:15
bizarre 107:5,10 107:15,20,22 108:1,2,4,15 108:20,23 109:5,10,21 110:10,18 210:10,16,21
bizarrely 109:25 110:2,5
black 206:19 206:25
Blackburn 1:14 3:16 5:3,8,25 6:2,4,25 7:1 214:25 222:13 223:3 224:5 224:20
blame 76:15
blanks 153:22 153:23
BLC 169:13
blockage 74:14
blockages 57:20 58:2 58:23
blocked 58:3 186:6 199:24
blood 37:24 51:7,15,24 52:1,2,3,12,14 52:24 53:3,5 53:8 56:16 70:1 76:19 79:11,15 80:22 81:11 89:10 104:14,19,19,21 104:25 113:11 113:11,12,24 114:17,18 129:1 136:15 143:9 144:23 168:6 174:24 175:1 187:5 202:2
BLS 168:15 169:11 220:3
Bluffs 3:20
blunt 179:24
body 41:2,9 47:2,3 49:6 80:23 183:1 192:4
bold 181:15
book 35:21 116:7
booked 115:17 129:10 130:12 153:7 209:5 216:1
booking 75:11 75:14 98:8 162:24 163:11 208:15 214:12 214:14 215:21 215:21 216:21
books 21:1
Boone 10:4,11 10:12,23 13:4 14:14 21:24 22:14 23:14 23:22 24:15 25:1,16 28:24 29:15 36:12,13 36:15 38:3,24 39:1,4 40:6,12 40:14,15 62:4 86:5 118:8,16 118:18 119:24 134:8 144:18 148:22 151:16 204:7,22 206:23,24 209:3 221:4
bothers 117:9
bottom 76:11 80:3,11 92:5 134:15 172:11 174:8,23 175:10,14,17 181:14 184:5 193:17 205:16
box 146:9 212:19 214:7 214:13
Boyce 144:24 145:3
bradycardia 194:4
brain 41:2,9 167:25 168:3 168:9,14 170:19 188:9,11 188:12 190:25 198:17,25 199:4
break 77:10,11
breakdown 152:10
breakdowns 196:19
breakfast 103:7
breath 58:24 83:9 86:13 114:24 115:1 147:23
breathing 47:17 81:23 104:1,2 114:25 115:2 148:2 169:10 170:5,6 219:19
Brewer 36:10
brief 32:21 209:10
brighter 82:19
bring 20:14 21:3 21:7 52:15 98:7
bringing 67:13
Brittney 139:8,11 167:19 198:13 218:16,16
broad 127:9
Broadway 3:20
broken 199:6,8 199:19
brought 6:6 21:15 37:21 38:24 39:10 39:16 40:6,12 67:23 69:18 74:15 84:22 85:23 100:17 207:24 208:2
Bruce 40:3,11 64:19,21 153:19 184:1,5
bruises 57:22
bunch 92:23 206:16
Bureau 149:16 149:19
burned 28:17 204:16
burnt 62:6
busy 28:17 202:12
Bynum 144:24 145:3

C

c 2:15 4:1 5:16 5:19 18:16
call 24:12 56:18 56:24 80:4,7 81:10 82:14 83:18 85:19 85:24 93:20 93:23,24 127:10 136:24 150:5,13 164:17 195:21 199:15,18,19 209:7 214:11 216:22
Callaway 1:7 3:11,23 34:21 35:8,12 39:11 39:16 42:25 50:15,16 65:16 67:7,14,23 70:5,14 74:4 77:17 84:2 89:14 92:8 94:16 97:17 103:12 106:15 122:12 130:9 135:22 141:23 142:1,25 143:20 144:8 145:5 146:14 147:17 149:11 149:20 151:4 155:12,23 156:1 159:10 160:19,21 161:1 168:17 169:18 171:7 173:12,16 173:16 175:19 176:14 177:22 188:2 194:23 195:24 197:15 197:22 200:11 200:15,15,22 201:11 202:3 202:15 215:15 222:10 223:4
called 71:19 78:23 79:3 143:17 146:11 180:21 199:10 204:24 214:17 215:22 216:11 217:9
calling 176:24

184:18 216:18
calls 5:20 6:11 37:17 45:19 56:4,5 58:19 59:22 61:6 67:9 68:3 70:8 97:22 114:22 118:11 140:22 151:14 161:5 176:24 177:8 201:13 212:4,17 213:4 219:9
calm 23:1
camera 182:23 187:13,16
cameras 134:10
Cap 28:11
Capital 16:13 27:9,12 28:4
Capitol 222:19
Captain 36:9,10
car 57:23 58:9 58:11 68:14,25 95:10 131:9 185:19
carbon 89:7
cardiac 43:1,5 55:23,24 56:1 56:2,3,3,11,14 56:18,20,20 56:21,24 57:4 60:1 70:6 71:17 112:15 187:23 193:16 215:13
cardiology 191:1
cardiomyopat... 74:15 78:23 190:21 194:11 199:7,15,17,18
care 15:2 16:14 16:21,22,24 17:1,7 20:3,4,5 20:8 21:20 29:19 42:24 50:25 51:25 52:2,3 53:11 53:13,17 55:3 69:10,12,15,16 76:10 102:14 105:7 106:6 106:20 114:11 116:24 117:16 121:15,16,18 124:15,16,23 130:9 142:8 148:23 149:13 155:15 164:17 169:2 173:6 179:6,8 180:19 180:24 190:15 191:14 197:24 198:22 202:12 202:13 203:2 203:23 204:11 205:22
career 69:8
careful 203:12
Carey 204:24
caring 114:13,15
Caroff 123:1 168:18 170:4,4 170:16 184:2 187:15 198:13 218:16,25 219:7
Caroff's 139:8,11
carried 159:25
carry 137:18
Carson 17:19,20
case 1:6 3:9 7:24 8:4 9:8,9 9:13,16 10:3,6 10:15,25 16:14 16:16 17:5,9,17 18:6,10,13,17 21:4,9,17 24:3 25:8 26:5,12 26:14,16 29:13 30:1,16 31:4,12 31:21 34:8,17 35:3 36:25 37:5 38:8,13 44:3 46:1 50:9 61:18,19 62:8,9,12,22 62:23,24,25 63:8,11,16,20 64:7,15,16,22 65:2 66:15 67:21 77:2,15 78:5 83:16 90:3 103:11 106:10,16 110:16 120:11 121:16 122:23 124:4 128:2 137:6,20 145:4 146:18 153:4 157:6 163:18 173:1 184:20 185:25 187:19 191:8 195:11 196:9 198:20 205:9 206:3,7,9,16 207:12 209:10 216:20 222:14 223:4
cases 16:3 17:24 24:17,18 25:21,25 55:21 120:4
Cassandra 1:4 3:5,23 29:13 29:22 30:3 38:2 48:7 51:1 51:7 64:19 65:9 68:7 70:4 77:16 79:23 84:2 85:20 86:21 91:16,18 92:7 93:1 94:15 95:23 114:4 115:9 124:24 130:14 131:5,21 133:21 147:7 151:2,4 160:1,4 161:2 166:12 175:20 176:5 178:25 182:20 199:8 203:2 207:24 208:19 209:22 210:4 213:3,15,22 214:15 215:12 215:17 216:24 217:6,24 218:23 219:5 220:13 222:10 223:4
catch 60:18,25 128:20 144:1 179:3 201:7
catchall 208:16
catches 185:22
catching 178:13
cath 199:23
catheterization 60:1
caught 75:9,22 77:22 128:15 134:5 150:8 178:4 179:24 185:10
causation 73:11 76:12 132:21
cause 3:21 47:13 62:17 62:20 80:25 81:2 84:6 111:23 113:1 141:6 186:8 191:20,22 198:23 199:1 200:17,24 201:10
caused 28:15 35:7,7 43:8 62:17,19 107:23 110:6 131:4 168:3,5 200:16,24 201:10
causes 58:10 75:23 79:20 81:19 112:6
causing 144:13
cautious 203:9 203:12 204:3
CCJ 92:7 122:8 132:10 142:23 145:20,20,25 156:13 162:13
CCR 222:25
cell 103:25 133:1,4 174:14
cells 133:3 134:10
Center 4:7 26:20,22 27:10 51:12 54:6 65:12 66:5 105:7,8 117:2 118:4 119:11 120:16 124:22 133:22 136:13 142:4 151:5 155:14 184:16,16 202:3 222:7
CENTRAL 1:2 3:3,22
certain 3:21 60:11 73:5 75:1 132:17 138:16 165:9 187:8 192:22
certainly 70:11 73:23 77:1 208:18
certainty 70:13 71:15,19,22,23 72:3,20 73:6 73:16 74:5 75:25 78:3 111:14 128:2 133:16 136:11 167:19 168:8 198:10 201:5 205:4 219:6
CERTIFICATE

221:1
certification 218:19
certified 149:3
certify 7:5 221:5 224:5
cetera 17:6 48:1
chance 64:14
change 28:15 81:12 96:6,17 97:19,25 137:10 144:15 159:16,22 167:16 204:17 204:18 223:10 223:14,17,20 223:23
changed 144:11 167:20,22,25 176:22
changes 222:16 224:7,10
changing 136:15 154:5
characteristics 93:11
characterize 13:3
charge 38:3,25 39:6,8 196:3 196:6
charges 94:25
check 53:2 100:7 131:25
checked 92:23 212:19
checks 94:21 101:20
chemical 192:1
chest 58:24 105:4 135:24 139:16 168:16 169:10,12 170:12 219:18 220:1,10
children 16:8
choice 23:7
59:25 213:18
chose 213:23 219:7
chronology 5:25 33:18,21 33:24 34:12 34:13
Cigarettes 41:11
circles 76:9
circulate 79:11 79:15
circulating 56:16 80:24 104:19,22 168:6,13
circulation 187:5
circumstances 98:4 102:19
cite 20:10,11 21:20 75:1
City 4:17
claim 72:15
claiming 76:13
claims 11:3 29:9
clarification 38:12 207:22
clarify 38:19
clarifying 57:14
clean 119:16
cleaned 138:11
clear 37:4 52:13 185:17 194:4 197:21 211:3 213:10
clearance 146:19,23 147:2 151:1 172:10,14,17
cleared 143:16 151:2 185:16
clears 172:20
clinic 188:21
Clonidine 148:19
close 25:11 163:11
closely 65:6 164:19
clothing 133:10
CMS 54:11,12,13
co-counsel 18:12
co-morbidities 44:7
co-morbidity 42:15
CO2 89:7,7
cognition 66:23 126:2,6 127:15
cognitive 180:9
Coil 17:19,20
Cole 16:12 17:2 17:16 18:6
College 27:3
color 32:8
Columbia 3:20 16:7 27:11
combination 86:6 195:22
combined 88:11 164:16
come 40:24 46:17 52:5,18 63:6 87:16 90:1,8,20 101:14 102:11 102:13 113:18 124:18 126:22 144:24 150:6 150:20 167:13 170:11 172:19 178:21 179:22 200:4 202:6 202:16 204:15 204:25 211:25 219:21
comedown 89:20 141:10 141:11 150:17 192:14
comes 75:20 99:12 187:23 202:22
208:14
coming 19:24 44:25 89:14 90:7 130:9 140:4 153:16 194:22 202:3 214:16 216:4,7 216:8
COMLEY 4:15
comment 25:22
Commission 149:6 224:24
commissioners 204:14
commit 174:13 184:25 185:1
committed 184:18
commonly 57:3
communication 5:16 30:17 33:11 167:10
communicati... 5:21,23 6:21 7:22 8:15 33:7
community 11:23
compare 46:7 189:1
comparison 205:17
competent 69:16 156:25
complain 85:1
complained 183:20
complaining 139:4 182:25
complains 193:15
complaint 170:25 183:1
complete 79:21 124:25
completely 31:6 45:19 79:24
complications 62:16
comply 200:16
comport 122:13
compound 192:1
compression 62:15 220:1,10
compressions 105:5 168:14 168:16 169:10 169:12 170:12 171:1 219:18
concern 146:1 156:17 158:10 169:25 184:5 184:6 190:23 191:24 214:13 215:24 216:5
concerned 138:4 166:10 204:2 216:17
concerning 93:1 161:21,22 163:15 213:8 219:15
concerns 48:24 93:11 115:15 120:24,25 153:15 157:18 158:2,5 162:13 162:19 164:22 214:16
concluded 220:20
conclusion 89:5 195:13 213:5
condition 35:6 88:7 162:23 167:11 216:24 217:10
confinement 37:2 38:5 39:2 51:19 67:6,13,20,22 68:9 69:2,6,11

70:18 71:16 74:6 75:11,19 75:21 77:21,21 95:24 96:19 97:12,20 111:11 112:2,9,13 115:21 116:6,9 116:16,18,21,22 117:7,9,19,22 119:1,3,9 120:2 120:4,15,21 121:11 123:15 123:24 146:19 146:25 147:4 150:7 151:8 155:13 177:7,11 178:3,10,22 179:1 201:23 201:25 202:7 202:22,23
confinements 202:16,17
confirm 144:9
confirmed 71:8
conflicting 44:10
confounding 44:10
confused 74:13 126:1,9 137:11
confusion 141:16,22 189:10
congenital 57:25
connect 108:23
connection 110:21
consented 51:15
conservator 44:21
consider 25:12
considered 55:2
consistent 64:8
construed 64:1
consulted 150:4
consumed 103:9
contact 107:5 161:12,22 165:11 197:3
contacted 30:15 31:4 63:4 124:7,8 161:20 212:24 218:2
contacting 165:15 177:3
content 6:17 137:10
contents 21:15 21:16
context 20:19 20:21
continue 24:7 47:1 49:2 98:5 141:9 191:1
continued 81:15 81:21 153:10 161:12 189:17 191:19
continues 81:16 88:20,21 189:13 190:1
continuously 133:25
contraband 165:22
contract 54:16 145:2,8,9 146:16
contracted 23:18 54:13,15
contracting 79:11
contractor 53:21 55:6,6,7
contributed 35:7 62:17,20 200:7,17,24 201:10
contributory 81:3
control 90:10 192:14
controlled 95:4
conversation 137:11,12,18,21 138:1,4 153:15 154:8 184:1 190:8
conversational 163:20,24
cooperation 183:22
cooperative 99:24 100:13 100:24 101:21 212:9
copies 21:3 32:6,10 222:13
copy 5:22 18:21 20:5,7,11 222:15
Corizon 53:24
corner 99:7
coronary 44:8 74:10 112:20
corporative 195:3
correct 6:8 8:5 8:23 9:16,17 9:20,21 10:20 11:6,14,15,17 11:20 13:21 15:22,23 16:2 18:22,23,25 19:1,7,8 20:3,4 20:5,8 21:20 28:6,11,12,13 28:25 29:4,16 31:9,15 32:22 33:3,12,19 34:21 35:3,4,8 35:9,12 36:1,2 36:4,5,8,20 38:8 39:17,19 39:25 40:21 41:18,21 42:21 42:22 43:5 44:12,16,19 45:4,10,11,14 46:6 48:5 49:16,17 51:12 51:16,17,20 54:23 56:12 57:2,4,10 58:3 60:21,25 63:4 64:22,23 65:2,13,16,19 66:2,9,18 68:24 70:16 72:6 73:14,21 73:24 76:23 77:25 78:7 80:17,23 86:9 87:11 88:2 92:12,20 94:12,16,22 95:3,5,9,11,20 97:12 98:17 99:7,15 100:10 102:24 103:5 103:7,14 104:8 105:9,12,13,18 105:20,21 106:7,8,10,11 106:17,18 107:1 107:5,8 108:17 108:18,24 109:2,18 110:23 111:1,7 111:22 112:11 117:16,20 119:4 119:19,23 120:19 121:12 122:10,13 123:3,7,10,11 123:16 124:5 125:21 126:11 126:14,15 127:5 128:4 130:18,23,24 131:3,5 132:5 132:23 133:1,4 133:7,10,13 134:2,3 137:3 138:4 140:5 141:3,7 142:5 143:1,3 144:5 145:7,11 146:2 146:21 149:17 149:21,22 150:1 152:1,4 154:17,23 155:5 156:3,6 156:11 157:14 157:17 158:3,7 158:8,11,12 160:10 161:16 162:16,20 163:9,12,16,21 163:24 164:4 164:5,8,23 165:16 166:15 171:14,24 173:1 173:6,9,18,25 174:2,3,10,11 174:15 175:6,9 176:11 179:7,17 181:4,19,22,25 182:3,9,18 183:8 184:2,7 186:12 187:9 187:20 188:5 188:6 190:1 191:15 192:10 193:10,17 194:2,14,15,17 194:23 195:1 195:15 196:1,4 197:20 199:5 204:24 205:22 207:17 209:15 209:16,19,19 209:25 215:10 217:12 218:20 224:9,13
correcting 197:24 198:5
correction 36:1

36:7,20 50:16 107:17
correction's 108:19 109:5 109:16 110:17
correctional 12:4 13:5 16:21 16:23 53:22 54:6,7,10,15,17 91:20 93:2 107:4 118:20 123:5 124:1 146:16 149:6 150:14 151:3 151:10 155:3 157:1,4 180:11 181:24 203:5 208:5 211:24 214:2 215:12 215:15 217:18
corrections 36:16 127:13 180:16 222:16
correctly 13:3 45:5 80:22 173:20
correlate 101:1
corresponde... 5:14 8:20 18:24 19:2,4
cortisol 81:19 199:25
cost 204:4
counsel 5:2,2 19:4 221:9,12
Counsel's 161:15
counter 99:23 100:12,24 101:21 183:21 212:9
counties 52:21 203:7
counting 17:12
counts 16:6 203:20
county 1:7 3:11 3:23 9:11 10:4 10:11,12,23 13:5 14:14 16:9 16:12 17:2,16 18:6 21:25 22:14 23:14 23:22 24:15 25:1,16 27:16 27:18 28:24 29:15 34:21 35:8,12 36:12 36:13,16 38:3 38:24 39:1,4 39:11,17 40:6 40:12,14,15 42:25 50:15 50:17 52:16 62:4 63:17 65:16 67:7,14 67:19,23 70:5 70:14 74:4 77:17 84:2,20 86:5 89:15 92:8 94:16 97:17 103:12 106:15 118:8,17 118:18 119:24 122:12 130:10 134:8 135:22 141:23 142:1 142:25 143:20 144:8,18 146:14 147:17 148:22 149:11 149:20 151:4 151:16 155:12 155:23 156:1 159:11 160:19 160:22 161:1 168:17 169:19 171:7 173:12,16 173:17 175:19 176:14 177:22 188:2 194:23 195:24 197:15 197:22 200:11 200:15,16,23 201:12 202:3 202:15 204:7 204:14,22 206:22,23,24 209:3 215:15 221:4 224:3
couple 19:18 109:1 130:5 189:21 220:8
course 41:4 74:25 88:24 90:5,16,22 115:15 129:1 131:6,16 140:8 140:9,11 155:15 189:1 219:20
court 1:1 3:1,21 4:21 14:24 15:5,10,15,17 206:2,5 221:17
coverage 28:18 28:21 36:7
covered 132:6 195:17 196:11
Cox 1:4 3:5,23 29:13,22 30:3 38:2,23 39:10 39:22 40:11 41:15 42:17,21 48:7 49:18 64:19,21 65:9 68:7 70:4 77:16 84:2 85:20 86:21 91:16,18 92:7 92:11 93:1,3 94:15 95:23 99:10 102:22 103:13,23 106:20 114:4 115:9 124:24 130:14 131:5,21 133:21 147:7 149:23 151:4 153:19 154:25 160:1,5 161:2 168:18 170:15 175:20 178:25 181:2 182:20 184:2,15 188:5 188:14 197:14 200:2 203:2 207:24 208:19,23 209:14,17,17 209:22 210:4 211:18 213:3,15 213:22 214:15 215:12,17 217:6 220:13 222:10 223:4
Cox's 40:3 79:24 123:10 167:20 184:5 200:17 210:16 210:21 216:24 218:23 219:5
CPR 167:18,20 168:7,9,18 169:6,18 170:9 170:17 171:6 186:3,5,7 187:18 198:4 198:12,12 218:16,20,22 218:24 219:1,4
Cramer 167:19
create 33:21 131:1
created 33:24 159:18,24
creating 166:13
criticism 134:13 136:3 144:3 145:4 156:5
criticisms 50:8 50:22 108:12 135:16,25
Cross 2:4 207:23
Crush 152:20
crying 36:25 37:10 38:1,3 38:25 39:5 183:4
curb 68:15
currently 8:15 26:19,20 155:23 193:6
curriculum 11:7 11:10
cursively 116:23
cursory 128:19 134:6
custody 65:22 66:21 68:7,18
CV 18:2,22 31:9 33:2 62:10
Cyrus 18:12

D

D 2:1,16 32:1,18 207:15,16
dad 138:1,3,6
daily 42:3
damage 198:1 199:1
Dashtaki 18:12
date 30:6 116:20 127:24 166:15 223:6
day 3:19 24:10 41:21 43:19 49:18,21 58:11 60:10 85:5 103:2 104:10 105:19 112:5 117:5 120:4 123:3,20 127:24 130:2 144:21 150:21 190:1 211:25 224:14
days 46:25 70:6 81:6,14 94:2 111:16 112:16 118:10 125:5 129:24 130:5 171:19

189:21 197:19 216:7 222:18
deal 132:12
dealing 36:20
deals 122:9 132:11,13 157:16 163:11
Dear 222:12
death 191:22 199:21
decide 6:15 151:17
decided 28:19 67:5,5 101:15 123:13 213:8
decision 15:12 34:14 73:1,15 94:1,3 97:3 107:19 108:20 109:15 123:6,9 123:14 151:12 161:24 169:4 192:10 218:11
decisions 19:25 28:21 109:1 161:18 180:24
declare 214:8 224:12
declared 214:10
decrease 47:15
Defendant 1:15 5:10
Defendants 1:8 3:13,24 4:12 5:3
defense 26:12 26:13 204:14
defer 143:18
deferential 196:24
deficiency 111:21
deficit 191:20
define 56:9 72:18 79:6 107:10 159:4
defined 58:8 122:20 164:3 210:11
defines 146:19
defining 12:1
definitely 69:23 71:12 83:16 91:2 142:3 170:2 179:3 179:22
definition 12:9 13:19 111:17 170:6
degree 11:13 13:7,10,20,22 15:21 16:24 70:13 71:14,18 71:22 72:3,11 72:20 73:16 75:25 78:3 111:14 116:4,5 128:1 133:15 136:11 167:18 168:8 196:18 198:10 201:5 205:4 219:6
dehydration 74:17 105:1 152:13
delayed 106:20
deliberate 11:20 14:5,6,13,20 15:6,20 206:6 206:10 213:2
department 12:4 27:9 49:19 50:6 51:11 65:23 67:19 68:2,7 70:4 77:17 91:12,17 92:16
depend 46:21
dependent 25:5
depending 42:10 108:2 116:21 147:24 202:10
depends 42:14 44:6 45:21 52:16 69:20 117:11 141:13 179:21 186:5
depo 210:24
deposes 5:10
depositing 94:15
deposition 1:14 3:16 5:3,14,23 6:1,23 7:23 8:17,22 9:25 10:6,9,15,25 11:1 16:7,9,11 16:23 17:10,25 18:7,15,16 20:17 21:4 22:19 26:15 32:25 40:3,9 50:5 64:24 89:22 92:1,25 101:4,7 139:9 139:11 153:25 154:10 175:4,5 179:16 182:12 182:14 184:6 196:4 201:15 203:16 209:9 210:2,14,25 211:13 213:11 217:2,20 218:15 220:20 221:6,10 222:13 224:6 224:8,11
depositions 9:1 9:18,22 11:2 15:25 16:4 23:1 31:14 64:18 65:1,7 162:21 165:5 210:7 217:19
depressed 84:25 140:20 140:20,25 194:21
depression 81:18 83:24 84:3 85:1 86:7 98:16,20 99:11 99:18 100:5,21 100:24 138:22 153:12 181:18 185:14 194:22 197:5
DEPT 222:11 223:5
Derek 10:4,12 29:2 203:16
derived 22:8 22:23
derogatory 161:18
describe 99:21
designated 64:7 67:25 68:1 114:7
designation 70:9 201:8,14
desired 222:16
desk 157:13
detail 66:18 117:21 122:1 134:22 195:17
detailed 126:21
determination 12:12 146:23 147:2 210:16
determinations 107:7
determine 14:2 14:21 15:15 17:5 37:12 58:5 61:20 101:9 107:19 107:22 108:20 109:5,9,17 113:5,12 123:6 123:13 127:11 164:7 180:15 187:7 196:18
determined 62:23 181:10
develop 153:1,4
developing 153:6,8
diabetic 44:8
Diabetics 59:4
diagnose 127:12
diagnosis 74:18 75:5 181:17 196:25
diagnostic 53:7 70:1 125:1 143:10
diaphoretic 47:10
die 83:21,22 85:3 87:1,3,5 87:19,20,25 87:25 88:5 132:22 174:14 183:11 188:5
diet 129:22
differ 82:24
difference 14:23 91:1 96:20 137:12 167:13 170:17
different 18:6 36:16,18 53:15 56:9,19 57:15 57:16,16,18,18 57:19 78:11 79:18 87:24 88:1,2 108:7 157:3 167:24 184:20 185:22 196:23 198:16 201:20 214:3 215:25
differential 181:17
differently 13:18 51:5 90:2 217:19
difficult 135:11 145:18 165:13 183:21

dinner 88:24 124:1 125:17
dioxide 89:7
dip 144:23
direct 2:2 57:23 58:14
direction 221:8
directly 53:20 54:8 197:18
director 10:13 10:20,23 12:4 12:22 13:4 14:14 25:2 27:9,14,22 28:8,23 36:15 36:19 86:5 118:16 148:22 214:3
disagree 40:17 40:18 107:25
disclose 6:20 6:22
disclosing 55:14 207:11
disclosure 6:24 207:7,11
discomfort 139:4 153:1
discovery 23:6 201:15
discuss 44:24 66:23
discussed 142:20 145:23
discussing 201:16
discussion 137:22 165:21 220:12
disease 44:8 74:11 112:20 137:15,16
disheveled 125:13,17 127:14
dismissed 206:21
disregard 134:21
distress 83:3 136:20
District 1:1,1 3:1 3:2,21,22 188:3
diverted 184:22
divided 25:18
DIVISION 1:2 3:3,22
Doc 46:1 54:16 54:20,21
doctor 5:15 18:2 20:22 22:9 23:7 26:18 37:8,16 40:21 49:25 50:14 50:18 55:11 56:6 58:20 59:17 67:10 68:4 70:10 87:20 93:12 96:11 111:14 112:14,14 114:7 118:7 121:7 124:16 125:4 155:8 161:5 175:20 177:9 178:2 188:10 192:24 210:1 211:7 219:22
doctors 82:19 117:4 180:7 203:10 216:16
document 20:14 64:5 86:20 94:24 95:7,13,16 96:10,25 97:5 126:8
documentation 103:10 125:19 174:1
documented 20:9 126:23 152:6 217:10
documents 6:1 7:7,8,9,14,20 8:2,3,7,11,13,14 18:21 19:9,14 19:18,19 20:13 21:21 31:14,15 31:17,22 32:2 34:3 126:5 163:19 205:8 205:20 208:1
doing 13:5 24:17,25 55:13 60:7 67:1 80:16,18 111:6 114:18 115:11 117:6,19 117:22 128:19 134:6 135:8 148:21 154:7 168:14 178:3 178:10 186:5,7 204:4 205:23 211:15 213:1 219:18,24
domestically 16:8
doom 83:18 85:2 87:2,6 87:10 88:6
door 204:13
doubt 146:15 176:6 178:6 180:2 201:23 203:18 210:2
downer 93:20
dozens 53:14
Dr 5:24 6:2,25 7:1 62:17,19 214:24
draft 5:17,21,24 6:21 19:11 20:19,22
drafts 5:18 6:7,9 6:14,16,17 7:21 7:22 8:14,16 8:20,20 19:3
dragging 162:9
draw 51:7,15,24 52:2,3,12 53:3 113:24 114:18 166:7 174:24 175:1 202:2
drawing 114:17
draws 52:1,14 52:25
drink 89:18 131:21 150:19
driving 209:14
drop 61:1
drug 38:3,24 39:6,8 45:12 59:5 66:7,11 66:14 67:2 73:19 85:5 93:3,25 94:2 94:12 95:2 108:24 109:13 110:14 140:19 142:24 143:5,7 143:9,13 144:4 144:7 145:5 190:9 192:22 193:19 201:19 208:7 214:23 215:1
drug-free 189:17
drug-related 181:19
drugs 36:25,25 69:1 91:22,23 94:25 95:15 95:19 96:6,16 102:6,12,18 107:5,23,24 108:2,15 109:10,21,24 110:3,6,6,19 143:3 148:12 148:25 158:24 158:24 159:2 159:6,8 175:25 208:2 210:22
dual 28:18,21
due 57:21,22 57:24 74:16 107:5,24 108:2,15 109:10 110:18 190:22 192:18 199:24 210:22
DUI 208:2
dumbfounds 219:23
duties 11:17 13:11
duty 12:2,9,14 12:19 13:8,19 14:2,4 36:6 163:16 206:2 206:10
DWI 36:25 91:22 92:11 94:25 95:19 96:6,16 115:17


E


E 2:1,8,18 4:1,1 207:11
e-mail 30:18,22 30:25
early 152:23
ears 127:7 128:12
easy 45:12 150:5 171:2
eat 85:12 89:18 150:19
eaten 130:14
eating 129:18 130:2 131:16,16
ED 27:9
educate 120:6
education 15:11
educational 12:15
effect 123:24
effects 41:1 42:25 47:2,3 47:4,6 190:17
eight 23:18

25:12,17 187:3 187:4
either 67:5 89:13 90:13 104:22 105:15 107:13 112:3 112:22 113:13 113:17 119:22 121:17 130:23 141:19 150:13 167:14 181:7 217:10
EKG 70:1 113:10 128:24
electrical 79:7
electrolyte 71:7 89:6
elevated 152:9 199:25
eliminated 49:6
elimination 48:1
emergency 16:13,17,25 24:13 27:21 40:20,21,24 48:22 53:18 53:19 69:17 71:10 75:6 87:16 103:25 110:23 111:10 112:23 113:10 113:15 116:22 120:8 123:15 124:3 133:20 135:10 150:23 160:5,19 161:3 161:15 162:5 165:16 167:5 170:11 173:21 180:17 185:5 185:16 191:10 194:10 199:22 213:12 214:8 214:10 219:6 219:22
emergent 197:6
emergently 214:9
emotional 190:12
emotionally 183:7,11,16,17 183:18
emphasize 203:4
emphatically 68:5
employ 146:17
employed 26:19 53:20 53:22 54:7,8 54:10 221:9,12
employee 54:1 54:3,4,17,20 54:21 146:13 211:14 221:11
employees 131:20 149:21 200:16
employment 24:1 62:4
EMS 79:4 103:25 105:3 107:5 168:12 187:4
enclosed 222:13,14
encompass 136:3
encompassed 64:10
encountered 91:9,18
encounters 107:4
ended 62:14
endorphins 199:25
ends 153:13,14
energetic 47:12
energy 140:18
engaged 14:20
entered 70:14 197:14
entering 195:24
enters 74:4
entire 5:24 34:19 148:21 204:18 219:24
entirely 22:4,12 22:22 23:5,8 36:9 96:24 213:13
entry 70:5 112:2
environment 53:18,19
enzymes 152:9
equipment 171:2
ER 113:13
errata 222:14,16 222:18 223:1
especially 144:21 158:17 190:11 203:5
essentially 104:2
established 77:14
estimate 49:7
et 1:7 3:11,24 17:6 48:1 222:11 223:5
euphoria 47:11
evaluate 157:10
evaluated 41:16 73:8 105:3 124:19 147:7 149:24 177:17 214:4
evaluating 166:12 210:5
evaluation 30:1 30:5 37:25 51:9 67:2 69:4 73:19 120:9 124:20 124:23 125:1 135:16,23 136:7 156:19 175:21 176:8 184:23 185:4 185:19 188:24 190:17 209:22 211:4,15 213:15 215:19 220:12
evaluations 120:9 135:17 191:2
evening 125:16 126:6 129:5 152:25
event 43:1,5 55:24 56:2,3 56:18,20,21 56:24 57:4 71:17 73:12 76:18,19,20 112:16 215:13
events 120:9
eventually 81:21 194:11
everybody 169:24
evidence 112:13 112:15,17 125:15 131:19 138:25 139:23 140:7,10 210:23
exact 60:17
exactly 163:4,19 179:1
exam 43:16 188:25 195:5
examination 2:2,4 5:12 69:6,19,22,24 75:22 111:13 123:25 128:20 150:8 176:9,11 188:17 207:23
examined 3:17 5:9
example 59:4 79:13 87:16 137:13 158:23 202:21
exception 196:13 198:4
excerpt 209:8
Executed 224:14
exhibit 2:12,13 2:15,16,18 10:9 10:14 11:9 18:16 32:1,18 94:6,8 98:25 99:6 157:25 172:3 187:23 187:24 207:11 211:3
exhibited 85:21 182:2
exhibiting 38:1 138:15 146:7 146:20 197:14
exhibits 2:10 31:14
exist 57:7
exists 166:15
expect 86:25 127:7 182:8
expectancy 42:13
expected 157:2
experience 12:7 15:12 26:18 41:6 45:8,9 47:6,8,10 59:9 59:11 84:21 89:23 90:1 100:14 118:7,15 118:16 127:3 151:9,16,17 186:1 191:10
experiences 40:20
experiencing 139:15
expert 9:15,16 9:20,23 10:18 17:25 18:9 22:8,23 24:17 24:18 25:1,6

26:1,3 30:16 63:21,23 66:7 68:1 201:19 206:17 207:7 207:11,12
Expert's 66:14
expiration 116:20
Expires 224:24
explain 78:14 88:16 103:17 103:22
explaining 14:24
exposure 82:22 90:4
expound 148:8 156:20
express 87:1 154:16 196:9 196:12
expressed 72:2 141:2 196:15
expresses 83:18
expressly 5:6
extent 6:10 64:9 135:21 155:7 176:24
extra 32:10
extremely 28:17 45:14
eyeball 135:1
eyeballed 134:11
eyeballing 135:12
eyes 14:6 127:7

F

facilities 53:15 54:25 55:23
facility 10:21 16:23 23:17 52:17,19,19 53:14 55:5 84:19 151:10 184:7 202:11 203:14 213:16 214:11
fact 39:24 68:25 87:19 96:1 125:20 129:9 137:9 150:4 164:10 176:20 183:19 196:16 200:2 217:5,14
factors 81:3
fail 157:9
failed 17:7 122:13 162:19 175:20 190:10 190:11 200:16
failing 157:9 160:3,16 165:14,14 166:20 169:17 171:12,17
failure 76:16 135:17 145:22 149:25 171:20
failures 170:14 197:21,23 200:22 201:9
fainted 186:21
fair 130:11 135:19 166:7,8
fairly 136:3
faking 180:3 186:22
false 60:12
family 169:3 170:11 192:24 199:21
fan 116:16
far 47:3 51:18 51:23 82:19 94:14 114:10 139:10,13 157:12 174:2 195:10 213:12
fashion 106:24
fast 128:25 147:24
father 130:22 137:9 153:16 153:16 184:18 185:1 200:3
fatigue 58:24 140:25
fault 62:24 157:5,7,8
fear 98:16,20 99:11,18 100:5 100:21,23 101:13,14,16 181:16 211:22 212:2,14
February 39:10 39:14,20 48:8 70:19 71:16 73:18,19 75:14 89:12 90:14 91:8 96:17 105:11,24 117:5 125:16 126:7 129:5,6 130:8 130:25 131:7 131:13 132:22 133:17 135:10 137:1,21 138:13 148:24 152:8 155:15 160:5 166:3,18,18 170:16 178:14 178:25 179:9 181:3,7 195:22 198:7 200:17 200:25 201:11
Federal 149:16 149:19
fee 5:23 33:5
feed 103:12
feel 18:1 35:23 62:21 69:3 70:10 79:14,14 81:3 83:20,22 87:19,21 134:16,20 150:2 156:22 161:9,10 165:8 167:11 172:13 180:3 191:3,16 196:19 197:1 201:1 214:1 219:11,11
feeling 47:11 87:6,10 88:6 203:5
feelings 83:17 83:18,18 85:2 86:7 87:2,6 153:9,12
feels 69:25 193:16
felt 17:2,3 28:18 62:25 63:18 120:25 134:12 161:22 165:10 190:8
ferret 111:19 126:25 132:7
fibrillation 74:16 79:3 80:5,8 81:23 87:18 104:3,4,5,6,9 104:11,12,13 219:14
fifth 17:13
figure 12:14 14:16 15:10,16 25:13 30:18 87:23
figured 25:11,13 25:14,15
file 21:16,16,18 211:14 218:20
filed 29:3,9 185:1
filing 222:20
fill 158:9 196:24 214:7
filled 92:23 94:14 98:13 146:9 160:9,15
filling 153:22,23 154:2
final 6:22
finances 24:2
financial 192:18
financially 221:13
find 58:25 62:19 63:9 112:9 171:3 222:13
finding 178:7
findings 105:25
fine 23:3 32:10 32:20 38:17 82:25 116:25 216:9 220:2
finish 42:20 160:25
Firm 30:22
first 49:13 75:19 78:22 85:5 106:25 108:19 123:17 133:23 136:8,12 142:3 168:20,23 169:2 171:2 187:14 198:14 218:18 220:4
fit 37:2 38:5 39:1 51:18 67:6,13,20,22 68:9,23 69:2 69:5,10,18 70:4,14,18 71:15 74:6 75:11,19,21 77:21,21 95:24 96:18 97:10,12,20 111:10 112:2,9 112:12,21 115:20 116:6,8 116:13,18,20,21 117:6,9,15,19 117:22 118:3,5 118:25 119:3,8 120:2,3,13,15 120:16,21,24

121:4,11 123:15 123:23 146:19 146:24 147:3 150:7 151:8,21 155:13,14,18 177:7,11 178:2 178:3,9,22 179:1 201:23 201:24 202:7 202:15,17,22 202:23 216:21
fits 112:1
five 9:2,3,18,22 15:25 16:3 33:14 42:12 135:23 156:18 198:14
flat 194:19
flip 99:5
fluid 71:11 91:3
fluttering 80:4 80:14
focus 47:9 180:20
folks 40:23 84:22 202:15
follow 123:12,14 124:2 149:15 150:13 174:7
follow-up 119:15 158:22 174:1 188:22 191:1,3 195:20
followed 131:6 131:15 189:23 204:23
following 149:4
food 131:20
force 103:12
foregoing 221:6 224:6,13
forenoon 3:18
forgotten 163:17
form 29:20 33:22 92:22 98:13,15,21,23 99:4,19 100:10 143:14 146:9 157:12,23 158:3,7,9,11,14 158:15 159:18 159:19,22,24 159:24,25 160:1,10,16 162:15 175:24 177:5 211:8 214:5,6,24 215:8 224:7
former 14:14
forth 105:2
forward 175:15
found 63:6 68:15 98:15 103:25 105:8 131:10 147:7 150:11 171:4 198:15
four 17:12,15 33:7 49:12,14 89:24
fourth 167:7
FPD 201:20
frank 190:7
free 18:1 70:10
frequent 156:15
frequently 134:12 156:8 158:25
Friday 49:20 70:15 75:14,19 81:4,8 88:4,24 89:14 105:15 105:16 111:3 129:11,19 130:8 141:2 145:1 146:6 216:7
front 7:14 99:3 180:12
full 6:3 103:21 112:8
fully 21:7 64:10
Fulton 49:19 50:6,19 51:11 51:11 65:12,22 66:4,21 67:19 68:2,7 70:3 77:16,17 91:12 91:17 92:16,22 105:7,8 113:25 117:2 118:4 119:11 120:12 120:16 124:3 124:21 133:22 136:13 142:4 151:5 155:13 202:2,19
function 97:9 195:7
further 38:21 60:20,23 105:7 112:22 114:3 119:22 136:6 179:6,8 191:2 192:16 220:16 221:11
future 60:9 115:23 166:20

## G

G 4:6 222:5,6
Gabe 17:18,21 18:4,5 63:13
gatekeeper 97:9
gauge 47:24,25
geez 216:8
general 57:3 108:4 116:12 116:16 119:10 125:6,8,9,10,11 201:1 208:16
generalized 193:15
generally 115:4 118:8
getting 28:17,19 57:15 72:18 76:19 81:12 89:2 99:10 154:6 164:11 187:6 195:6 202:7 203:7
gig 179:24
Gilmore 147:6 148:11 157:5,9 213:22
give 10:6,25 11:16,19 13:8,10 13:11 15:13 17:6 23:7 30:6 35:19 36:24 49:1 50:15 55:12 61:23 62:1 63:7 64:11 73:5 75:16 122:2 148:19,20 172:7 176:5,13 180:2,19 181:11 186:24 191:13
given 7:10 8:22 8:25 9:3,18,23 9:25 11:2 15:25 16:4 26:14 72:19 117:23 118:18 133:6 150:16 205:3
gives 64:2
giving 10:9 219:18
Glen 93:2 98:10 99:4 111:6 115:8,19 120:20 126:10 159:23 160:9 196:22 209:9
go 7:5 15:4,15 25:3 28:19 34:16 37:9,13 46:1 48:16 50:17 56:6 58:19 59:17 59:23 60:21 61:8,10 64:11 66:17 68:23 72:13 73:20 77:7,20 93:16 96:11 97:23 106:6,12,23 114:8,23 115:2 116:24 118:10 121:5 128:13 148:9 155:7 158:13 162:9 172:21 175:2 175:15 177:9 182:5 206:18 207:9 215:13 219:25
goes 103:15 179:1 188:12
going 7:5 12:21 14:24 15:10,17 18:15 20:11 22:1,15,21 23:10 25:22 27:11 29:18 31:24 32:1 34:9 36:23 38:6,11 42:18 43:1,3,24,25 44:5,6 45:7,18 46:21 47:5,15 47:16 49:4,6 58:11 59:19 60:6,8 61:9 63:11,21 64:11 64:15 67:24 69:19,23,24 70:21 72:13,17 73:11 74:3 76:8 77:8 83:15,20,21 83:22 85:2 87:3,6,19,25 88:18 90:6 93:16,17 94:1 102:16 103:17 106:23,24 112:15 113:14 117:25 119:15 122:2 124:3 125:4 131:11

133:19,20 135:9,25 142:12 151:18 155:9,10,22 161:4 163:20 166:17,18 167:17 175:8 176:17 178:9 179:2,3 180:3 181:5 184:10 188:21 191:14 191:16 196:19 196:20 197:6 199:12 200:4 201:8 204:13 207:9,10,13 208:9 209:8 209:11 213:21 215:3,12 216:6 216:10 218:4
good 14:18 66:22 82:17 89:16 116:22 118:10 156:8 168:6 180:19 188:18 189:5 190:3 205:17 218:10
gotten 70:18 117:15 142:4
gradations 57:6
gram 48:17
great 102:15,22
green 125:20 133:6 174:16
grimace 154:19
group 28:20 173:14
guarantee 71:19 71:22,24 72:5 72:7,9 87:14 116:19 119:1 202:24
guarantees 71:20
guardian 44:20
guards 17:6
96:4 180:11
guess 21:1 24:21 25:5 72:18 87:23 138:14 145:13 170:7 179:21 185:9
guidance 109:4 109:7,9 165:11
guide 34:8
guideline 117:10
guidelines 149:4,9 205:24 220:3
guppy 170:5

H

H 2:8
half 65:18 77:10 190:1
hallway 213:21
hand-in-hand 115:2
hand-off 167:11 167:12
handing 91:4 99:5
handle 13:14 216:11
handwriting 99:20
hanging 148:5
Hanrahan 17:22
happen 59:17 83:15,21 87:7 102:4 143:15 166:20 187:21 216:10
happened 35:24,24 37:20 43:2 63:12 71:17 74:7 78:14 87:14,22 103:16 121:23 124:4 150:10 171:18 173:4
173:23 185:7
happens 76:22 163:23 185:11 202:13
hard 58:25
harm 153:9,12 160:1 161:10
Harris 17:18 18:4 18:6 63:13
Harrison 217:20 218:2,9
Haus 62:9,12,17 62:19
head 99:23 100:12,24 101:21 135:24 156:18 183:21
health 53:23 130:11 174:10 209:19 214:21 214:22 215:1,8
Healthcare 118:20 146:16 149:7 150:14 157:2,5
healthy 59:12 59:16 116:4,5 129:18
hear 59:10 168:21
heard 38:10 154:8 212:8
hearing 141:20 141:22
heart 47:10 53:2 56:15,22 56:22,23,25 57:6,9,11,11,12 57:17,19,19,20 57:21,22,23 57:24,24,25 58:6,10,15,15 58:16,22 59:3 59:3,6,13,16 59:17,20 60:5 60:6,9,20,25 70:21,22,23
70:24 71:3,25 73:20,25 74:5 74:7,14 75:15 75:23 76:1,3 76:18,22 77:22 78:7,12 78:15,20,23 78:25,25 79:10,10,19,20 79:21,24,24 80:2,3,9,11,19 81:1,2,17,20 81:20 83:5 84:9 85:21 87:17,18 88:12 88:24 89:12 90:15 94:1 103:16 111:15 111:18,23 112:6 112:20 113:6 121:22 125:4 128:7 129:4 131:2,17 136:14 139:20,22 140:2 142:12 147:24 155:15 155:20 168:4 168:5 170:16 170:23,24 178:14 179:9 183:5 184:11 186:6,9,9,10 186:15,17 188:14 190:18 190:18,21 194:3,4,7,11 197:11,19,25 198:4,6 199:6 199:8,19,22 199:23,25 200:1,3,8,17 200:24 201:10 215:13
heart-related 190:20
heartbeat 79:14 79:20 104:4
128:11,13,15,25
heavy 42:12
held 166:19
help 19:11 34:10 34:13 75:24 87:15 89:9 90:9,10,25 131:3 148:17,19 150:17 151:17 180:15 190:8,9 191:18 203:8
helped 71:12 73:23 91:2 113:12
helps 111:23
heroin 93:15,16 93:18,22
Hi 85:13
high 46:12,14,15 46:19 48:16 48:23,25 76:19 89:23 93:9,10,12,17 93:17,19,20 93:23 180:1 203:21
higher 49:5 140:21 216:5
highest 49:11,13
highlight 34:4
highlighted 94:9,10
highlighting 32:6 33:25 34:3,6,8
hindsight 159:22 166:25 219:20,21
HIPPA 55:12
hiring 26:1
history 37:24 39:11 40:2 43:17 44:15 176:10 194:10
hit 45:24 100:20 177:5 182:5 186:3

hold 203:3
home 90:20 169:9
honest 179:20
honesty 202:6
hook 202:25
hope 177:2 218:12
Hoskins 36:9
hospital 26:21 27:4 35:1 37:13 75:9,10 86:8 90:22 112:24 113:2,16 115:20 116:6 121:11 139:20 151:11,13 152:9 188:21 202:19
host 105:1
hour 21:10 24:25 25:9,10 25:12,13,15,15 25:19 77:9 196:4
hours 3:17 21:9 23:16,18,21 25:18,18 31:20 49:12 58:16 59:16,20 60:5 60:24 65:18 89:24 94:10 95:15 133:23 136:8,12 142:3 144:25 153:7 177:6
Houstin 10:4
Houston 10:12 29:2 55:17 179:16 203:16
huge 203:10
human 203:10
hundreds 34:16 53:19 69:9
hungry 89:24 90:6
hurricane 195:22
hurt 70:11 133:10 159:18,21 161:24
hydrate 91:6
hydrated 71:10
hydration 81:15 88:21 89:3 91:3
hypotensive 104:18,20,21
hypothetical 36:24 37:4,6 37:8,15 38:7 38:12 56:5 58:19 59:22 61:6 97:23 114:6,22 117:25 118:1 140:23 151:15 173:4

I

idea 14:18 48:18
ideations 87:24
identification 31:25
identified 33:3
ignore 134:19
ignoring 170:14
illicit 93:3 94:11 158:23,24
illness 146:20
illnesses 15:3
imagine 102:13 187:13 194:1
immediate 214:12
impact 58:14
impaired 126:2
impairment 126:6
impetus 195:21
implication 192:19
implicit 175:9 180:8,11,14 203:6,11,13
imply 192:18
implying 64:6
importance 134:24
important 43:7 43:11 44:12 94:2 117:12 167:15 171:13 171:21 187:12 192:25
Impossible 181:15
improper 22:4 22:13,22 23:8 37:4,8,15 45:19 56:5 58:19 59:22 61:6 97:22 114:5,22 119:14 140:23 151:15 175:24 177:11 202:13 206:16
improperly 56:16
improve 90:11 202:19
inactions 35:8
inadequacies 172:2
inadequate 143:7 170:1,2
inappropriate 34:15 137:23 202:13
inappropriately 136:19
incarcerated 90:22
incident 16:11 71:13 81:4 139:25 190:22 197:8
incidents 76:14
include 172:10
included 8:3 32:24 35:15 214:23
including 31:14 33:25 124:25 134:8 217:19
inclusive 64:2
income 22:8,23
increase 25:23 81:19
increased 71:11 141:12 150:18 153:9,12
incredibly 79:16 85:8
incumbent 208:4
independent 53:21
index 32:21
indicate 125:16 140:17 197:18 219:19 222:16
indicated 200:3 210:15 217:21,24
indicates 89:4 212:3
indication 49:2 137:20 141:21
indications 212:23
indicative 152:9
indifference 11:20 14:6,13 14:20 15:7,21 206:6,10 213:2
indirect 60:1
individual 109:16 116:19 146:24 147:3 157:10 159:5 164:6 165:14 165:16 166:11 166:12 169:5 177:16 211:9
individuals 102:21 159:17 172:21 214:9
induced 105:2 200:8
infection 144:14 144:14 152:13
inference 159:4
influence 93:3 93:5 110:13
inform 92:18
information 6:20 30:20 34:14 35:23 37:12 55:14 72:24 73:4,13 73:16,17 93:1 94:24 99:4 120:22 124:17 133:18 137:25 145:15 149:9 159:25 162:18 162:20 163:7 163:15 164:1 167:14,15 171:13,21,24 172:18,19 175:3 176:25 209:1,4,14 212:7 215:17 215:21 216:20 216:23,25 217:18 218:9 218:12,23 219:1,18
ingest 47:20 192:10
ingested 48:7 94:11 105:14
ingesting 192:3
ingestion 49:3 49:11,12 129:17
initial 49:3 63:15 68:13 75:4 112:3 113:24 175:21 185:3 195:20 214:21
initially 30:15 31:3,5

initiative 204:12
injuries 29:10 152:20 188:14
injury 29:7 146:20 167:25 168:3,10 170:19 188:10 188:11 190:25 198:18 199:4
inmate 10:1 16:12,16,17,19 29:13 36:23 36:24 53:17 54:24 55:3,7 62:14 100:14 100:16,18 107:4 116:23 148:24 163:20 167:10 172:18 206:19,20 211:9 212:16 217:21
inmate/patient 172:19
inmates 11:3,3 29:8 179:11,19 208:24 211:25
inquire 192:16 208:6
inquired 114:3
inquiry 93:25 206:17
inside 97:6
insight 13:8,10 13:12,14
instruct 6:11,25
instructing 38:15,18
insufficient 143:21 144:4
insurance 192:23
intake 37:1 91:20 92:22 96:25 97:5 98:13,15 111:5 115:11,12,14,16 126:10 143:2 157:23 158:3 175:24 183:24
intakes 84:18 116:3
intend 35:19 159:21
intended 64:1 159:18 160:1
intense 47:9
intent 220:13
interact 66:1
interaction 118:15 134:14
interested 102:15 221:13
intermittent 41:23 43:9,19 191:19 192:21
intermittently 42:2
interpret 215:5
interpretation 159:3 176:3 187:18 210:12
interpreted 176:25
interpreting 107:18
interrelated 182:3
interrupt 24:7 82:16 104:24 117:8
intervene 73:22
intervention 182:7 218:24 218:24
interventional 117:16 121:18 142:8
intoxicated 71:8 81:10 92:19 148:12,25 164:2 177:15 178:23 208:8 208:20 209:5 209:15,24 210:4 217:22
intoxication 108:24 110:18 146:21 148:14 163:8
introduce 205:7
intubated 105:5 198:21
invasive 23:5
involve 5:24
involved 10:3 17:19,24 52:4 52:8 62:9 127:12 180:17 204:12,13,15 213:14
involvement 24:2
involving 5:16
irregular 79:1 79:20 104:4
isolated 133:1
isolation 174:14
issue 62:20 84:9 86:3 113:25 116:3 143:17 184:11 185:22 187:7 208:20
issues 42:15 43:4,8 44:10 62:18 84:3,11 89:6 101:14 115:23,25 116:1 137:19 162:13 172:3 174:10 181:19 185:14 187:8 189:10 190:20,24 192:9 194:22 204:10,23
itemized 21:8
items 125:3
IV 91:3

J

jail 10:23 14:14 16:20 17:2,6 19:20 21:25 22:14 23:14 23:22 24:15 25:2,16,25 26:4,4,5 28:24 29:4,8 29:10,10,13,15 34:21 35:8,12 36:3,10,13,16 37:2 38:3,24 39:1,4,11,17 40:6,12 42:25 50:15,17 53:21 54:1,2,13,25 55:1 62:5 65:16 67:7,14 67:23 70:6,15 74:4 75:11,15 75:20 77:16,17 77:18 81:9 83:4 84:2,18 84:20,22 85:23 88:20 89:15 90:24 92:8 94:16 95:23 96:4,16 96:23 97:4,17 100:14,17 102:11,14,22 103:12 118:8,17 118:18 119:24 122:12 126:8 130:10,17 131:16,17,20 133:18 135:22 138:8 140:5 141:23 142:1 142:25 143:11 143:20 144:8 144:16 145:5 146:14 147:17 148:11,22,25 149:3,10,11,20 149:24 151:4 151:16 155:24 156:1 159:11 160:19,22 161:1 166:14,19 168:17 169:19 170:15 171:7 173:12,16,17 175:19 176:14 177:23 179:22 186:8,22 194:23 195:24 196:20 197:6 197:8,15,22 200:11,15,16 200:23 201:12 202:4,15 203:23 204:10 206:3 206:7,24 207:25 208:21 209:4 211:14,25 214:16 215:15 217:5,7,20 218:1 219:12
jailor 77:20 169:5
jailors 91:7,16 96:14 143:13 151:9 155:12
jails 26:7,9 118:8 134:8
January 28:13
JCCC 63:17
Jefferson 4:17
Jenna 3:20 4:23 5:4 221:5 222:25
jittery 148:18
job 27:14 126:18 193:12 216:15
Joel 1:14 3:16 5:3,8,24 6:4 222:13 223:3 224:5,20
joined 53:23

judge 15:13,20 185:2 206:1,5
jump 36:23
jumping 38:12
June 24:16 28:24 29:9 30:21,23 31:2
jury 14:25 15:5 15:13,20 83:1 83:2 198:25

K

KCOM 27:1
keep 113:2 155:9 162:9
keeping 126:21 216:17
keeps 180:23
Kenney 208:19 209:13
Kenny 92:10 93:1 120:12 159:24 208:1 208:6 210:19 210:20
Kenny's 94:18
kept 76:7 208:16
kidneys 89:8,8
kids 206:25
kind 9:8 56:21 126:23 127:7 167:2 182:16
Kirksville 26:25 27:3,12,13
knew 96:5 110:12 161:11 176:10,13 177:15,16,19 186:13 208:19 209:22 210:3 210:8,8 212:18 212:21 213:7
know 7:17 12:10 14:13,15 17:16 17:18,21,23 23:6 29:2 30:17,21 31:1 31:14 32:4,6 40:1,2 44:20 44:22 46:2 47:25 48:4,13 48:19 49:18,21 51:21,23 52:3 52:9 53:10 55:10,16,20 56:24 57:4 58:11 59:3 60:4,5 61:7 68:17,23 72:8 76:15 78:20 81:7 82:16 83:24 88:13 91:8,17 92:2 92:14 93:6,7,8 93:9,23 95:7 95:13,14,19 96:4,14,22 97:17 100:9,12 101:8 102:15 105:17,19 108:1 108:4 109:11 109:20 114:1,17 117:6,18,21 118:9 119:8,11 119:17 126:18 127:8 129:25 129:25 134:21 135:12 136:22 137:8,24 139:7 139:10,13 140:4 141:1 146:13,15 150:14 151:3 153:15,18 154:15,19 155:3 157:12 159:4,21 162:4 162:22,23 163:3,4,7,23 166:14,17,20 167:13 179:1,3 180:22 181:4,7 181:8,9 182:11 182:20 184:9 184:9 186:8,10 186:12 187:2 188:19 189:2 190:13 193:9 200:13 201:21 201:22 202:6 203:11 204:9 204:25 205:10 208:1 208:13 209:8 211:14 212:1,11 212:21 215:12 215:17 216:5 216:23 218:10 218:16 219:19 219:20,21 220:11
knowing 153:5 218:2
knowledge 11:25 57:16 162:3,7 215:16
known 59:6 145:13 150:20 166:3 174:25 175:1 184:23 185:18 217:21 219:7,12
knows 190:7 211:25 218:13

L

lab 73:4
laboratory 125:2
lack 57:16 83:24 84:6 85:6 88:10 111:23 134:22 164:22,25 165:2 195:23
lacking 128:3
Laramore 4:5,6 5:13 6:5,10,19 7:3,10,11,18,25 10:18 12:21 13:1 14:8,12 18:1,10 20:18 20:21 21:12 22:1,4,7,12,21 23:5,25 24:6 25:3 30:19,24 31:11 32:3,8 33:12,19,23 34:5 36:12 37:3,7,14 38:6 38:11,14,18 39:3 45:18,25 49:24 50:10 50:13 55:9 56:4 58:18 59:21 60:15 60:22 61:2,5 61:23 62:11 67:8,15 68:11 70:8 74:12 77:11 85:13 94:9 96:8 97:21 98:25 103:19 114:5,21 118:11 119:13 132:2,4 139:8 140:22 148:4 151:14 153:24 154:4 155:6 160:7 161:4 165:23 166:1 174:4,7 176:23 177:8 187:25 188:7 196:6 201:13 202:8 205:25 206:15 207:8 207:15,21,24 208:18 211:2 212:20,22 213:10 215:7 217:5 218:14 220:6,18 222:5,6,12
Laramore's 19:15
larger 164:13
lasting 190:17
law 11:13 14:7,22 15:21 30:22 206:16
lawful 5:9
lawsuit 29:3
lay 12:17 56:21 57:1 82:16,24 169:8
laying 183:21
layperson 82:14 82:15 85:19 197:17,18
lead 6:14 159:8 179:6
leading 153:8
leads 56:20 88:12 133:12 183:18
learn 64:15 180:22
learned 13:21 19:23
leave 15:24 28:19 103:17
leaves 49:16 167:14 208:16
leaving 134:20 147:8
lectures 118:17 118:19 180:8
led 68:8 78:18 89:4 131:2 164:17 180:14 198:25 200:1
leeway 127:10
left 35:11 62:4 77:13 172:11 189:12 217:7
left-hand 99:7
legal 11:22,23 12:8 13:19 51:7 51:15 52:12,14 52:24 174:24 213:4
legalese 15:14
length 189:22

let's 32:11 36:25 56:9 77:11 121:5
lethargic 140:17
lethargy 138:20 140:10,21,25
level 216:5
levels 132:17 137:16 140:21
Lewis 18:3 26:9 61:19 62:11,16 206:20
license 82:18
life 42:9,12 169:7,8,13,14 169:16 219:17
life-saving 219:17
lifesaving 105:2
line 23:8 45:10 73:23 81:24 133:16 209:11 223:8,12,15,18 223:21
lines 108:21 130:23 184:19 185:3 202:17
list 61:23 64:19 187:24 196:25
listed 8:7 61:11 85:18 205:13
listen 77:4
literature 19:24
Litigation 3:19 4:24 222:1
little 58:9 74:13 79:18 97:14 111:20 128:25 167:3 203:15 222:19
live 104:10
liver 137:15,16
LLC 222:6
location 127:24
locum 28:9
lodge 55:9
log 217:1,5,10
long 46:12,19 46:23 47:1 49:2,5,7 144:19 153:3 189:11
longer 49:6 113:15
look 7:13 18:1 30:7,17,24 34:9,13 43:16 52:11 61:18 66:14 128:12 134:6 156:25 199:14 205:15 218:10
looked 19:21 63:15 87:20 124:1 187:3
looking 36:19 45:24 63:8 82:4 91:24 92:5 94:7 96:9 108:14 154:20 184:3 210:1 219:20
looks 32:5 66:17
losing 77:6,7
lost 112:4
lot 35:21 40:7 48:9 69:7 91:3 108:7 116:13 127:8 159:2,4 190:11 196:23 200:14 213:11
Louis 4:8 222:8
low 71:11 93:23 104:19,21,23 104:25 161:21 208:16 216:18
lunch 88:23
lungs 89:9
lying 176:6 180:13

M

M 6:4
magazine 20:8 173:10,11,13 205:22,22
main 59:25 89:7
major 116:1,3 196:18
majority 102:20 115:6
making 14:23 21:24 22:2 24:25 25:1 34:12 70:23 72:12 93:25 107:19 123:6 137:23 151:12 180:23 192:10 218:6,7
malicious 159:20
maliciously 161:25
malnourished 88:17
malpractice 206:14
management 12:6 118:17
mandatory 121:10 122:15 149:20 168:25 169:1
manipulative 179:25
manner 159:23
manual 34:19 34:20 168:14 171:1
marijuana 41:13 44:18,25 45:6 90:4,5,8,24 92:12,15 93:10 192:13 193:23
mark 10:8 11:9 18:15 32:1,3,9 32:11,12,13 207:3,6,9,10
marked 11:9 32:1,15,18 99:6
marking 99:16
Mary 6:4
Mary's 27:22 28:14,20
materials 19:10
matter 14:10 39:24 125:20 176:20 179:16 203:16
matters 68:20
McDaniels 2:10 4:14 5:11 6:2 6:13 7:1,13 8:5 8:6 10:22 12:24 13:7 14:10,15 18:5 20:20,25 22:3,6,10,15 22:25 23:10 24:4,8 25:7 31:3 32:5,11 34:2,7 36:14 37:6,11,19 38:9,14,20,23 39:4,6 45:22 46:3 50:1,12 55:16 56:8 60:3,19,24 61:4,9 62:13 67:12,17,24 68:6,17 70:12 74:18 77:9,13 85:14,17 96:14 97:25 99:2,3 103:20 114:13 118:13 119:15 119:17 121:7 132:3,5,7 139:10 141:1 148:6 151:19 154:1,7 155:9 160:9 161:13 162:12 165:24 166:2 174:5,8 177:4,13 188:2 188:8,9 202:9 206:22 207:9 207:16,19 208:9 210:23 212:4,17 213:4 213:24 215:3 217:3 218:4 219:9 220:8,9 220:16
meal 85:9 103:1 103:5 123:17 130:25
meals 88:23 102:23 111:23 122:9,19 129:16,19 140:16,16 147:14 218:1
mean 12:13 34:25 35:20 37:19 42:1 44:2 59:10 72:23 102:17 104:24 113:23 116:14,17 131:24 141:15 166:7 183:15 194:20 202:20 212:15
meaning 88:17 105:3
means 42:2 72:5,7,24 79:9 103:24 104:20,21 122:23 127:23 141:16 170:5 188:11 194:21
meant 12:14 123:7 169:8
measures 105:2
mechanism 95:7
mechanisms 78:6
Medicaid 193:2

medical 5:25 10:13,20,22 12:4 13:4,7,10 13:20 14:14 25:2 27:9,10 28:23 29:19 31:8 33:18,21 33:24 34:11,13 34:17,23 35:2 35:6,11 36:15 36:19 37:24 41:5,9 42:24 51:8,11 53:22 54:7,10,18 55:1,7 65:12 66:5 69:4 70:13 71:15,19 71:22 72:3,11 72:20 73:5,16 73:20,24 74:5 74:19 75:25 78:3 86:4 99:4 103:25 105:7,8 107:15 111:14 115:9 117:2,16 118:4 118:16 119:11 120:16 124:9 124:16,22 126:19 127:3,8 128:2,10 129:15 133:16 133:19,22 135:9 136:11,13 140:21 142:4 143:17 146:9 146:19,23,24 147:2,3 148:22 149:1 150:3 151:1,2,5 155:13 157:1 157:23 158:3 160:5,18 161:3 161:12,14,19,20 161:23 162:4,5 164:11,17 165:9 165:12,15,15 167:5,11,18 168:8 170:8,13 170:20 171:12 171:13,17,21 172:10,14,14 172:20 177:3 180:19,24 181:21 182:7 184:11,22 185:25 188:13 196:17,18 197:8 198:10 202:3 205:3 205:4,12 206:13 209:7 209:22 211:4 211:18 212:7 212:24 213:2 213:14 214:3,5 214:8,10,14,14 215:8,14,18 216:11,15,24 217:10 218:3

medically 82:9 82:11 184:24 185:15,17

medication 105:1,4 148:17

medications 150:17

medicine 12:4 13:4 27:3 48:22 71:20 158:18 180:17 191:10 203:5 203:24 219:22

meet 17:7 197:23

member 83:1,1 83:2 169:3

members 170:12

memory 40:8 130:19 188:18 188:20,23 189:4

mental 113:3,23 113:25 125:24 136:18,25 137:6 144:15 174:9 188:17

mentioned 9:18 44:24,24 127:15 141:14 196:22 199:8

mercury 104:15

merely 173:3

met 29:22 30:3 123:13 182:21 194:13

metabolic 74:16 75:7,8 81:10 129:1,3,10 181:18 187:22

metabolism 81:16

meth 45:6,7 48:3,23 88:11 89:20,23 91:25 93:6,7,8 144:10 177:18 177:19 192:13 192:17,21

methampheta... 39:12,22,25 40:2,13,23 41:2,21,24 42:8,11 43:9 43:12,15 44:1 44:11,23 45:1 45:3,8,9,23 45:24 46:8,12 46:14,20,22 46:23 47:1,7,8 47:14,20 48:7 48:14,25 49:2 49:11,16 68:16 68:18,22 71:9 81:6,18 84:5 88:18 89:13 92:12,15 93:12 96:2,5,15 97:18 105:9,15 105:24 106:1 109:12 110:13 129:17 131:10 138:7,15 141:6 152:14 174:24 176:20 181:2,6 181:11 189:7,9 189:14 191:20 191:24 192:1 193:25 195:23 208:20 209:15,24 210:5,8 217:23

middle 199:20

midway 184:4

mild 57:9,12

Milligan 31:10

millimeters 104:15

mimic 84:16

mind 32:14 123:21 154:5 173:22 178:6 207:6 210:2

mine 25:11 32:7 182:22

minimal 150:2

minimum 25:12 134:10 149:23

ministerial 11:17 12:2,9,14,19 13:8,11,19 14:2 14:4 206:2,10

minor 115:25

minute 113:6 162:10

minutes 65:13 83:5 135:18 156:18 186:23 187:1,3,4,15 198:14 202:16

misleading 162:1

missed 64:3

misses 60:17

missing 129:16 129:19

Missouri 1:1,7 3:2,11,20,22 3:24 19:20 34:25 74:22 184:15 221:2

misstates 12:22 13:2 38:7 96:9 96:10 97:22 155:7 217:3

mistake 14:23

Mizzou 184:16

MO 4:8,17 222:8

Moberly 54:6 54:15

moderate 57:12

molestation 9:9 16:9

moment 97:10 134:18 170:9

Moments 140:2

money 28:8 45:16,25 192:23 204:3 204:4

monitor 79:10 105:4 113:9 163:7

monitored 132:15 133:25 134:1 164:19 165:7

monitoring 132:13 133:12 133:17 134:5 135:7 142:1,16 142:19,20 156:2,7,15 157:16 163:6,11 167:4 174:21 217:25

Monroe 4:16 27:18

month 26:23 31:1 127:25

moot 73:8,9

Morgan 63:17
morning 28:22 48:9 49:20 49:23 70:16 75:14,19 86:22 90:14 91:9,19 95:11 103:7,23 129:17 133:17 137:1 151:6
Mortality 19:22
mouth 111:22 220:1
mouthed 170:4
move 145:21 167:17 202:12
moving 122:8 132:3,4,10 142:23 145:20
multiple 58:2 81:3 101:14 182:2
MUPC 184:16 184:22,24 185:4,14,15,22 185:22
muscle 79:10,21 152:9,10
musculoskele... 138:18 139:1 139:24 142:11 152:6 194:16

N

N 2:1 4:1
Nacy 17:22
name 6:3 10:3 17:16 55:11 223:3,4 224:11
names 55:12
narcotics 148:15 209:6
narrative 173:6
National 149:6
nature 134:13 135:16 158:6
NCCHC 149:2,3 149:5 173:14 205:23
near 60:9
nearly 34:19
necessarily 85:11 86:7,16 126:18 133:3 148:4 150:22 150:24,25 161:10 163:14 180:18 203:17 204:23 208:12
necessary 82:22 108:1 150:25 218:25 224:9
need 7:6 12:24 14:20 35:11 37:12,12,18 61:24 67:5 72:18 93:7,8 111:19 120:7 124:2 127:9 132:18 134:7 143:17,25 154:16 159:16 159:22 167:15 171:8,9 190:15 191:14 201:23 202:23 203:9 213:2 216:15 216:16 218:24
needed 28:18 68:22 91:3 134:12 184:18
needle 53:8
needs 38:21 69:25 77:20 144:2 148:11 153:18 154:5 158:19,22 162:15 182:6 190:25 191:15 192:13 202:19 203:6
negatives 60:12
negligence 14:23 63:19
neither 221:9
neurological 62:15 190:24 191:20 195:5,7
neurologist 191:5
neurology 188:20 189:16 189:23 191:2,3 191:7,9,12,14
never 35:25 36:3,6 53:11 117:2 128:13 151:2 165:7 171:18 174:2 207:6 219:17 220:3
NEWMAN 4:15
nice 37:23 180:18
night 176:21
nights 28:17
nighttime 28:18
no's 92:23
nocturnalist 28:16
non-biased 63:10
non-emergent 214:6
non-prescripti... 94:12
noncompliant 188:22
nonspecific 85:24,25 101:6 115:18 182:2 196:15 196:17 197:2,4 197:15
nope 75:21
normal 84:21 85:6,9 92:18 101:24 129:18 182:15 194:4 212:1,1
normalize 89:8 89:9
notarized 222:18
notary 222:17 224:23
note 11:13 41:20 43:7,12 63:24 92:4 98:10,15 102:23 105:11 106:25 110:8 133:19 138:13 151:24 174:23 175:23 181:14 182:1,7,11 183:22 187:23 194:3,13
noted 34:2 88:5 98:19 100:5 141:5 183:19 189:11
notes 20:16,23 99:14 140:13
notice 5:14,22 6:1 7:23 8:16 18:15,16 32:24 85:19 188:23 199:20 202:11
noticed 71:6 75:12 128:25 129:1 133:24 136:8,11,12,14 142:2
notices 212:10
noticing 152:23 212:8
notify 214:14
notifying 216:18
noting 211:8
November 27:8
number 8:6 35:2 60:17 61:11 104:15 106:24 182:8
nurse 52:16,17 52:18,19,21 53:2,5 86:11 86:18 112:14 114:1,3,11 124:12,16,18 126:22 146:8 146:11,13 147:6 148:11 149:24 150:5,6,8,12 150:15,19 157:5,9 175:20 178:4 213:15 214:11 214:12 216:2
nurse's 214:7
nurses 36:11 82:18 144:21 145:19 202:11 216:16
nursing 146:1
nutrients 81:16 112:4
nutrition 71:11 74:17 81:7,15 88:10,19,21 131:20 152:13 195:23
nutritional 111:21

O

o'clock 3:18,18
object 5:15,20 6:10 7:25 12:21 13:1 20:18 22:1,21 37:3,7,14 38:6 38:11 45:18 50:13 58:18 59:21 67:8,24 96:8 97:21 118:11 119:13 151:14 155:6 161:4 176:23 201:13 206:15 208:9 215:3 218:4
objection 5:18

6:5,24 8:15 12:25,25 18:25 19:15 24:1,5,6 50:10 55:9 56:4 60:15 61:3 67:15 68:12 70:8 114:5,21 153:25 154:4 160:7 161:15 177:1,8 201:7 202:8 210:23 212:17 213:4 213:24 217:3 219:9
objections 23:2 23:2 25:3 38:15,16,16 60:22 68:10,11
objective 178:7 211:11
objectively 181:9,10
observation 112:24 113:14 132:17 155:2 172:18 211:11 211:21 212:6
observations 211:6,7,9
observe 212:16
observed 71:9 99:10 144:11
observing 66:18
obtain 51:7,8 67:20 172:18 197:3 216:21
obtained 13:21 63:18 105:4,4 185:18
obvious 82:4 178:20 182:6 219:23
obviously 18:10 21:19 58:9,12 78:9 132:21 148:7 162:16
occur 57:20,21 57:22,24 120:10 133:20 152:16,21 173:1 190:24 191:4 196:23,25
occurred 61:21 63:16,19 70:24,25 78:25 90:18 130:19 146:10 170:15 195:24 198:24 199:4 215:25 219:13
occurrence 37:18
occurring 133:20
occurs 152:12 188:11 197:8
offenses 166:11
offer 14:16 42:16 42:21,23 130:22 198:9
offered 50:15 106:4
offering 78:2 191:7
office 4:7 8:2 33:23 34:1 106:16 222:7 222:18
officer 14:19 36:1,17 50:19 50:20 51:5 52:5,15,22 65:8 91:8,11,18 91:20 93:2 94:15,21 95:14 97:1 98:10 99:10 107:4,17 108:19 109:5 109:16 110:17 123:5 124:1 131:9 151:3 164:6 165:14 165:18,25 166:3 169:9 170:4 176:24 177:5,17,18 181:24 187:15 187:16 201:16 201:24 207:25 208:5 208:7,15,18,19 209:13 211:8 211:12,24 217:24
officer's 126:18
officers 12:5 13:6,16 15:1 17:6 36:7,11 36:20 50:16 65:6 92:19 96:4 97:18 118:9,15,18 120:1,6 127:6 131:20 133:19 142:1 144:8 149:10 155:3 156:22 167:4 167:10 175:2 180:5,6,11 186:8 202:21 203:10 208:24 209:2 210:3,12 214:21 216:14 217:18
officially 199:15
Oh 62:12 101:2
okay 7:20 9:10 9:12,15,25 10:3,8,17 11:7 13:13 16:10 17:5 24:14 25:20 26:11 26:24 27:8 28:2 29:17 34:11 36:18 37:7,11,22 39:9,15,18 40:11 42:19 49:15 50:2 51:4,10,25 53:10 54:5 59:18 61:9 62:3,8,22 63:14 64:12,16 65:8 69:21 73:2 75:3,18 76:17,21 77:3 78:21,24 79:2 79:12 80:6 81:13,25 83:7 83:12,19 86:13 88:10 89:19 89:25 93:4 96:21,22 97:16 98:4,5,7 99:9,22 100:6 100:8,11 101:15 103:4 104:24 106:14 107:14 108:13,16,19 110:21 111:13 116:8 118:2 119:1 121:25 122:8,22 125:23 128:12 128:12 130:2 131:12,23 132:14 134:20 135:6 138:3 139:23 141:18 143:6 144:3 148:3,8 152:16 153:17 154:12 155:22 166:7 172:16 175:18 175:23 182:14 184:14 186:8 193:5,22 200:20 201:3 201:19 207:6 215:23
old 124:18
older 199:20
once 24:12 30:4 97:6 142:7 151:21 155:11
ones 89:7 132:20 161:22
ongoing 26:16 171:18 188:19 191:2 203:7 205:12 215:22
online 12:15 13:23 205:10 205:10
open 103:17 179:24 210:11
open-ended 143:25,25 158:19 160:18
opinion 14:16 15:6,13 31:8 34:10 37:1 42:23 52:1 63:7 71:23,24 73:3,10 76:11 77:15 78:2 80:25 81:2 88:14,14 90:12 96:1,6,17 97:9 97:19 98:1,3 106:4 108:10 114:10 115:7,12 115:14,16 120:23 121:14 123:24 124:14 127:2 129:9 131:18 137:5 140:21 142:15 143:6,19 147:7 147:16,19 165:3 166:8,8 166:13 167:8 170:8 171:16 171:22 173:19 176:18,21 178:13 179:8 185:25 188:13 190:10 191:7,9 197:2,4,24 198:5,9,12

200:24 205:3 214:15 216:8 216:20
opinions 11:17 11:19 17:1,6 34:12 35:15,18 35:21 42:16,21 50:11,15 64:8 64:9,12 72:2 72:11,19 106:9 121:8 122:2 131:24 132:8 146:4 158:13 165:1 172:6 173:3 182:6 195:14,17 196:8 197:22 203:1 205:3 207:13
opioid 93:22
opportunity 28:4 65:25 66:22 158:19
opposed 25:8 53:21 135:17 158:20
option 213:14
orally 91:6
order 13:16 28:7 47:20 48:7,8 48:11 63:3 103:11 107:23 130:7 144:1 154:15 158:16
orders 144:22 150:15
organized 98:24
orientation 188:17
oriented 127:18 127:22 136:20 137:17
original 222:14
originals 32:4
Osteopathic 27:3
ounce 48:17
outcome 42:24 44:2 55:2,4,8 86:2 167:20 170:18 174:25 176:22 184:19 198:15,20 221:13
outlines 167:3
outpatient 188:20 189:16 189:23 191:11
outside 18:10 20:19,21 23:6 35:18 97:3,4 131:17 201:6,7 201:11,16,18 212:11,15
outward 114:19 115:7
outwardly 81:25
overall 96:10
overcome 203:6
overdose 131:6 131:11 138:15 195:23
overdosed 131:10,13
oversimplify 178:18
oversimplifying 88:13
overstate 148:7
overwhelmed 81:22
oxygen 104:3 105:6 168:11 168:13,15 188:12 219:25

P

P 4:1,1
P&P 34:19
P.C 4:15
p.m 220:20
pack 190:1
page 31:23 61:10 63:25 74:23,25 92:5 92:6 94:7 99:5 102:25 106:9 132:2 145:20 151:24 165:21,23,24 167:17 172:12 174:4,9,23 175:8,16 181:14 182:5 184:4 187:23,25 188:1 193:17 194:3 195:5 196:14 209:10 209:11,12 222:14,17,18 223:8,12,15,18 223:21
pages 31:13 34:16,18 75:1
paid 25:14,15
pain 58:24 138:18 139:1,4 139:5,14,16,16 139:24 142:11 152:6,15,24 154:13,15,20 154:22,23,25 155:4 182:25 194:13
pale 182:11,15,18 182:21,22
panic 83:8 84:13 181:18
panicky 86:5
panting 147:23 148:1,2
PAP 171:1
paper 99:2 163:19 214:13
paperclip 99:7
paperwork 185:1
paragraph 92:5 92:25 103:1,15 103:18,19,20 103:21 165:21 165:24 167:2 167:7 174:6,9 174:9 184:5
parking 48:9
parse 97:2
part 5:20 7:18 19:11 41:5,9 61:20 66:11 67:1,1 68:22 80:3 89:1,2 89:20 90:20 96:1,3,24 103:16 107:19 108:12 109:16 117:14 119:2 134:20 145:14 164:12,13 169:4 183:11 185:14 194:8 207:14,16 209:11
particular 34:24 88:9
parties 221:10 221:12
partly 165:4
party 62:24 145:10
pass 47:14,17 47:20 48:12 104:23 162:19 163:6 164:7,10 171:12,20 186:14 205:21 209:3,4
pass-on 163:21
pass-ons 163:24
passed 48:8,10 105:19 171:23 172:20 186:23 187:1 209:18 216:25
passing 162:17 163:5 209:1
passion 204:20
passive 219:25
path 196:1
patience 77:7
patient 8:3 37:20,25 52:6 55:14 68:13 69:20 77:6 83:17 119:1 120:8 124:19,20 125:4 128:13 147:9 148:24 151:21 167:16 181:15 214:4,4 214:8 216:6
patients 13:15 53:17 58:22 120:5 134:8 148:14 170:11 191:10 194:9 202:6,10 204:13
pause 125:14
pawn 216:15,18
pay 15:2
PD 66:21 92:22 113:25 120:12
PEA 79:4,5 80:1
peak 49:4 135:24
penalty 224:12
pending 3:21 8:15 218:10
people 57:3,4 59:2 60:11,13 60:18,18,20 61:5 82:17,24 85:11 87:16 90:1 102:6,10 102:13 104:10 114:10,14,15 123:1 132:18 137:7 140:24 140:24 148:12 148:15 151:9 179:12,20

180:17,18,19 180:24 182:18 186:7 190:12 190:13 203:8 204:11 216:17 216:18
percent 59:12 59:16 60:17,18 72:8 118:24
percentage 22:7 60:11,13 60:20
percentages 22:23
perception 120:3
perform 168:18
performance 151:1
performed 143:10 146:6 167:19 168:9 170:17 209:21 211:4,17
performing 52:20
performs 52:18
period 48:1 66:5 81:14 113:13 141:10 153:6 173:24 193:9
perjury 224:12
perks 128:12
permanent 188:13
permission 150:15
persistent 104:11 122:9 122:19,23 123:7,21 124:2 131:23
persistently 122:19
person 45:21 47:6,13 48:25 49:3 59:10,12 59:15 69:18 76:22 81:24 83:3 85:19,22 100:17 108:3 109:21,24 110:2,5 114:20 118:9 127:3,23 135:2 140:19 141:13 159:3 164:2 179:21 185:15 186:14 189:6,9 201:9 201:20 202:1 202:2
person's 42:9 46:24 47:19 79:13
personal 114:10 218:20
personally 34:17 41:15 50:25 58:25 165:5
personnel 126:19
pertinent 163:15 164:1,3,7 171:23
Petree 3:20 4:23 5:4 221:5 222:25
pH 81:11 89:9
phone 30:7 137:2 200:2 216:22
photographic 40:8
phrase 174:19
physical 43:16 44:15 69:22 69:24 176:9,11 188:16 190:16
physician 9:12 14:19 16:13,18 16:21 27:22 37:24 52:11 54:7 69:17,24 124:10,12,18 125:1 150:14 150:16 167:12 167:12,13 219:21,22
physicians 15:1 116:23 192:22 196:24
pick 82:12,25 144:24 216:22
picked 209:14 209:23
picture 78:22 112:8 164:13
piece-by-piece 72:14
place 76:15 81:20 122:24 127:23 185:11 197:22
placed 105:3 132:25 133:4 217:25
plaintiff 1:5 3:7 3:23 4:3 5:2 5:15 19:10 29:12 64:22
plaintiff's 19:4 65:7 94:6 207:11
plaintiffs 26:8 64:19
plan 6:18 21:12 134:18 196:9,11 220:13
planning 11:16 11:19
play 43:24 192:9
please 6:3 38:22 56:7 67:11 87:20 88:13 222:13 222:15,18
plenty 216:20
point 14:17 17:19 26:20,22 32:16 37:13 40:10 49:1 55:11 66:1 68:6,18 73:7,8 73:9,18 74:4 80:2,19 81:6,7 85:9 86:2 87:1 92:14 93:24 96:23 97:19 106:2 110:9 111:21 112:19,25 114:4 114:19 115:10 115:10 117:16 121:18 122:1 123:23 124:22 124:24 125:12 125:21,25 126:3 127:4,8 127:19 128:6 133:1 135:8 138:7 139:17 142:11,21 145:23 146:11 147:11,13 155:11 162:2,25 163:6 177:25 178:3 181:12 182:24 188:18 188:22 189:2 189:4,20 191:13 195:18 196:16 202:14 209:23 216:13
points 112:4 207:21
poison 192:6,10
Police 49:19 50:6,19 51:11 65:22 67:19 68:2,7 70:4 77:16 91:12,17 92:16
policies 13:15 106:16,20 119:23 121:9 122:8 132:10 143:20 149:15 149:19 155:12 156:13 165:6 167:5 169:15 169:16,25 200:10 210:11 216:13
policy 34:20 53:15 72:15 76:12 106:25 107:3,10,18,23 108:9,10,14 109:4,17 110:22 122:2 122:13,16,20 123:12,13,14,18 124:2 131:24 132:11,16 135:22 136:4 142:23 143:12 145:20,22,25 149:25 155:24 156:1,24 157:15,21 158:6,10 159:10 162:13 162:25 164:4 168:17,20,22 168:25 171:5 171:22 173:12 197:23 200:14 214:19,20,24 215:4,6
poor 74:17 81:15 89:21 129:22 130:12 138:22 141:5,6,11 152:13 180:23
pop 156:18
population 180:1
portion 172:11 210:19 211:8
position 14:2 27:23 28:8,9 215:4

positive 68:16 68:18,21 91:25 93:6 105:8 144:10 174:24 177:18
possession 95:4
possibility 87:13 104:9
possible 59:1,9 83:8,10,14 102:18 191:3
possibly 19:22 71:4,10 219:10
potentially 58:6 110:5 144:10 154:20 193:19 201:21 202:5 216:2
pre-dating 84:11
precipitate 56:3
preclude 187:8 190:14
predated 194:17 194:22
prefer 99:2
prejudice 206:21
preparation 20:16 27:22 205:8
prescription 94:11
present 129:5 150:5
presented 77:16 81:9 95:23 96:16 97:5 109:18 124:17 128:5 128:23
presentment 120:11
pressure 53:5 76:19 104:14 104:19,21,25 136:15
presumably 102:10 145:10 176:15,16,17 212:1
presume 42:18 69:16 102:9 102:20 129:13 150:12 184:13 218:12
presumes 116:17
presuming 61:7 125:25 143:8 187:14
presumption 42:14 70:23 218:6,7
presumptions 127:20
presumptuous 90:17
pretty 14:18 25:11 65:6 85:3 113:4 188:18 189:5 190:23
prevent 71:12 75:24 179:9
prevented 71:3 71:25 76:4 77:22 155:14
prevents 55:12 178:14
previous 8:25 161:15
previously 7:9 8:12 11:8 152:4 175:24
prior 6:23 21:4 24:19 37:18 37:24 39:10,11 39:14,21,22 40:1,2 44:2 62:8 64:14 70:5 81:3 84:1 85:21 89:14 90:22 129:18 129:23,24 130:9,12 139:3 170:15 181:2,6 185:16 186:1 193:13 195:24 202:3 211:18 214:16 217:15
prison 26:10,11 53:23 54:3,4 54:16,25 55:1 84:18 179:23 180:12
prisoner 163:15 180:12
Prisons 19:22 26:9 149:16 149:20
private 28:20
probably 6:14 23:19 58:10 71:12 113:4 114:12 121:3 129:9 130:5 139:15 151:19 155:11 190:3 192:25 193:25 201:7
problem 57:25 86:13 120:7 158:25 161:11 169:2 171:19 180:16 196:18 204:9,19
problems 127:15 144:1 165:10 182:3 188:20 189:3
procedure 92:18 119:9 132:11 135:22 142:19,23 145:21,25 155:24 156:1,2 157:15,21 158:6,10 159:10 162:25 168:20,22 171:5 197:23
procedures 13:15 34:20 117:4 121:9 122:8 132:10 143:20 156:14 156:24 162:14 200:10,14 210:11
process 76:19 76:20 109:2 111:6 157:3 202:20
produce 20:4
produced 3:16 5:9,22 11:7 21:16,22 31:13 32:2 50:14 94:8
product 5:17,19 6:11 89:8
professional 124:16 128:10 146:24 147:3 149:1 181:21 197:3 213:14 215:18
prolonged 170:20,20
prompted 136:24
prompts 132:1
pronounced 199:16
proof 174:18
proper 81:7 82:21,22 88:19,21 89:2 109:7 165:6,9 165:10 180:5,6 180:7 192:22 195:7 203:7 206:17 218:11
properly 91:5 114:15 158:17 163:7
prosecution 176:15
prosecutors 204:15
protect 180:23
protocol 53:15 132:16,17 133:25 134:12 134:25 135:1 150:13
protocols 13:15 165:6 214:1 216:14
prove 129:13
provide 9:19 31:7 35:22 54:14 63:21 64:8 113:1 117:22 119:21 121:17 169:17 173:9 207:13
provided 7:7,8 7:17 8:12,12,17 18:9,21,24 19:3,9,10,13,19 33:8,19 35:16 142:7 173:8
provider 117:11
provides 159:2 159:3
providing 27:15 29:19 30:16 33:9 54:25 63:23
psychiatric 184:7,16,16 185:14 194:19
psychosis 138:23 141:14 141:16 181:18
psychotic 108:3 137:8
public 222:17 224:23
publications 19:23
published

20:25
pull 99:1 139:7
pulled 139:11
pulling 53:8
pulse 79:10,14 79:16 80:20 80:20 128:16 169:11
Pulseless 79:7
pumping 80:22
purchase 45:17
purpose 161:20 176:10
purposes 12:16 31:24 93:25 97:4 193:1 207:10
pursuant 5:21
pursue 6:15
push 97:14 216:12
put 6:5 32:19 59:18 64:4 111:22 118:19 129:20 146:9 162:2 174:12 174:14,16,21 205:19 214:7
putting 101:11 105:5 169:24 214:5,13

Q

qualify 87:5
quality 156:8,9 156:10
quantify 182:24
Quest 145:2
question 6:25 7:2,6 8:1 14:11 14:12 20:22 22:5,13,16,22 23:8,11,12 24:1 37:9,15 38:9 38:19,22 42:6 42:20 44:14 45:19,20 46:9 47:5 52:13 53:25 54:22 56:7,10 59:23 67:11 68:4 70:10 71:2 76:6 82:21 89:16 97:24 98:22 103:8 105:23 123:25 137:25 158:21 158:22 159:1 160:25 161:8 162:3 166:15 166:22 169:20 171:10 173:22 175:15 176:7,17 192:20 195:20 206:16 211:6 212:13,13,20 217:16 218:5
questioning 23:9 77:7 99:24
questionnaire 100:25 115:15 115:25 116:2 143:23 144:2 146:6 158:16 165:4 172:2,7 172:15,22 196:21 208:15 212:7 214:22 215:9 217:23
questionnaires 211:18
questions 5:11 22:13 38:17 55:13 61:11,11 61:14,17,18,22 61:24 62:1 76:8,10 77:4,5 94:22 100:13 100:19 101:22 106:13,25 134:8 143:3 143:22,24 144:1 158:19,21 158:23 159:12 160:4,17,18 175:16 176:9 194:25 195:14 206:9 210:10 214:19 215:11 220:6
quick 18:21 218:24
quicker 28:21
quit 45:12,23 155:22
quite 34:18 66:17 189:17
quotes 173:13

R

R 4:1
r-h-a-b-d-o-m-... 152:12
R-i-p-s-c-h 98:11
races 47:10
racist 206:20 207:1
ramifications 161:18
ran 204:22
Randolph 9:11 16:9 27:16
random 83:1,1
rapid 115:1 128:11,13,15 148:2
rapidly 114:25
rate 21:9 53:2 61:1 113:7 128:8 136:14 194:4,4
re-evaluate 150:21
read 40:3,7 43:22 65:4,6 103:22 146:21 161:8 165:8 175:13 209:8 209:10 210:18 220:18 222:15 223:9,13,16,19 223:22 224:6
reading 107:17 110:20
ready 204:25
real 18:21 148:17 191:24
realize 121:3 179:23
really 14:10 61:7 82:17 85:14 102:14 103:9 116:17 153:4 161:24 182:24
realm 126:13
reason 28:2 40:17,18 60:6 62:3 86:8,10 119:2 152:7 161:20 170:3 184:9,12 186:20 192:19 196:14 199:19 223:10,14,17 223:20,23
reasonable 6:16 23:1 70:13 71:14,18 71:21,23 72:3 72:11,20 73:15 75:25 78:3 111:14 128:1 131:12 133:15 136:11 167:18 168:8 198:9 201:4 205:4 219:6
reasoning 68:22
reasons 153:20 153:21 154:2 165:18 166:2 186:14 204:6 204:8
recall 40:10,19 42:5,6 43:16 55:20 91:23 92:17 110:20 163:4 165:20 179:15 182:13 210:14,17,20 210:25 218:21
receive 112:22
received 16:22 19:6 31:5 33:16 91:16 92:7 105:2 120:22 151:4 155:16 209:13 209:17
receiving 92:19 94:18 198:22
recess 77:12 85:16 121:6 162:11
recheck 132:18
recognition 66:7,11,14 67:2 165:9 201:19
recognized 170:3
recommend 168:15,16
recommenda... 149:2 190:25
record 5:13 6:3 6:5 23:3 24:24 67:18 74:20,21 85:14 88:5 92:4 96:9,10 97:22 102:23 103:5 115:9 121:5 125:15 126:5 130:13 130:21 131:19 138:25 139:24 142:25 151:25 155:7 160:13 162:10 163:19 189:11 205:16 207:10 217:4
recorded 87:4
records 34:17

34:23 35:2,11 63:17,18 74:19 91:7 94:6 130:17 185:18 188:3,21
reduced 221:8
refer 49:24
reference 149:17 169:17 173:1,6 205:16
referenced 31:17,25 217:6
referencing 205:23
referred 192:6
referring 31:15 175:5
refusal 122:9 123:18,20 125:17 131:24 140:15
refusals 103:2 130:25
refuse 103:5
refused 102:23 116:7 124:1 147:14 218:1
refusing 7:2 122:19
regained 80:20
regard 11:20 12:1,17,18 13:15 14:5 16:19 26:11 34:23 40:13 41:15 43:11 44:23 48:3 50:9 52:13 55:8 58:1,9 94:25 101:4 102:22 106:13 121:8 122:2,5 133:20 135:15 136:25 137:25 138:7,14 142:19 143:19 151:12 156:2,6 156:10,13 157:21 158:2 158:13 162:13 163:8 164:25 165:1 167:8,17 167:19 169:16 169:17 170:1 171:16 172:1,7 206:24
regarding 5:16 6:21 24:1 36:10 42:23 50:15,25 143:22 167:10 214:20,21 216:23 218:23
regardless 85:5 102:18 115:18 120:23 142:12 149:3 173:24 178:10 190:13 203:20
Region 16:13 27:9,12 28:5
Regional 28:11
regular 40:24 42:3 85:22 159:1,4 175:25 176:2,19 181:5 181:10 194:5
regularly 42:11 181:6
rehab 170:21 189:12,21 190:9 192:22 220:14
rehabilitation 170:21
relate 43:4 158:5,6
related 7:8,22 8:4,15,20 10:1 11:3,17 19:2 26:7 29:3,10 29:20 42:16 42:21,24 77:1 84:8 121:14 131:24 132:8 136:4 138:16 142:15 146:4 181:17 189:19 193:19,23 195:14 203:1 221:9
relates 76:24
relation 68:2 219:5
relative 221:11
relay 175:3
relayed 93:1
release 191:4
relied 19:18,24 20:14
rely 21:21 34:11
remain 46:23
remember 10:9 16:14 29:19 31:5 40:5,8 45:1,5 60:16 64:4 92:3 139:3 151:7 182:16 189:22
reminding 11:6
render 224:9
repeat 38:22 56:7 67:11 120:8
replacement 71:11
report 5:22,24 6:7,9,22 7:9 7:18 8:7 11:16 15:5 19:11,19 20:9,9 21:20 30:5 31:18 33:14,16 35:16 35:18,22,23 37:18 41:20 49:24 50:1 56:11 61:10,20 63:24 64:4,8 64:10 66:8,15 68:13 70:15 72:3,10,19 75:2 79:4 91:21 99:6 100:21 105:9 122:1 123:2 138:1 141:24 195:15 205:14 205:19 207:14
reported 38:25 126:22 188:20 208:1
Reporter 4:21 221:1,17
reports 5:17,17 5:18,19,21,24 6:21 19:3 20:19,22 126:22 168:19
represented 206:21
request 214:5
require 37:1 124:16,23 168:18 169:4 169:21 170:8 197:2 214:24
required 6:20 6:22 55:12 110:22 119:21 121:17 127:11 133:21 134:9 149:10 155:12 159:11 169:11 170:9 171:6 177:7,10 180:19 208:12 209:4,7 214:11 214:20
requirement 53:9 150:24 150:25
requirements 109:15 173:15
requires 107:3 143:13 163:3 215:2
requiring 169:19
research 12:15 12:18 13:23
reserve 88:15
reserved 5:6
resign 24:14 27:25
resignation 28:3
resigned 25:24 27:24
resolve 190:23
resolved 115:23
resource 205:12
resources 192:19 204:5
respiratory 47:16
respond 187:17
Responders 220:4
response 177:12 209:16
responses 137:22
responsibility 201:22 208:6 216:13,19
responsible 216:15
responsive 5:25 7:23 8:16
rest 155:18
restated 72:1
restroom 77:11
result 16:1 43:1 159:19 160:4 160:18 161:2,9 161:14 164:11 165:15 184:17 188:14
resulted 106:20 185:4 197:25 198:6
results 144:19
retained 2:10 9:16,19,23 17:25 24:25

25:6 26:1,3,4
62:22 63:3
return 194:11
222:18
returned 145:10
194:8
revealed 201:1
review 11:9
24:18 26:1,5
35:10,11 40:9
40:9 50:5
62:8,23,24
64:3,24 66:1
66:12,22
67:21 91:7
92:1 101:4,7
112:3 205:10
211:1
reviewed 7:9
31:21 35:13,14
61:19 62:25
65:1 72:25
94:6 121:17
205:8,20
209:9 218:15
reviewing 61:20
63:14 66:21
123:5
revolving
204:13
rhabdomyoly...
152:10,14,16
153:1 154:25
rhythm 79:1
80:2 194:5
right 15:20,24
18:19 22:20
24:14 31:24
36:23 47:24
50:3 57:1
59:18 60:7
61:9 62:3,10
78:12 79:5
84:8 85:3,17
86:10,17 88:10
92:8 94:18,25
95:12 98:11
99:3 100:3
101:12 102:2,8
105:17 108:6
109:13 112:3,6
116:15 118:5
119:5 120:18
121:7 123:2
126:16,20
128:22 130:17
136:6 138:6
139:4,22
144:23 146:11
148:1 153:22
154:12,19,20
157:22 172:1,6
172:19 179:4
182:23 185:11
185:12 193:5
195:9 200:5
204:4 207:19
213:16 218:8
Ripsch 93:2
98:10,10 99:4
99:10 110:8
111:6 115:8
120:20 126:10
159:23 160:9
165:18 176:25
196:22 208:19
209:9,21 211:5
211:13 212:15
212:18,23
213:13 217:24
Ripsch's 166:3
209:16 210:14
211:21 213:18
rise 137:16
risk 12:6 118:17
169:24 180:1
Robbie 217:20
218:1,9
Rock 222:19
role 36:15
room 16:13,17
16:25 27:21
40:21,24
69:17 71:10
75:6 87:16
98:8 110:23
111:10 112:23
113:10,15
116:22 123:15
124:3 150:23
170:11 173:21
185:5,16
194:10 199:22
213:13
rule 5:16,19,21
119:10
rules 6:20
run 18:20 69:19
running 23:25
24:4,6 61:2
68:11,14 69:1
171:3
Rusk 170:21
189:12,21
RUTH 4:15
Ryan 4:14

S

S 2:8 4:1
safe 130:7
216:17
safety 208:20
salary 22:14
salient 35:23
salt 186:25
187:2
salts 186:19,21
187:8,12
219:16
Saturday 145:1
152:25,25
saving 204:3
saw 99:14,16
115:8,9 120:4
125:16 130:21
148:11 211:13
211:13
saying 8:1 15:9
63:2 72:7
76:7 86:24
87:10,24
100:4 102:17
121:3 127:2
148:1 164:14
166:23 175:3
176:6 184:18
185:23 187:8
206:20
207:12 212:8
218:9
says 5:10 43:18
50:1 74:23
89:22 95:17
104:5 105:9
108:1 110:17
175:4,25 177:6
192:15 206:16
209:12 211:5
schedule 5:23
30:8 33:5
36:6
scientific 19:24
scoliosis 194:16
scope 23:6
67:25 70:9
114:6 201:7,14
208:10
screamed 139:5
139:16 142:11
screaming
139:14
screen 70:2
158:17 209:19
screened
143:16 185:13
screening
96:25 98:6,11
142:24 143:4
143:5,7,9,13
144:4,7 145:5
151:1 158:16,17
159:16 172:2,7
172:15,23,25
173:20 177:17
178:12 196:21
202:20 214:21
214:23 215:1,1
215:2,7,8
screenings
214:25
screw 14:19
se 143:9
second 76:6
85:15 104:16
121:1 123:20
124:6 165:21
165:24
secondary
92:11
section 94:9
121:25 122:6
142:16,20
169:17 211:5
see 40:23
48:23 51:8
61:12 62:16
67:17 76:24
77:8 83:2
85:22 86:11,18
92:23 94:12
99:20,24
103:3 115:4
116:22 120:7
131:19 146:10
147:22 148:10
150:6,21
157:12 184:7
186:21 187:21
188:25 189:2
190:17 191:10
192:22 194:9
216:6
seeing 141:19
141:22 204:12
seen 18:16
52:21 53:1
59:11 102:10
112:21 128:2
128:10 146:1
149:1 189:15
202:17 211:25
214:9,9,18
sees 101:11
192:24
seizing 79:21

seizure 168:4 198:20,23,25 199:3
seizures 198:24
self-treat 90:19 90:21
self-treating 90:5
send 37:2 86:8 116:25 120:8 124:3,20 133:21 136:13 144:22,23 151:18 155:13 173:10 177:10 202:24 203:18
sending 151:12 204:4
sense 9:15 47:10 87:22 88:9 137:19 137:23
sent 16:12 30:19 30:22 38:5 95:24 96:18 97:10,20 112:2 112:12 115:20 116:6 117:15 118:3,4 119:10 119:11 120:5,15 120:16,21,25 121:4,10,15 123:23 124:21 150:22 153:18 154:6 173:21 177:7 184:15 184:15,25 185:4,22 202:15 213:12 214:5 215:18
separate 76:14 213:13 214:25
sepsis 144:14
September 1:16 3:17 222:3,13 223:6
sequelae 43:24
Sergeant 92:10 93:1 159:24 184:2 208:1,6
serious 146:20 146:20,21 160:5 213:2
seriously 174:10
served 7:23 8:2
service 27:16,19 63:23
services 3:19 4:24 9:20 18:9 27:15 30:16 53:23 53:23 54:11,14 54:18 55:1 63:22 104:1 222:1
set 88:24 98:4
sets 149:13
setting 58:14 186:22 194:10
settled 26:17
seven 92:24
severe 57:13
severity 58:5
sew 76:24
shaking 148:18
shame 98:16,20 99:11,18 100:4 100:21,23 101:13,14,16 181:16 211:22 212:2,14
Shane 165:25
shape 29:19 33:22 160:1
shared 163:16
Shawn 50:5
SHEET 223:1
sheets 222:14 222:16,18
Sheriff 106:15 118:20 204:24
SHERIFF'S 222:10 223:4
shift 163:16 164:8 167:16 171:23,23 217:1
shifts 36:7,10 163:21
shock 105:4
short 114:24
shorten 42:8
shorter 170:22
shorthand 5:4
shortness 58:24 83:8 86:13 115:1 147:23
show 10:8,14 59:19 60:8,13 60:16 98:23
showed 16:1 177:18 213:1
showing 99:11
shown 111:13 144:8
shows 86:21
sick 112:17,18,22 113:13 116:19 116:20
sicker 81:12
side 26:12
side-by-side 115:5
sign 83:3 165:7 220:18 222:16
signature 5:5 222:14,16,18 223:25
significant 48:11 48:14
significantly 42:8
signs 58:16 98:16,20 99:11 100:1,4,20,23 101:16 111:15 114:19 125:1 138:16 212:2 212:14 213:8
similar 110:13
simple 213:21
simply 135:1,22 135:23 143:7 143:19 156:17
Sincerely 222:22
single 31:23 64:5 135:7
sir 205:5
sit 119:7
situation 38:13 88:9 117:23 123:10 124:23 131:2 167:6 171:6
six 15:25 33:18 49:12
skimmed 65:5 65:7
skin 182:16,21
skip 85:9 175:12
skipping 88:23
Skylar 92:10 94:18 120:12
sleep 140:18
sleeping 140:12 140:13,15
sleeps 193:22
sleepy 89:24
slightly 56:8
slow 132:3
slowly 49:15
smelling 186:19 186:21,24 187:2,8,12 219:16
Smith 18:3 26:9 61:19 62:11,16 206:20
smock 125:20 133:6 174:16
smoke 44:9,16 190:1
smokes 44:18
smoking 41:8,10
snapshots 72:12
snorting 192:3
so-to-speak 137:8
society 190:10 190:11 204:11
sole 34:14
solely 65:22
solving 204:9
somebody 56:22 79:9 124:7 127:10 148:17 151:10 158:17 169:1 196:17 199:12 201:22 204:4 216:22
somewhat 84:14 103:16 182:21
soon 75:20 102:16
soon-to-be 100:14,15,18
sopped 81:23
sorry 25:7 48:13 67:9 74:13 76:10 96:13 103:19 125:7 160:12 166:1,5
sort 47:23 107:19 122:23 164:6 165:22 167:7 203:21 204:6
sorts 41:2 66:23
sound 22:19 50:3
sounds 55:6 135:15 178:20 194:3
speak 31:11
speaking 12:25 38:14,16
speaks 215:4
specific 11:25 53:25 62:1

72:14 74:23
74:25 86:2,3
100:12 106:13
108:9 122:6
123:10 157:21
158:2,6 171:6
171:10
specifically 12:8
19:19 31:17
51:4 55:10
78:16 94:7
98:19 99:14
100:20 110:17
152:19 160:8
162:13 171:21
183:4,10
192:20 198:3
specify 83:4
speculating
153:19
speculation
37:17 45:19
56:5 58:19
59:22 61:6
67:9 68:3
70:9 81:5
114:22 118:12
140:22 145:14
151:15 161:5
176:24 177:2,9
201:14 208:10
212:4,18
219:10
spell 152:11
199:12
spelled 199:14
199:16
spent 138:8
spinal 62:15
sporadically
134:1
spot 130:8
spots 113:17
squares 129:18
ss 221:3
St 4:8 27:22
28:14,20
222:8
stack 19:6
staff 124:10,13
146:1 171:12,17
212:24 215:12
215:15
stand 6:24
standard 17:7
51:25 52:2,3
53:11,13 69:10
69:12,15,15
117:6 119:14,20
119:21 121:15
121:16 124:15
124:15,23
148:16,23
149:13 197:24
203:23
Standards
19:20
standpoint
48:22
start 26:25
27:13 28:8
209:11
started 81:22
170:12 196:1
starting 27:8
81:11 189:16
starts 56:15
211:6
starved 16:8
STAT 144:22
state 6:3 19:22
22:25 66:1
92:25 162:4
162:22 174:8
184:6 192:12
220:2,4,13
221:2 224:1
stated 187:15
217:2
statement 21:8
184:17 217:25
statements
87:2
states 1:1 3:1,21
169:11 171:1
192:12 215:6
stating 165:5
status 113:3,23
113:25 125:24
136:18,25
137:6 144:15
188:17
stay 29:20 38:4
38:25 140:8,9
140:11 142:3
145:11 170:20
170:21 174:25
216:22
stays 168:11
stealing 32:14
step 172:11,14,15
172:17,21 174:1
stepping
204:12
stethoscope
113:8 128:16
sticking 53:7
stimulant 94:4
178:24
stimulants
148:15
stipulate 33:23
34:5 188:7
202:9
STIPULATED
5:1
Stokes 165:25
stop 79:5,24
104:16 220:4
stoppages 58:1
stopped 62:4
155:19 188:21
stops 56:15
57:24 79:21
stories 59:10
street 4:16
179:12
streets 179:20
stress 57:21
60:2,3,7,12
74:15 78:23
81:17,19,21
90:10 112:20
190:21,22
194:10 199:7
199:15,18,21
200:7
stressed 85:8
199:25
stresses 36:22
81:20
strike 208:5
stroke 191:11
strong 210:3,6
studies 70:1
125:2
study 143:11
stuff 127:8
183:24
subconscious
180:15
subject 18:25
19:14 37:16,17
50:17 56:6
67:9 68:3
114:8,22 161:5
161:15 176:2
206:17
subjective
154:13
subscribe
224:11
subsequent
168:4 176:15
198:19
substance 95:5
224:8
substantial
48:20
substantially
198:16
sue 206:20
sued 206:13
suffer 188:14
suffered 29:10
198:17
suffering 139:1
151:25
suffers 43:4
sufficient 37:1
39:1 69:2
122:1 124:11
131:1 133:18
139:18,20
162:3,6 215:16
215:20
sufficiently
132:6
suggest 102:17
106:15 118:9
138:25 142:2
149:9 156:14
184:10 194:7
195:6
suggests 92:1
135:9 182:15
suicidal 87:24
133:3 138:22
141:1 183:15,20
184:17 217:25
suicide 133:6
174:13,18
183:10 215:1
Suite 4:7,16
222:7,19
summarize
35:23 167:8
summary 195:9
Summit 118:20
Sunday 70:6
71:17 73:12
76:1 77:23
88:25 89:12
90:15 105:12
112:6 121:22
145:1 152:8
153:2,10
195:22
supervisor
217:9,14
supplemental
168:15
supplied 33:24
supply 81:17
support 169:7,8

169:13,14,16 219:17
supportive 198:22
suppose 58:25
supposed 162:22 168:19 168:23 171:1 220:4
sure 7:14 11:8 35:20 50:12 63:1 82:20 87:8 89:16 91:23 92:14 105:23 113:4 118:22,24 119:8,25 120:11 126:17 127:1 134:7 135:4,24 137:14 153:11 162:2 180:20 180:22 187:1 189:8 200:6 208:12,25
surface 57:22
survive 186:7
suspect 181:16
suspected 69:1 217:22
suspicion 116:4 116:5 209:23 210:4,7
sweating 83:13 83:14,17 86:15 86:21
sworn 3:16 5:9
symptom 178:16 197:1
symptoms 37:25 47:16 49:10 56:2 58:16 66:23 76:23 77:22 78:21 81:24 84:16 85:18,21 90:9,10 101:6 101:13 102:21 111:15 112:25 115:4,7,18 132:19 138:16 144:1,13,15 146:7,20 148:13,20 150:3 151:23 152:3 156:8 161:21 162:23 181:17 182:7 192:14 196:15 196:17,22,23 197:2,4,14,18 214:16 216:9 217:15
syndrome 199:6,9,11,17
system 46:24 46:25 49:16 97:19 105:24 167:9 168:12 196:20 204:16 204:18
systematic 76:16 106:24
systolic 104:14

T

T 2:8
T-a-k 199:14
t-a-k-o-t-s-u-b... 199:16
tachycardia 115:2 147:22 150:8,12 178:4 178:14 179:4
tachycardiac 71:7
tachycardic 113:4,5 114:20 128:7 147:11,17 147:20 148:18 177:25 178:22
take 7:6 10:17 15:2 28:4 46:22 47:15 49:6 51:11 53:5 69:2 75:21 77:10,11 78:22 110:22 113:14 123:14 144:19 167:15 190:15 192:19 216:12,19
taken 1:15 5:4 25:21,25 38:2 48:15 53:17 55:3 65:16 68:8 70:4 74:6 75:9,10 75:13,19 77:12 85:16 89:13 94:11 95:15 106:1 111:9 114:11 121:6 134:9 135:14 153:3 162:11 174:10 177:22 178:2,9 221:7 221:10 222:13 223:6
takes 49:5 53:3 79:13 196:17 204:5
takotsubo 199:11,17
talk 12:5 134:17 134:18 137:10 150:13 157:23 162:17 163:14 165:18 167:9 184:1 203:8 212:12 213:11
talked 7:21 78:11 79:18 104:7 120:2 121:8,25 131:23 142:15 151:23 152:3 155:23 162:12 162:15 171:16 171:20 172:3 173:7 182:8 183:1 196:9 200:11,18,23 205:7 210:9
talking 10:11 14:9 20:19 37:5 38:8,15 39:3 46:14,17 55:23 65:8 74:12 77:18 102:25 108:9 136:7,19 137:2 137:8,9 160:7 160:17 169:15 180:10 182:6 183:12,14 194:17 212:10 213:22
tape 32:19
tapering 49:15
taser 152:21
task 213:21
tear 133:9
tearful 190:12
teenager 161:17
telemetry 178:8
tell 6:13 11:10 15:5,17 23:3 30:7 38:20 43:18 47:18 48:6,10 51:18 56:9,14 59:10 63:11 69:5 70:3,12 71:14 71:18 74:3,25 75:13 78:18 79:8 94:14 95:2 104:17 104:20 105:25 112:13 113:24 128:1 132:12 133:15 144:12 145:22 146:4 146:18 147:6 154:16,23 155:1 158:13 167:14,18 175:11 181:1 202:21
telling 12:8 22:10 48:3 162:8 178:21
tells 45:5 104:18 130:13
ten 42:12 156:18 202:16
ten-minute 135:23
tendencies 203:17
tenens 28:9
term 12:9 56:11 56:21 57:1 70:22 72:18 79:6 104:1 107:15 108:5 116:8,12,17 119:3 122:18 131:11 164:1 176:2 181:5 210:10
termination 165:19 166:3
terminology 103:18
terms 11:22 56:10 58:8 114:15
test 59:18,18,25 60:1,2,4,7,7 69:19
tested 145:9 174:23
testified 16:24 40:11 44:6 78:5 110:8 154:2 179:14 203:15 211:18 218:23
testify 16:22 35:6 64:16 68:1 114:7 206:2,6,11 207:13 213:5 220:9
testifying 40:5

179:15 210:20
testimony 9:4 9:15 12:22 13:2,3 21:4 22:8,19,24 26:14 31:20 38:7 43:3 60:8 73:11 95:22,25 96:11,24 110:16 117:14 119:8 120:20 121:21 122:22 123:17 128:19 137:1 141:25 143:6 155:14 155:19 163:18 170:7 175:4,5 175:24 185:10 199:3 202:14 221:6
testing 53:7 73:20 179:2
tests 60:12
Thank 8:22 11:6 56:25 220:18
their's 127:6
theirs 146:17
thereon 224:10
thereto 121:15 221:12
THEUNITED 3:1
thing 6:17 51:23 75:20 76:16 120:2 138:8 144:13 165:22 178:21 179:3 180:20 204:4 207:3 218:8 218:14 219:12
things 20:11 22:9 35:5 36:18 41:3 43:2 44:10 56:19 61:24 66:24 72:12 75:1 83:25 88:1,2 101:24 105:1 108:7 120:10 127:9 136:21 141:20 141:22 145:13 149:16 153:6 162:4 164:17 169:23 180:15 183:22 195:10 196:24,25 205:10 208:15 215:24 218:2
think 6:16 14:15 14:18 17:11 19:21 30:6 34:9 35:5,21 37:15 42:14 43:23 45:21 49:22 51:6 53:13,14 56:4 56:10 58:18 61:19 63:11 64:18 67:8 68:3,20 74:12 77:14 82:17 86:17 87:13 88:8,8 89:1,2 89:18 90:3,16 90:16,18,20 91:3 93:8,17 94:4 96:8,10 97:9,21 98:25 101:1 105:22 107:25 108:2 108:9 110:25 111:17,20 112:13,21 113:17 114:2,11,21 115:24,25 116:1 116:3,12 117:12 117:14 118:23 119:13 122:23 124:4,6 125:6 127:15 128:18 134:10,22 135:13 136:10 136:14,17,20 136:21 137:9 137:19 139:15 139:17 143:8 143:23,25 147:9 153:6,8 153:18,24 155:11 156:9 157:7,7 158:15 159:15,20 160:3,15 161:13 161:16,25 162:14 163:5,6 167:2 169:22 171:8,9 174:18 175:8,14,23 182:22 184:12 184:21,22,23 184:25 185:7 185:13 187:24 190:9,10,13 191:15 200:4,9 202:1,19 203:6,12 204:9,18 205:13 207:8 207:20 208:4 208:5,13,14,14 208:15 210:6 215:24
thinking 132:1 153:17,20 161:25 167:3
third 103:21 145:10 167:2,7 174:6
thorough 156:19 178:17 185:19
thoroughly 164:20
thoroughness 115:24
thought 43:13 110:9 120:5 138:6 141:2 161:24 162:8 179:19 182:15 184:10 210:21 212:18
thoughts 138:22
thousands 8:3 8:3 31:13
three 28:1 33:5 61:11 65:18 127:18,22 128:3 129:18 174:1 187:15 195:13 214:25
threshold 161:21 208:17 216:18
throat 105:6
Thursday 89:13 105:17 129:18 216:2
tie 109:22 129:4
Tiffany 213:22
time 9:20,20 14:17 17:20,20 21:13 23:14 24:19 27:12 29:2,3 37:13 40:10 43:12,15 44:2 48:1 49:18,21 51:19 65:21 66:2,5 66:8,20 68:23 73:21 73:25 74:4,5 77:15 80:2,17 81:14 83:4 85:10 88:19 93:24 96:19 96:23 97:19 111:9 112:3,5,19 114:4,19 115:6 115:10 117:16 118:14 120:10 121:19 122:1 124:22,24 125:12,18,25 126:3 127:4 127:24 128:6 131:9 133:1 134:2 138:8,13 139:16,18,20 140:12,14,15 142:21 145:10 145:23 146:12 147:20 148:21 153:7 160:15 168:12 169:2 173:24 178:3 185:12 186:9 186:23,24 187:2,3,11 188:18,22 189:2,4,15,17 189:21,22 190:23 195:18 196:3 209:21 209:23 213:16 214:10 215:21 219:24 220:10
timed 110:25
times 8:25 9:3 30:3 31:25 76:22 78:6 127:18,22 128:3 182:8
tired 62:6 204:16
tires 68:14
tissue 188:11
tobacco 44:9,17
today 6:7,23,23 7:7,10,21 8:13 8:17 11:8 15:6 16:1 19:7,15,25 20:14,17 21:22 32:2 33:8,9 34:12 35:6,19 42:21 46:10 50:14 64:11,12 68:1 70:9 114:7 119:7 173:8 181:1 196:3,9 200:11 200:18,23 203:3 205:4,7

told 13:3 22:18 25:23 31:12 48:23 63:16 72:2 91:21,24 95:14 97:18 111:20 125:3 157:11 168:23 169:3 176:18 190:7 195:10 203:3
tone 182:16
Tongue 148:4
top 63:25 80:9 99:6 104:15 175:16
topic 171:13 172:1
total 178:11
totality 175:11
toxicology 70:2 177:16
tract 144:14
train 13:5,20 14:3 15:1
trained 12:5 52:22 82:6,7 82:9,11 158:18 160:24 202:21 218:16,22
training 11:25 12:7 14:3 19:20 41:5,9 82:22 101:9 109:8 120:1 127:3 129:15 143:23 156:23 156:24 157:8 158:9 164:23 164:25 165:2 165:6,9,11 167:8 168:23 170:2,13 180:5 180:6,7 203:7 218:18,20 219:1,4
transcribed 5:5
transcript 209:11 222:16
transported 105:7
trap 195:21
trauma 57:23 152:17
treat 90:23 127:12 148:12 148:13
treated 144:12 148:16
treating 9:12
treatises 19:17 19:23
treatment 45:23 46:1,3,4 46:5 73:25 75:4 90:21 112:23 113:1,14 119:22 164:11 193:2 203:2
tremors 83:13 83:14,17 86:17 86:18,21 188:19,23,25 189:3,7,18,19
triage 125:1
trial 9:3 35:19 64:14
tried 35:22 46:4 187:15,16
trouble 180:4
true 10:19 37:5 129:15 189:6 208:2,21 209:2 210:12 211:10,15,19 211:22 212:24 213:16,19 215:9 217:1,11 218:3,17 219:2 224:9,13
Truman 27:7
truthful 179:12
try 15:17 63:9,10 120:6 185:2 186:19
trying 14:16,25 14:25 15:10,16 30:18 31:5 38:19 46:7 76:15 77:3,6 87:9,23 89:8 97:8,14 108:8 112:1 126:25 154:12 161:10 166:24,25 171:3 174:7 178:18 184:6 189:25 193:1 204:15
tube 105:6
turn 18:19
two 12:5 16:7 33:2 49:13 56:19 70:6 76:14 81:14 87:25 88:2 94:1 111:15 112:16 113:17 115:4 123:1 125:5 129:16 129:19,21 130:25 147:14 171:19 172:15 172:21 187:14 197:19 216:7 218:1
type 37:24 47:3 58:15 104:14 111:18 143:9 199:21 212:9
typed 100:2
types 57:17,18 57:19 58:15 78:12 79:19 83:25 149:16 153:5
typewriting 5:5 221:8
typical 100:15 100:18
typically 147:22
typo 104:5

U

Uh-huh 8:8 12:20 16:7 29:5,25 31:19 91:13 118:6 120:17 131:14
ultimately 75:22 88:11 112:5 115:22 129:4 154:2 161:2 173:11,15 185:3,21 188:5 198:1
unbiased 34:10
uncomfortable 136:22,23
unconscious 48:16,24 49:1 68:15 69:1,3 81:9 87:21 95:10 115:17 131:9 185:18 198:15
underneath 99:7
understand 9:19 11:22 14:22 15:4 63:1 64:17,21 77:18 78:9 86:24 87:8,9 96:9 100:3 111:19 118:13 127:1 131:5 140:11 154:1 165:14 166:22 166:24 169:20 169:22 170:9 171:9 178:19 187:6 190:16 197:7 201:6 203:8 205:2 211:7
understanding 6:6 21:8 23:13 29:12 39:9,21 41:1,8 65:10,21 79:23 97:3 161:17 209:18
understood 12:8 118:22 160:3,16,20 160:22 161:1 161:14,16 189:13
unevaluated 128:14
Unfortunately 204:2
UNITED 1:1 3:21
University 34:25 74:22 198:20
unresponsive 103:24 131:8 139:6 186:13 186:17,24 219:16
unstable 184:24
untruthful 180:13
up-to-date 11:10 205:11,16,17
up-up-to-date 205:12
updated 162:16
upset 85:3,4 102:1,18 126:9 126:23 183:8 183:11,16,17,18 183:23 197:5
urge 199:24
urgent 177:3
urinalysis 143:10,14 144:17 145:6,9
urinary 144:13
urine 70:2 144:23
usage 44:23 84:6 85:6 88:11 138:7 141:6 193:23

193:25
use 8:25 34:7 34:14 39:12 42:3,10 43:9 43:19 44:2,9 45:3,25 70:21 103:18 107:18 123:6 131:11 137:12 140:19 158:24 159:6 159:7,9,19,25 168:18 171:6 181:5 189:13 191:20 192:21 193:20
user 39:22 41:24 42:12 45:16 159:1,5 175:25 176:19 181:11 210:8
users 45:9,9 59:5
uses 42:2,4,11 43:12,14 44:12 44:25 45:5,6 88:18 176:2 192:12
usually 63:4 69:17 89:23 214:6

V

v 222:10 223:4
vague 37:16 127:9 182:1 196:15,16,22 196:23 197:1,4
vaguely 182:17
vagueness 8:1
Valium 148:21
valuation 124:25
ventilator 198:22
ventricle 80:8 104:12,13
ventricles 80:4 80:7,12,13
ventricular 74:16 79:3 81:23 87:18 104:6 219:14
verification 38:21
versus 10:4,12 62:9
vessel 186:6
vessels 57:25 58:2,23 199:24
video 11:1 182:23 187:13 187:16
videos 187:19
view 52:11
viewpoint 144:11
violated 108:10 121:10 123:18 123:18
violation 76:12 149:25 171:22 178:12
violations 72:15 106:19 200:14
visit 51:22
visited 66:8
vitae 11:7,11
vital 125:1
vitals 69:23 134:9 135:14 136:16,17 147:10 178:8,9
voices 141:20 141:22
vs 1:6 3:9

W

waited 214:17
walked 204:6
walking 189:4
want 7:13 22:23 23:2,4 28:15 30:16 32:3,9 32:13 37:4 38:16 42:20 55:11 77:10 78:6,18,20,21 86:17 87:5,24 88:5 97:2 98:25 102:3 105:23 106:12 106:12 111:21 118:22 122:5 134:17,18 140:18 145:22 148:6 150:18 153:11 157:20 161:24 162:2,9 172:7 175:12 182:5 204:18 205:21 207:3 209:10 210:18 211:2 213:10 215:14 216:11 218:15
wanted 25:14 25:15 28:4 62:16 87:1 89:18 132:22 138:11 174:13 174:14 183:11 185:19 196:13 204:9,17
wanting 75:16 140:16 153:9 153:12
warrant 52:7
warranty 116:19
Warren 36:10
wasn't 16:20,20 17:3,20 28:19 29:17 31:1 64:4 89:2 91:4 103:24 112:20 152:6 170:25 194:13 204:23 211:12 217:14
watch 162:23
watching 219:15
water 91:4
way 29:19 33:22 56:9 58:21 63:10,15 92:2 96:7 129:13 130:14 142:2 148:11 155:3 159:5 160:1 176:18,21 179:2 217:23 219:5
ways 57:16,18 214:3
we'll 7:6 15:24 18:20 56:9 71:1 77:3 85:18 98:23 125:14 188:7 220:18
we're 38:7 97:8 108:8 147:13 194:17
we've 17:12 33:2 43:13 132:20 182:7
weak 79:16 169:11
weakness 193:16
website 192:6
Wednesday 216:1
week 23:16,21 23:21 24:11,12 24:12 26:25 130:15,20 215:25
weekend 28:16 145:19,19 146:10 214:18 216:3,4,8,10
weekends 144:22
weeks 8:2 23:24 24:9 25:17,18 28:1 75:5 189:22
weight 47:19 48:2,21
went 27:7 28:14 34:18,18 35:1 75:6 79:1 81:22 112:9 152:8 187:5 187:22 219:13
West 222:19
WESTERN 1:1 3:2,22
whatsoever 127:11
widespread 204:10
wife 206:25
Wikipedia 205:18
willing 31:10
Wisswell 50:6,8 50:19 51:5 65:9 91:8,10,11 91:18 94:15,19 94:21 95:14 131:9 175:3 177:5,18 201:17,24 207:25 208:7
Wisswell's 91:21
withdraw 36:22 45:6 46:18 90:5,20 123:25 124:14 141:11 148:14 148:19 150:17 189:19,24 212:20
withdrawing 189:7,10,20 209:6
withheld 131:20
witness 5:6 6:12 12:18 18:9 22:8 23:3 38:15 68:2 213:5 220:17 221:6 222:15 223:3,25
witnessed

52:24
women 199:20
wonderful 35:14
word 64:5 195:6 199:7,10 199:18
worded 115:16 116:3 143:24
wording 103:18
words 103:23 111:22
work 5:17,19 6:11 13:25 25:1 25:6 26:3,7 28:16 36:9 37:24 45:10 50:16 70:1 72:17 73:5 89:9 113:11,11 113:12 125:2 129:1 143:10 144:23
worked 21:9 24:10 26:19 28:11,23 31:21 35:25 36:3 55:5 117:2 144:16
working 21:24 23:14,16,19,22 23:24 24:8 25:17 26:20 27:11,13,21 28:7 55:8 60:4 62:4,6 80:13 117:5 118:7 151:9 193:5,7,9,12 211:14
works 186:3
workup 178:17
worried 85:8 138:2 154:6
worse 88:22 153:10 154:6 193:16
wouldn't 38:4 43:7,11 52:9 77:1 86:7 91:5 100:15 112:8 117:5 121:4 129:20,21 131:4 150:22 151:20 170:8 189:20
wrap-up 195:10
Wright 31:8,10
Wrights 18:4 30:22
write 99:17,19 100:3
writes 99:23
written 72:10
wrong 111:22 177:14
wrote 35:22

X

X 2:1,8
x-ray 70:1

Y

yeah 24:4 27:4 59:7 61:4 92:7 92:24 93:19 104:13 116:24 127:6 148:9 156:21 167:9 174:5
year 23:24 24:9 25:8,17,23 30:13 42:12 118:21
years 12:3 40:22 182:20
yelled 155:1
Yup 18:8

Z

0

1

1 116:13 180:22
1-1 98:25 99:6 157:25 172:4 211:3
1-2 187:23,24
1:00 28:22
10 2:12 23:23
10.02 122:9
100 59:12,15 72:8 113:6 118:23 128:8
10024 4:7 222:7
11 2:13 151:24
11:00 3:18
12 12:3 21:9 23:23 31:20
12.05 107:1 121:9 122:3
13 12:3 64:19 94:7
13.02 157:16 162:14 163:1,3 163:8
13.03 156:14
13.04 132:11 136:4 142:16 142:20
133.00 25:19
14 165:21,24 209:10,12,12
15 135:17 167:17 211:6
15-minute 133:12,16 135:7,23 174:21 217:25
15-monitoring 156:6
16 111:1 174:9 207:25 212:6 212:23 215:16 215:16
17 1:16 3:17 174:4 222:13 223:6
18 2:15 175:8,10 175:11,14
19 64:18 181:14 196:14

2

2 61:10
2-1 94:6,8
2.01 143:12 145:21,23 214:20
2.02 145:25 149:25 155:24
2.045 106:25 121:9 122:3
2/26 73:25 102:23 110:25 139:1 147:8 184:17 207:25 212:22 215:16 216:24 217:24
2/26/2016 118:3
2/27 103:2,9 139:2 184:17 215:16 216:24
2/28 73:25 103:5 111:24 139:2,3 153:13 155:1 183:2 184:17 215:13 216:25
2:00 28:22
2:18-cv-0405-... 1:6 3:9
20 40:22 65:1 182:5 184:4 196:14,14 222:3 224:15
20/20 166:25 219:20
2004 10:24 28:24 29:9
2005 9:7
2015 29:14 38:2 38:23 39:4,24 40:6,12
2016 10:23,24 24:16 28:24 29:9 39:3,10 39:14,20 40:1 70:19 71:16 75:14 89:12 90:14 91:8 96:17 102:23 105:11 117:5 129:19 130:8 131:1,7,13 132:22 135:10 137:21 138:14 147:8 148:24 155:2 160:6 166:3,18,19 170:16 178:15 181:3,7 183:2 195:22 198:7 200:18,25 201:11
2017 28:13
2019 1:16 3:17 222:3,13 223:6
202 4:7 222:7
207 2:18
208 2:4
21 187:23 188:1
22 193:17
22.01 142:23
229 222:18
23 194:3
24 58:16 59:16 59:20 60:4 94:10 95:15 133:23 136:8 136:12 142:3 153:7 177:6 195:5
25 131:7,13
250.00 25:12 25:15
2511 3:19
25th 48:8 129:19
26 5:19 70:19 71:16 73:18 75:14 91:8 96:17 117:5

130:8,25 131:7 131:13 132:22 138:13 178:25 181:3,7
**26(b)(4)** 5:16
**26(b)4(c)** 5:21
**26th** 48:8,9 125:16 126:7 129:6 133:17
**27** 178:25
**27th** 86:22 133:17 138:14
**28** 73:19 105:11 105:24 135:10 137:21 155:15 160:5 170:16 178:14,25 179:9 195:22 198:7 200:17 200:25 201:11
**28th** 71:17 86:22 89:12 90:14 129:5 133:18 137:1 138:14 152:8

3

**3** 19:13 103:1
**3:46** 220:20
**30** 30:9,10,11 65:13 83:4 222:18
**300.00** 21:9 25:9 196:4
**301** 4:16
**314-241-0999...** 4:9
**32** 2:16
**35** 60:17

4

**4** 19:17 63:25 103:20
**4:00** 3:18
**4:30** 70:19
**4:37** 50:1 65:9
**416** 25:18,18
**48** 60:24

5

**5** 2:2 5:18
**5:07** 65:13
**5:41** 66:8
**50** 23:24 24:8
**52** 23:24 24:8 25:17
**55-56,000.00** 23:14
**55,000.00** 25:18
**56,000.00** 22:18
**573-298-4313** 4:18

6

**6** 92:5,6
**6.02** 156:2
**6.04** 156:14
**6:00** 49:22
**601** 4:16
**63128** 4:8 222:8
**65101** 4:17

7

**7** 102:25
**7:00** 49:22
**7:30** 103:23
**70** 60:18
**72201** 222:19
**75,000.00** 25:23

8

**8** 106:9
**8:00** 65:15 70:15,19 71:16 75:20 177:20
**80** 104:14

9

**9** 5:20 132:2
**96-hour** 185:1